UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHEILA CALLAGHAN, ARUN GUPTA, SCOTT
KERNS, VADIM NEWQUIST, JESSICA
RECHTSCHAFFER, WILLIAM SCHWARTZ, LIZ
SHURA, WILLIAM TSU, JASON YEN, THOMAS
BONAMICI, BRADFORD CONOVER, JOSHUA
COTTON, SARAH HACKNEY, SALLY NEWMAN, and
NAOMI RENEK,

Plaintiffs,

-against-

THE CITY OF NEW YORK; NEW YORK CITY POLICE
DEPARTMENT ("NYPD") COMMISSIONER
RAYMOND KELLY; NYPD ASSISTANT CHIEF
BRUCE SMOLKA; NYPD DISORDER CONTROL UNIT
COMMANDER THOMAS GRAHAM; NYPD LEGAL
BUREAU LIEUTENANT DANIEL ALBANO; NYPD
LIEUTENANT JOSEPH CANECO; NYPD OFFICER
FIRST NAME UNKNOWN ("FNU") DELLEVALLE,
SHIELD #6830; NYPD OFFICER KENNETH WAGNER,
SHIELD #28519; NYPD OFFICER JOHN WARREN,
SHIELD #13763; NYPD OFFICER JOSEPH SCHINZ,
SHIELD #21951; NYPD OFFICER RAYMOND NG,
SHIELD #21793; NYPD OFFICER, ANTHONY
DIFRANCESCA, SHIELD # 4200; NYPD OFFICER
"FNU" WOLF, SHIELD # UNKNOWN; CAUCASIAN
FEMALE NYPD OFFICER FNU LAST NAME
UNKNOWN, SHIELD # 22451; NYPD OFFICER "FNU"
FURBUSH; NYPD OFFICER JUAN BERRIO, SHIELD
#28430; NYPD SUPERVISORS AND COMMANDERS
RICHARD AND MARY ROES 1-50; NYPD OFFICERS
JOHN AND JULIE DOES 1-50; individually and in their
official capacities, jointly and severally, (the names John
and Jane Doe, as well as Richard and Mary Roe, being
fictitious, as the true names of these defendants are
presently unknown),

Defendants.

**Index Number:**

**07civ9611 (PKC)**

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

Plaintiffs SHEILA CALLAGHAN, ARUN GUPTA, SCOTT KERNS, VADIM NEWQUIST, JESSICA RECHTSCHAFFER, WILLIAM SCHWARTZ, ELIZABETH SHURA, WILLIAM TSU, JASON YEN, THOMAS BONAMICI, BRADFORD CONOVER, JOSHUA COTTON, SARAH HACKNEY, SALLY NEWMAN, NAOMI RENEK, by their attorneys, Rose M. Weber, Esq., Gideon Orion Oliver, Esq., and David B. Rankin, Esq., complaining of defendants, respectfully allege as follows:

PRELIMINARY STATEMENT

1.    Plaintiffs bring this action for compensatory damages, punitive damages, and attorneys' fees pursuant to 42 USC §§ 1983 and 1988 for violations of their civil rights, as said rights are secured by said statutes and the Constitutions of the United States and the State of New York.

JURISDICTION

2.    This action is brought pursuant to 42 USC §§ 1983 and 1988 and the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

3.    Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343,

VENUE

4.    Venue is properly laid in the Southern District of New York under 28 USC § 1391(b) in that this is the District in which the claims arose.

JURY DEMAND

5.    Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

PARTIES

2

6.      Plaintiff SHEILA CALLAGHAN is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

7.      Plaintiff ARUN GUPTA is an Asian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

8.      Plaintiff SCOTT KERNS is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

9.      Plaintiff VADIM NEWQUIST is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

10.     Plaintiff JESSICA RECHTSCHAFFER is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

11.     Plaintiff WILLIAM SCHWARTZ is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

12.     Plaintiff ELIZABETH SHURA is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

13.     Plaintiff WILLIAM TSU is an Asian male and at all relevant times a resident of the City and State of New York.

14.     Plaintiff JASON YEN is an Asian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

15.     Plaintiff THOMAS BONAMICI is a caucasian male, a citizen of the United States.

16.     Plaintiff BRADFORD CONOVER is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

17.    Plaintiff JOSHUA COTTON is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

18.    Plaintiff SARAH HACKNEY is a caucasian female and a citizen of the United States.

19.    Plaintiff SALLY NEWMAN is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

20.    Plaintiff NAOMI RENEK is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

21.    Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

22.    At all times relevant herein, as set forth more fully below, defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

23.    Each individual defendant is sued in her or his individual and official capacities.

24.    Defendant THE CITY OF NEW YORK ("NYC" or "the City") is a municipal entity created and authorized under the laws of the State of New York, with general offices located at City Hall, New York, New York  10007.  NYC is authorized by law to maintain the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement, and defendant NYC is ultimately responsible for the NYPD and assumes the risks incidental to the maintenance of it and its employees.

25.     At all times relevant herein, defendant RAYMOND KELLY was the NYPD Commissioner and its chief policymaking official, defendant BRUCE H. SMOLKA was the Assistant Chief of NYPD Patrol Boro Manhattan South, defendant THOMAS GRAHAM was the Commander of the NYPD Disorder Control Unit, defendant DANIEL ALBANO was a Lieutenant in the NYPD Legal Bureau, defendant JOSEPH CANECO was a NYPD Lieutenant, and these defendants were each and all supervisors and high-level NYPD policymaking officials personally involved in depriving plaintiffs of their rights and/or in developing and/or implementing the unconstitutional policies, practices, customs and/or conduct complained of herein.

26.     At all times relevant herein, defendants NYPD OFFICER FIRST NAME UNKNOWN ("FNU") DELLEVALLE, SHIELD #6830; NYPD OFFICER KENNETH WAGNER, SHIELD #28519; NYPD OFFICER JOHN WARREN, SHIELD #13763; NYPD OFFICER JOSEPH SCHINZ, SHIELD #21951; NYPD OFFICER "FNU" FURBUSH; NYPD OFFICER JUAN BERRIO, SHIELD #28430;  NYPD OFFICER RAYMOND NG, SHIELD #21793; NYPD OFFICER ANTHONY DIFRANCESCA, SHIELD #4200; NYPD OFFICER "FNU" WOLF, SHIELD # UNKNOWN; CAUCASIAN FEMALE NYPD OFFICER FNU LAST NAME UNKNOWN, SHIELD # 22451; NYPD SUPERVISORS AND COMMANDERS RICHARD AND MARY ROES 1-50; and NYPD OFFICERS JOHN AND JULIE DOES 1-50 were each and all personally involved in depriving plaintiffs of their rights and  in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein.

27.     At all times relevant herein, as set forth more fully below, defendant NYC had *de facto* policies, practices, customs and usages of failing properly to train, screen, supervise, and discipline agents, employees, and police officers, and of failing to inform the individual

defendants and their supervisors of their need to train, screen, supervise or discipline said defendants, which were a direct and proximate cause of the unconstitutional conduct alleged herein and the damages attendant thereto.

28.     At all times relevant herein, defendants were duly sworn police officers of the NYPD and were acting under the supervision of said department and according to their official duties.

29.     At all times relevant herein, defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

30.     Each and all of the acts of defendants alleged herein were done by said defendants while acting within the scope of and in furtherance of their employment by defendant THE CITY OF NEW YORK.

<u>FACTS</u>

31.     Critical Mass is a bicycle riding phenomenon that occurs in hundreds of major cities worldwide the last Friday of every month.

32.     Manhattan Critical Mass bicycle rides began in approximately 1994 and have occurred on the last Friday of every month since.

33.     Cyclists who wish to participate in the rides have been congregating at Union Square Park at 7:00 PM on the last Friday of every month for at least the past approximately five years.

34.     Upon information and belief, between 1994 and approximately August of 2004, the NYPD regularly escorted and/or otherwise facilitated the monthly rides by blocking traffic at intersections and ushering riders through red lights.

6

35.    Upon information and belief, NYPD's actions created a situation wherein riders in Critical Mass bicycle rides came to believe that it was NYPD's desire the ride remain together, even if that involved blocking intersections and riding through red lights.

36.    Upon information and belief, Critical Mass bicycle rides were approximately the same size in the summer of 2003 as they were in the summer of 2004 prior to the RNC.

37.    After defendant Smolka was promoted in April of 2004, he became involved with planning the NYPD's police response to future rides, in connection with which he made arrangements for the use of orange nets as well as NYPD scooters and other marked and unmarked police vehicles for crowd control and mass arrest purposes.

38.    Upon information and belief, at all times relevant herein, defendants Kelly, Smolka, Graham, Caneco, and Albano cooperated to develop, design, implement, and supervise the implementation of the procedures, policies, regulations, practices and/or customs of the NYPD about which plaintiffs complain.

39.    Defendants designed and implemented policies, practices or customs of indiscriminately arresting without just or probable cause groups of people who were peacefully assembled, and who were either participating in, supporting, observing, or in the vicinity of demonstrations and protests, including Critical Mass bicycle rides.

40.    Specifically, in anticipation of the RNC, defendants gathered intelligence regarding the activities and potential plans of potential demonstrators, including participants in Critical Mass bicycle rides, and developed plans to: arrest participants on the August 27, 2004 ride in Manhattan for, *inter alia*, riding their bicycles "*en masse*" or more than two abreast; to prosecute them for violating the parade permitting scheme and committing disorderly conduct; to assign officers who had not observed plaintiffs engage in unlawful conduct to process their

arrests and sign criminal court complaints charging them with violations based on false allegations that plaintiffs were observed engaging in unlawful conduct; to seize and voucher their bicycles as "arrest evidence" and to refuse to release plaintiffs' bicycles until the criminal proceedings against them were terminated; and to falsify and/or withhold evidence in connection with those criminal proceedings.

41.    Defendants' indiscriminate mass arrest policy was a refinement of the tactic employed by the defendants at other recent demonstrations in the City, including, *inter alia*, the February 15, 2003 protest against the war which is the subject of *Haus, et al. v. City of New York, et al.*, 03 Civ. 4915 (RWS), the April 7, 2003 protest against the Carlyle Group which is the subject of *Larsen, et al. v. City of New York, et al.*, 04 Civ. 665 (RWS), and protests against the Republican National Convention ("RNC") in 2004, in which mass arrests were used to unlawfully suppress conduct protected by the First Amendment.

42.    Defendants' policies of mass arrests, processing, and prosecutions about which plaintiffs complain feature:

(a) Use of orange netting, lines of police officers and lines of police bicycles or scooters to corral and essentially trap groups of people who were engaging, or were perceived by the NYPD as associated with, Critical Mass bicycle rides;

(b) Failure to distinguish bystanders, media personnel and legal observers from groups of corralled or trapped people prior to effecting arrests;

(c) Failure to advise prospective arrestees who were behaving in a peaceful and non-violent manner that they were in violation of any law or ordinance;

(d) Failure to give dispersal orders that, if given at all, were audible to all prospective arrestees;

(e)  Failure to provide a reasonable opportunity to disperse, including actively preventing people who wanted to disperse from leaving;

(f)  Assigning one arresting officer to multiple arrestees, regardless of whether the officer had seen any of them prior to their arrest or had even been present at the scene when the decision to arrest was made or aware of the name of the supervisor who made the decision;

(g)  Review by NYPD Legal Bureau and/or other personnel of arresting/assigned officers' paperwork before it was shown to the District Attorney's office for the purpose of insuring that the paperwork was facially sufficient despite the attesting officers' lack of personal knowledge, resulting in boilerplate allegations which routinely overstated the attesting officers' personal knowledge;

(h)  Having arresting officers sign police complaints and swear to criminal court complaints falsely attesting they had witnessed arrestees engaging in conduct that provided a basis for the alleged probable cause when the officers, in fact, lacked personal knowledge of the arrestees' conduct; and

(i)  Selective enforcement of the vague, overbroad and strict liability parade permitting scheme, the New York State disorderly conduct statute, and VTL § 1234, *inter alia*, to criminalize participation in, or proximity to, Critical Mass bicycle rides.

43.    In designing and implementing these policies, procedures, and practices, defendants knew or should have known that participation in Critical Mass bicycle rides was protected by the First Amendment.

44.    In designing and implementing these policies, procedures, and practices, defendants knew or should have known that the use of police vehicles against peaceful perceived

9

demonstrators as a means of crowd control was an unreasonable use of force and lacked narrow tailoring as a means of regulating participation in Critical Mass bicycle rides.

45.    In designing and implementing these policies, procedures, and practices, defendants knew or should have known that applying the parade permitting scheme and the New York State disorderly conduct statute to criminalize perceived participation in Critical Mass bicycle rides was unconstitutional.

46.    In designing and implementing these policies, procedures, and practices, defendants knew or should have known that their use of nets to trap peaceful perceived participants in Critical Mass bicycle rides would result in unlawful arrests, malicious prosecutions, and property deprivation.

47.    Defendants Kelly, Smolka, Graham, Albano, and Caneco were each and all personally involved in making command and control – including arrest – decisions in connection with plaintiffs' arrests.

48.    Upon information and belief, defendants Kelly, Smolka, Graham, Albano, and Caneco were personally involved in supervising plaintiffs' arrests and their processings and/or prosecutions, and defendants Kelly, Smolka, Albano, and Caneco were advised of the circumstances surrounding plaintiffs' arrests and aware of the status of their prosecutions.  Upon information and belief, defendant Albano assisted other defendants fill out paperwork regarding plaintiffs' arrests or supervised other NYPD Legal Bureau officers who did so.

49.    On August 27, 2004 - the eve of the 2004 RNC in New York - 5,000 cyclists participated in the Critical Mass ride, and the NYPD arrested 264 cyclists.

50.    Upon information and belief, the majority of those 264 people were subsequently charged with parading without a permit in violation of New York City Administrative Code

("NYCAC") § 10-110(c) and committing disorderly conduct New York State Penal Law ("PL")
§§ 240.20(5) and/or (6).

51.    Upon information and belief, on or about September 22, 2004, the NYPD put up a
"Statement Concerning Possible Bicyclist Event on 9/24" and a set of "Reminders to Bicyclists
in the Five Boroughs" on its website stating, *inter alia*, that bicyclists must not ride more than
two abreast.

52.    Upon information and belief, the source of those portions of the "Reminders" was
New York State Vehicle and Traffic Law  ("VTL") § 1234, which has no effect whatsoever in
the City of New York, as it has been specifically superseded by rules of the New York City
Department of Transportation ("NYCDOT") pursuant to VTL § 1642 and the relevant provisions
of the NYCDOT rules.

53.    Nothing in the NYCDOT rules prohibits bicyclists from riding more than two
abreast.

54.    The September 24, 2004 Critical Mass ride drew approximately 1,200 participants
to Union Square Park.

55.    As potential participants assembled in Union Square Park, the NYPD circulated a
flyer threatening bicyclists with arrest, *inter alia*, if they participated in an unpermitted
procession or rode more than two abreast.

56.    Defendant Smolka negotiated an on-the-spot route for cyclists who wished to
participate in the ride that evening based on a conversation he had with a single attorney, which
defendant Smolka considered effectively the same thing as a permit.

57.    Although there were over a thousand people gathered in Union Square Park,
defendant Smolka only conveyed the route he had proposed to a single attorney; the NYPD

provided cyclists with no written flyers describing its proposed route, and made no bullhorn or loudspeaker announcements proposing that such a route exist, let alone setting the course it was to take.

58.    Nevertheless, police officers escorted the ride along the route defendant Smolka had proposed and did their best to facilitate the ride by blocking traffic and/or waving cyclists through intersections at which the traffic lights were red.

59.    At some point, a group of riders turned east on 36th Street from Fifth Avenue, thereby moving beyond the route defendant Smolka had proposed. Moments later, a phalanx of police officers on scooters interdicted the 36th Street riders between Fifth and Sixth Avenues.

60.    According to defendant Smolka, the NYPD had only been escorting and providing assistance to those who were following his proposed route; when cyclists diverted from it, they would have been parading without a permit at certain points, possibly, even if they obeyed all traffic laws.

61.    The NYPD made nine arrests, allegedly because those arrestees were participating in an unpermitted event.

62.    The lawsuit underlying *Bray v. New York City*, 346 F.Supp.2d 480 (S.D.N.Y., October 28, 2004) was filed on October 20, 2004 on behalf of five individuals whose bicycles the NYPD had seized during the September Critical Mass bicycle ride although they were not charged with any crime or violation of law.

63.    On October 25, 2004, the City counterclaimed for a reverse class action and moved to enjoin preliminarily the five individual plaintiffs and others with notice from participating in the October 29, 2004 Critical Mass bicycle ride and subsequent Critical Mass events unless parade permits were issued by the Police Department.

64.    The parties appeared for a hearing before United States District Court Judge Hon. William H. Pauley III on October 27, 2004 at which the City admitted that VTL § 1234 had no application in the City of New York.

65.    On October 28, 2004, Judge Pauley denied the City's application for a preliminary injunction as barred by the doctrine of *laches* and because it raised the need to adjudicate novel and complex state law issues, primarily concerning the lawfulness of applying the parade permitting scheme to Manhattan Critical Mass rides.

66.    On October 28, 2004, the New York Daily News published an article by defendant Kelly entitled "BE OUR GUEST:  Extremists have hijacked the bike rides," in which defendant Kelly stated:  "Now that Critical Mass has identified itself as an interested party, the Police Department has called on it to seek a permit if it intends to continue to use the rides in a way that puts so many in jeopardy.  Otherwise, each and every participant is expected to obey the law or be subject to arrest.  That includes observing traffic signals and riding in the curb lane no more than two abreast."

67.    Because of the Court's involvement, the NYPD agreed to unilaterally propose a route for cyclists to follow during the October 29, 2004 Critical Mass ride.

68.    Upon information and belief, on October 28 or 29, 2004, defendants Kelly, Smolka, Graham, Albano, and Caneco devised such a route and otherwise developed a plan to police the October 29, 2004 Critical Mass ride.

69.    The route that was proposed was for the bicyclists to gather in Union Square Park, ride northbound from Union Square Park along Park Avenue to 55th Street, ride east on 55th Street to Fifth Avenue, ride south on Fifth Avenue to 23rd Street, and at 23rd Street ride south along Broadway to Union Square Park where the riders would disperse.

<u>THE OCTOBER 29, 2004 ARRESTS</u>

70.    On the evening of October 29, 2004, cyclists began to congregate in Union Square at approximately 7:00 PM.  The NYPD unilaterally proposed a route by distributing a flyer describing the route and, *inter alia*, threatening bicyclists with arrest if they rode more than two abreast, and broadcasting its contents from an amplified sound truck.

71.    The NYPD deployed several hundred police personnel in connection with policing the October 29, 2004 Critical Mass ride.

72.    Defendant Smolka told his subordinates that if cyclists deviated from the NYPD's proposed route, they could be arrested.

73.    For the first thirty minutes of the ride, the majority of cyclists followed the designated route.

74.    Police officers regularly stopped cross-town traffic to ensure the safety of the participants.  In addition, officers were present at the back of the group to ensure that cars that were behind the cyclists would remain at a safe distance behind the riders.

75.    Just after 8:00 PM, some cyclists deviated from the proposed route by turning right from Fifth Avenue onto 39th Street.

76.    At approximately Madison Square Park on 25th Street, where Broadway and 5th Avenue merge, the NYPD's route directed cyclists to proceed south on Broadway to Union Square.

77.    However, NYPD officers stretched orange mesh netting across 5th Avenue to Broadway and directed cyclists to proceed west on 23rd Street.

78.    Defendant Smolka subsequently received radio reports from other officers stating that other riders were "breaking off" the designated route in "groups" of anywhere between

twenty and five hundred cyclists at other points along the way, including at Fifth Avenue near Madison Square Park.

79.    Defendant Smolka tried to follow them in his vehicle and continued to patrol the ride and the areas where the NYPD knew cyclists had deviated until after the conclusion of the ride (approximately 10:15 PM).

80.    Upon information and belief, there were only approximately 200 riders that followed the designated route back to Union Square Park.

81.    The NYPD made 35 arrests, and charged the vast majority of those arrestees with disorderly conduct and parading without a permit.

### PLAINTIFF SHEILA CALLAGHAN

82.    At approximately 9:00 PM on October 29, 2004, plaintiff SHEILA CALLAGHAN was lawfully present in the vicinity of 26th street and 10th Avenue in the County, City, and State of New York.

83.    Upon information and belief, defendant "FNU" DELLAVELLE, #6830, and other unidentified NYPD officers, detained and arrested plaintiff Callaghan and seized her bicycle without any probable cause, privilege, or consent.

84.    Defendant Dellavalle and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

85.    Defendant Dellavalle and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

86.    Plaintiff Callaghan was subsequently transported to an NYPD facility for arrest processing and eventually issued a Desk Appearance Ticket ("DAT.")

87.    Plaintiff Callaghan was in NYPD custody for approximately five hours.

88.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving her of the use and enjoyment of her primary means of transportation and forcing her to spend money for travel expenses.

89.    Defendants initiated criminal proceedings against plaintiff Callaghan despite their knowledge that they lacked probable cause to do so.

90.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

91.    At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

92.    Plaintiff was offered, and accepted, an Adjournment in Contemplation of Dismissal ("ACD") in order to retrieve her bicycle from the NYPD and to avoid further disruption to her life.

93.    When Ms. Callaghan retrieved her bicycle, the front wheel was bent and several spokes in the back wheel were broken, and plaintiff spent approximately $80.00 repairing her bicycle.

<u>PLAINTIFF ARUN GUPTA</u>

94.    At approximately 9:00 PM on October 29, 2004, plaintiff ARUN GUPTA was lawfully present in the vicinity of 11th Street and 5th Avenue in the County, City, and State of New York.

95. Upon information and belief, defendant KENNETH WAGNER, #28519, and other unidentified NYPD officers, detained and arrested plaintiff Gupta and seized his bicycle without any probable cause, privilege, or consent.

96. Defendant Wagner and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

97. Defendant Wagner and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

98. Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

99. Plaintiff was in NYPD custody for approximately three hours.

100. Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving him of the use and enjoyment of his bicycle.

101. Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

102. At plaintiff's arraignment approximately a month after his arrest, plaintiff pleaded not guilty to charges that he violated the parade permitting scheme and committed disorderly conduct by riding his bicycle as part of a group.

103. Plaintiff hired an attorney to defend the charges against him.

104. Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

105.    On or about May 2, 2005, after appearing approximately three times to defend against the charges in the criminal proceedings defendants had initiated against him, those charges were dismissed.

106.    When plaintiff retrieved his bicycle, the bicycle was damaged, and plaintiff was forced to pay approximately $80.00 to repair it.

<u>PLAINTIFF SCOTT KERNS</u>

107.    At approximately 9:00 PM on October 29, 2004, plaintiff SCOTT KERNS was lawfully present in the vicinity of 26th street and 10th Avenue in the County, City, and State of New York.

108.    Upon information and belief, defendant JOHN WARREN, #13763, and other unidentified NYPD officers, detained and arrested plaintiff and seized his bicycle without any probable cause, privilege, or consent.

109.    Defendant Warren and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

110.    Defendant Warren and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

111.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

112.    Plaintiff was in NYPD custody for approximately six hours.

113.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of

the deprivation *pendent lite*, depriving him of the use and enjoyment of his primary means of transportation and forcing him to spend money for travel expenses.

114.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

115.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

116.    At plaintiff's arraignment approximately a month after his arrest, plaintiff pleaded not guilty to charges that he violated the parade permitting scheme and committed disorderly conduct by riding his bicycle as part of a group.

117.    On or about February 17, 2005, after appearing approximately three times to defend against the charges in the criminal proceedings defendants had initiated against him, those charges were dismissed.

118.    When plaintiff retrieved his bicycle after February 17, 2005, the bicycle was damaged, and plaintiff was forced to pay approximately $30.00 to repair it.

<u>PLAINTIFF VADIM NEWQUIST</u>

119.    At approximately 9:00 PM on October 29, 2004, plaintiff VADIM NEWQUIST was lawfully present in the vicinity of 11th Street and 7th Avenue in the County, City, and State of New York.

120.    Upon information and belief, defendant RAYMOND NG, SHIELD # 21793, and other unidentified NYPD officers, detained and arrested plaintiff and seized his bicycle without any probable cause, privilege, or consent.

121.    Defendant Ng deliberately handcuffed plaintiff too tightly and kept him handcuffed for an excessive period of time, causing plaintiff pain and injury.

122.   Defendant Ng then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

123.   Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

124.   Plaintiff was in NYPD custody for approximately eight hours.

125.   Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving him of the use and enjoyment of his bicycle.

126.   Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

127.   Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

128.   At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

129.   Plaintiff was offered, and accepted, an ACD in order to retrieve the bicycle from the NYPD and to avoid further disruption to his life.

130.   When plaintiff retrieved the bicycle, the bicycle was damaged.

<u>PLAINTIFF JESSICA RECHTSCHAFFER</u>

131.   At approximately 9:00 PM on October 29, 2004, plaintiff JESSICA RECHTSCHAFFER was lawfully present in the vicinity of 28th Street and 7th Avenue in the County, City, and State of New York.

132.    Upon information and belief, defendant NYPD officer FNU WOLF and other unidentified NYPD officers detained and arrested plaintiff and seized plaintiff's bicycle without any probable cause, privilege, or consent.

133.    Defendant Wolf deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

134.    Unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

135.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a summons and released.

136.    Plaintiff was in NYPD custody for approximately one and a half hours.

137.    The charges against plaintiff were subsequently dismissed.

<u>PLAINTIFF WILLIAM SCHWARTZ</u>

138.    At approximately 9:00 PM on October 29, 2004, plaintiff WILLIAM SCHWARTZ was lawfully present in the vicinity of 26th street and 10th Avenue in the County, City, and State of New York.

139.    Upon information and belief, defendant CAUCASIAN FEMALE NYPD OFFICER FNU LAST NAME UNKNOWN, SHIELD # 22451 ("22451") and other unidentified NYPD officers detained and arrested plaintiff and seized plaintiff's bicycle without any probable cause, privilege, or consent.

140.    Defendant 22451 and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept him handcuffed for an excessive period of time, causing plaintiff pain and injury.

141.    Unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

142.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

143.    Plaintiff was in NYPD custody for a number of hours.

144.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving plaintiff of the use and enjoyment of plaintiff's primary means of transportation and forcing plaintiff to spend money for travel expenses.

145.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

146.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

147.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

148.    Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption to his life.

<u>PLAINTIFF ELIZABETH SHURA</u>

149.    At approximately 9:00 PM on October 29, 2004, plaintiff ELIZABETH SHURA was lawfully present in the vicinity of 11th Street and 5th Avenue in the County, City, and State of New York.

150.    Upon information and belief, defendant JOSEPH SHINZ, SHIELD #21951, and other unidentified NYPD officers, detained and arrested plaintiff Shura and seized her bicycle without any probable cause, privilege, or consent.

151.    Defendant Shinz and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

152.    Defendant Shinz and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

153.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

154.    Plaintiff was in NYPD custody for approximately seven hours.

155.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving her of the use and enjoyment of her bicycle.

156.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

157.    At plaintiff's arraignment approximately a month after her arrest, plaintiff pleaded not guilty to charges that she violated the parade permitting scheme and committed disorderly conduct by riding her bicycle as part of a group.

158.    Plaintiff hired an attorney to defend the charges against her.

159.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

160.    On or about June 28, 2005, following a bench trial, after appearing approximately five times to defend against the charges in the criminal proceedings defendants had initiated against her, those charges were dismissed.

### PLAINTIFF WILLIAM TSU

161.    At approximately 9:00 PM on October 29, 2004, plaintiff WILLIAM TSU was lawfully present in the vicinity of 10th Street and 5th Avenue in the County, City, and State of New York.

162.    Upon information and belief, defendant NYPD officer ANTHONY DIFRANCESCA, # 4200, and other unidentified NYPD officers detained and arrested plaintiff and seized plaintiff's bicycle without any probable cause, privilege, or consent.

163.    Defendant Difrancesca  deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

164.    Defendant Difrancesca then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

165.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

166.    Plaintiff was in NYPD custody for a number of hours.

167.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

168.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

169.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

170.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

171.    Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption to his life.

PLAINTIFF JASON YEN

172.    At approximately 9:00 PM on October 29, 2004, plaintiff JASON YEN was lawfully present in the vicinity of 26th Street and 10th Avenue in the County, City, and State of New York.

173.    Upon information and belief, defendant JOHN WARREN, #13763, and other unidentified NYPD officers, detained and arrested plaintiff and seized his bicycle without any probable cause, privilege, or consent.

174.    Defendant Warren and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

175.    Defendant Warren and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

176.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

177.    Plaintiff was in NYPD custody for approximately four hours.

25

178.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

179.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

180.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

181.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

182.    Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption to his life.

### THE NOVEMBER 2004 ARRESTEES

183.    The NYPD deployed several hundred police personnel in connection with the November 26, 2004 assembly in Union Square.

184.    Upon information and belief, defendants Smolka, Graham, Caneco, and Albano were personally involved in making command and control decisions in connection with the November 26, 2004 Critical Mass detail.

185.    NYPD officers distributed a flyer threatening bicyclists with arrest, *inter alia*, if they participated in an unpermitted procession, the contents which were repeated in a loop over a loud speaker as of approximately 7:30 PM.

PLAINTIFFS JOSHUA COTTON,
SALLY NEWMAN,THOMAS BONAMICI, AND SARAH HACKNEY

26

186.    Prior to arriving in Union Square Park on November 26, 2004, plaintiffs Josh Cotton, Sally Newman, Thomas Bonamici, and Sarah Hackney had gathered at Mr. Cotton's house earlier that evening planning to participate in the Critical Mass bicycle ride and then see a 9:30 PM comedy show at the Laugh Factory.

187.    On the way from the subway station exit to the north end of Union Square Park, an unidentified female NYPD officer told Mr. Cotton that if they "rode no more than two abreast and obeyed all traffic laws" they would not get arrested, but that "they're going to be real strict tonight."

188.    Mr. Cotton and his friends decided to forego riding in the Critical Mass ride because they were scared that they would be arrested if they participated.  They left Union Square riding two abreast down Union Square west directly south of East 15th Street.

189.    They stopped behind two cars at the red light at the intersection of Union Square West and East 14th Street.

190.    While waiting at the red light, unidentified NYPD officers spread an orange net across University Place at the southern end of East 14th Street directly in front of plaintiffs Cotton, Newman, Bonamici, and Hackney.  When the light turned green, plaintiffs Cotton, Newman, Bonamici, and Hackney followed the two cars, which made a right turn onto East 14th Street heading west.

191.    As soon as the two cars completed their turns, NYPD officers pulled orange nets from the north and south sides of East 14th Street on the Western side of the intersection, detaining plaintiffs Cotton, Newman, Bonamici, and Hackney.

192.    Plaintiffs Cotton, Newman, Bonamici, and Hackney were then ushered onto the sidewalk and placed under arrest.

27

193.    Upon information and belief, defendants "FNU" FURBUSH, JUAN BERRIO, SHIELD #28430, and other unidentified NYPD officers, detained and arrested plaintiffs Cotton, Newman, Bonamici, and Hackney and seized their bicycles without any probable cause, privilege, or consent.

194.    Defendants Furbush and Berrio and/or other unidentified NYPD officers deliberately handcuffed plaintiffs Cotton, Newman, Bonamici, and Hackney too tightly and kept then handcuffed for an excessive period of time, causing plaintiffs pain and injury.

195.    Defendants Furbush and Berrio and other unidentified NYPD officers caused a Polaroid photograph or photographs of Cotton, Newman, Bonamici, and Hackney and their bicycles to be taken.

196.    Plaintiffs Cotton, Newman, Bonamici, and Hackney were subsequently transported to an NYPD facility for arrest processing and eventually issued DATs.

197.    Plaintiffs Cotton, Newman, Bonamici, and Hackney were in NYPD custody for approximately five hours.

198.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs a prompt hearing before a neutral fact-finder to test the probable validity of the deprivations *pendent lite*, depriving them of the use and enjoyment of their bicycles.

199.    Defendants initiated criminal proceedings against plaintiffs Cotton, Newman, Bonamici, and Hackney despite their knowledge that they lacked probable cause to do so.

200.    Defendants refused to release plaintiffs' bicycles until the criminal proceedings against plaintiffs were terminated.

201.    At plaintiffs' arraignments approximately a month after their arrests, plaintiffs Cotton, Newman, Bonamici, and Hackney were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

202.    Defendants refused to release plaintiffs' bicycles until the criminal proceedings against plaintiff were terminated.

203.    Upon information and belief, plaintiff Bonamici took an ACD in order to retrieve the bicycle from the NYPD and to avoid further disruption to his life.

204.    Plaintiffs Cotton, Newman, and Hackney hired an attorney to defend the charges against them.

205.    Upon information and belief, on or about May of 2005, after appearing several times to defend against the charges in the criminal proceedings defendants had initiated against them, the charges against plaintiffs Cotton, Newman, and Hackney were dismissed.

PLAINTIFF NAOMI RENEK

206.    At approximately 8:15 PM on November 26, 2004, plaintiff NAOMI RENEK was lawfully present in the vicinity of Mercer and West 3rd Streets in the County, City, and State of New York.

207.    Unidentified NYPD officers detained and arrested plaintiff and seized her bicycle without any probable cause, privilege, or consent.

208.    Unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

209.    Unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

210.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

211.    Plaintiff was in NYPD custody for numerous hours.

212.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving her of the use and enjoyment of her primary means of transportation and forcing her to spend money for travel expenses.

213.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

214.    At plaintiff's arraignment approximately a month after her arrest, plaintiff pleaded not guilty to charges that she violated the parade permitting scheme and committed disorderly conduct by riding her bicycle as part of a group.

215.    Plaintiff hired an attorney to defend the charges against her.

216.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

217.    Several months later, after appearing approximately five times to defend against the charges in the criminal proceedings defendants had initiated against her, those charges were dismissed on speedy trial grounds.

PLAINTIFF BRADFORD CONOVER

218.    At approximately 8:30 PM on November 26, 2004, plaintiff BRADFORD CONOVER was lawfully present in the vicinity of Houston Street and Broadway in the County, City, and State of New York.

219.    Upon information and belief, defendants Schinz and other unidentified NYPD officers detained and arrested plaintiff and seized his bicycle without any probable cause, privilege, or consent.

220.    Defendants deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

221.    Defendants then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

222.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

223.    Plaintiff was in NYPD custody for approximately four hours.

224.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

225.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

226.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

227.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating PL § 240.20(5).

228.    Plaintiff hired attorneys to defend the charges him.

229.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

230.    On or about September 19, 2004, after appearing approximately seven times to defend against the charges in the criminal proceedings defendants had initiated against him, those charges were dismissed on speedy trial grounds.

<u>AS AND FOR A FIRST CLAIM FOR RELIEF</u>

DEPRIVATION OF PLAINTIFFS' RIGHTS UNDER THE UNITED STATES
CONSTITUTION AND 42 U.S.C. § 1983

231.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 230 above as if fully set forth hereat and incorporate them by reference.

232.    By their conduct and actions and/or omissions in depriving plaintiffs of their freedoms to be let alone, to move freely, to assemble, to associate, and to enjoy their property, in seizing them, in falsely arresting them, in assaulting and battering them, in maliciously prosecuting them on the basis of false and/or untrustworthy information, in abusing process against them, in retaliating against them for the exercise of constitutionally protected rights, in inflicting emotional distress upon them, in violating their rights to due process and equal protection, and/or for failing to remedy the aforementioned violations after having witnessed them or having been informed of them by report or appeal, and/or by failing properly to train, supervise, or discipline employees of the defendant CITY OF NEW YORK under their supervision, defendants, acting under color of law and without lawful justification, intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, deprived plaintiffs of the equal protection of the laws and/or of equal privileges and immunities under the laws, and thereby caused injury and damage in violation of plaintiffs' constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its First, Fourth, Fifth, and Fourteenth Amendments.

233.    All of the aforementioned acts of defendants and their agents, servants, and employees were carried out under color of state law, while defendants were acting in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto, under the supervision of ranking officers of said department, pursuant to the customs, usages, practices, procedures, and the rules of defendant City and the NYPD, and/or defendants, collectively and individually, engaged in conduct that constituted a custom, usage, practice, procedure or rule of defendant NYC.

234.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## AS AND FOR A SECOND CLAIM FOR RELIEF

### FALSE ARREST

235.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 234 above as if fully set forth hereat and incorporate them by reference.

236.    As a result of defendants' conduct as described above, plaintiffs were subjected to illegal, improper, and false arrest by defendants and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege, or consent.

237.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## AS AND FOR A THIRD CLAIM FOR RELIEF

### EXCESSIVE USE OF FORCE

238.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 237 above as if fully set forth hereat and incorporate them by reference.

239.    The level of force employed by defendants was objectively unreasonable and in violation of plaintiffs' constitutional rights.

240.    As a result of the foregoing, plaintiffs were subjected to excessive force and sustained physical and emotional injuries.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

### FIRST AMENDMENT

241.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 240 above as if fully set forth hereat and incorporate them by reference.

242.    In detaining, assaulting, and arresting plaintiffs, in prosecuting plaintiffs, and in seizing and impounding plaintiffs' bicycles, and in implementing, enforcing, encouraging, sanctioning, and/or ratifying policies, practices, and/or customs punishing peaceful protest, defendants violated plaintiffs' rights to speak, assemble, associate, and petition the government for redress of grievances peaceably in retaliation for their speaking out on a matter of public concern.

243.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## AS AND FOR A FIFTH CLAIM FOR RELIEF

### MALICIOUS ABUSE OF PROCESS

244.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 243 above as if fully set forth hereat and incorporate them by reference.

245.    Defendants issued legal process to place plaintiffs under arrest.

246.    Defendants arrested plaintiffs in order to obtain a collateral objective outside the legitimate ends of the legal process.

247.    Defendants acted with intent to do harm to plaintiffs without excuse or justification.

248.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## AS AND FOR A SIXTH CLAIM FOR RELIEF

### MALICIOUS PROSECUTION

249.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 248 above as if fully set forth hereat and incorporate them by reference.

250.    Defendants misrepresented and falsified evidence before the District Attorney of New York County ("DANY").

251.    Defendants did not make a complete and full statement of facts to DANY.

252.    Defendants withheld exculpatory evidence from DANY.

253.    Defendants were directly and actively involved in the initiation of criminal proceedings against plaintiffs.

254.    Defendants lacked probable cause to initiate criminal proceedings against plaintiffs.

255.    Defendants acted with malice in initiating criminal proceedings against plaintiffs.

256.    Defendants were directly and actively involved in the continuation of criminal proceedings against plaintiffs.

257.    Defendants lacked probable cause to continue criminal proceedings against plaintiffs.

258.    Defendants acted with malice in continuing criminal proceedings against plaintiffs.

259.    Defendants misrepresented and falsified evidence throughout all phases of the criminal proceedings.

260.    Notwithstanding defendants' misconduct, the criminal proceedings against plaintiffs were favorably terminated on the merits.

261.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

<u>AS AND FOR A SIXTH CLAIM FOR RELIEF</u>

DENIAL OF CONSTITUTIONAL RIGHTS TO FAIR TRIALS

262.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 261 above as if fully set forth hereat and incorporate them by reference.

263.    Defendants created false information against plaintiffs.

264.    Defendants forwarded false information to prosecutors in the Office of the District Attorney of New York County.

265.    Defendants misled the prosecutors and/or the Court by providing false information and/or testimony in initiating and throughout the criminal proceedings.

266.    Defendants failed to turn over exculpatory evidence and other materials to the prosecutor despite proper demands and/or requests for the same.

267.    Defendants therefore violated plaintiffs' constitutional rights to fair trials under the Fifth and Fourteenth Amendments to the United States Constitution.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF

### DENIAL OF  PROPERTY AND DUE PROCESS RIGHTS

268.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 267 above as if fully set forth hereat and incorporate them by reference.

269.    Defendants seized plaintiffs' bicycles and impounded them as "arrest evidence" and refused to release them until after the criminal proceedings against plaintiffs were terminated.

270.    Defendants refused to afford plaintiffs notice and an opportunity to be heard to challenge the seizures or retentions.

271.    Defendants' seizure and retention of plaintiffs' vehicles as "arrest evidence" without affording plaintiffs notice and an opportunity to be heard to challenge the seizures and retentions  violated plaintiffs' constitutional rights to enjoy their property and to due process under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

## AS AND FOR AN EIGHTH CLAIM FOR RELIEF

### SELECTIVE ENFORCEMENT

272.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 271 above as if fully set forth hereat and incorporate them by reference.

273.    Defendants' use of the parade permitting scheme, the New York State disorderly conduct statute, VTL § 1234, and/or their powers to retain plaintiffs' bicycles against plaintiffs, but not others similarly situated, was invidiously discriminatory, malicious, purposeful, and/or arbitrary and capricious.

274.   Defendants' selective enforcement of the parade permitting scheme, the New York State disorderly conduct statute, VTL § 1234, and/or their powers to retain plaintiffs' bicycles against plaintiffs violated plaintiffs' constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

275.   As a result of the foregoing, each plaintiff is entitled to compensatory damages in the sum of five million dollars ($5,000,000.00) and is further entitled to punitive damages against the individual defendants in the sum of five million dollars ($5,000,000.00).

WHEREFORE, each plaintiff demands the following relief jointly and severally against all of the defendants:

A.     An order requiring defendants to return to plaintiffs, or where necessary to expunge and/or destroy all records of fingerprints and other information taken in conjunction with plaintiffs' arrests, to remove from all records and databases and information systems maintained by defendants or their agents or partners any reference to plaintiffs' arrests, and to request that all law enforcement agencies and partners that have received such information destroy the same;

B.     Judgment in the sum of five million dollars ($5,000,000.00) in compensatory damages and five million dollars ($5,000,000.00) in punitive damages;

C.     An award of attorneys' fees and costs and disbursements; and

D.     Other such relief as this Court may deem just and proper.

DATED:     NEW YORK, NEW YORK
           October 29, 2007

                              RESPECTFULLY SUBMITTED,


                              _____
                              ROSE M. WEBER (RW 0515)

38

225 Broadway, Suite 1608
New York, NY 10007
(212) 748-3355


_____
DAVID B. RANKIN (DR 0863)
350 Broadway, Suite 700
New York, NY 10013
(212) 226-4507


Of Counsel:
GIDEON ORION OLIVER (GO 8799)
OLIVER & OLIVER
c/o 200 E. 10th St. #917
New York, New York   10003
(646) 602-9242