UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

SHEILA CALLAGHAN, ARUN GUPTA, SCOTT
KERNS, VADIM NEWQUIST, JESSICA
RECHTSCHAFFER, WILLIAM SCHWARTZ, LIZ
SHURA, WILLIAM TSU, JASON YEN, THOMAS
BONAMICI, BRADFORD CONOVER, JOSHUA
COTTON, SARAH HACKNEY, SALLY NEWMAN,
TERESA TORCHIANO, JAMESON ROLLINS,
JONATHAN BECK, REBECCA HEINEGG, MADELINE
NELSON, CAROLINE SAMPONARO, MARK
TAYLOR, BLUE MINER YOUNG, CHRISTOPHER
BLAND, TOMAS MELCHOR, CHRISTOPHER NEFF,
BARBARA ROSS, CHRISTOPHER RYAN, LISA
SHALOM, SARA STOUT, NEAL ALDRICH,
NICHOLAS BIRTH, CHRISTOPHER BLAND, MARK
DAVIS, KAREN DE GEORGE, ANDREW DZIJA,
BRONWYN FLEMING-JONES, TIM GAMBLE,
JEFFREY GANO, ZACHARY GELNAW-RUBIN,
JASON GODLEWICZ, NIALL HEFFERNAN, GWEN
KASH, BRIDGET KENNEDY, WILLIAM LAVIANO,
JULIETTE MOORE, GABRIEL PAGANO, and
BENJAMIN BRODIE,

Plaintiffs,

-against-

THE CITY OF NEW YORK; NEW YORK CITY POLICE
DEPARTMENT ("NYPD") COMMISSIONER
RAYMOND KELLY; NYPD ASSISTANT CHIEF
BRUCE SMOLKA; NYPD DISORDER CONTROL UNIT
COMMANDER THOMAS GRAHAM; NYPD DEPUTY
CHIEF STEPHEN PARAGALLO; NYPD LEGAL
BUREAU LIEUTENANT DANIEL ALBANO; NYPD
LIEUTENANT JOSEPH CANECO; NYPD
LIEUTENANT LOUIS TURCO; NYPD LIEUTENANT
PATRICK STEFFENS; NYPD OFFICER FIRST NAME
UNKNOWN ("FNU") DELLEVALLE, SHIELD #6830;
NYPD OFFICER KENNETH WAGNER, SHIELD
#28519; NYPD OFFICER JOHN WARREN, SHIELD
#13763; NYPD OFFICER JOSEPH SCHINZ, SHIELD
#21951; NYPD OFFICER RAYMOND NG, SHIELD
#21793; NYPD OFFICER, ANTHONY DIFRANCESCA,
SHIELD # 4200; NYPD OFFICER "FNU" WOLF,

SECOND AMENDED
COMPLAINT AND
DEMAND FOR JURY TRIAL

07-cv-9611 (PKC) (DFE)

SHIELD # UNKNOWN; CAUCASIAN FEMALE NYPD OFFICER FNU LAST NAME UNKNOWN, SHIELD # 22451; NYPD OFFICER "FNU" FURBUSH; NYPD OFFICER JUAN BERRIO, SHIELD #28430;  NYPD OFFICER JOANN SPREEN, #19464, NYPD OFFICER JOSE TORRES, #11394, NYPD OFFICER JAMES ZAVALA, #05726, NYPD OFFICER ARTHUR CLARKE, #8001, NYPD OFFICER MICHAEL GERBASI, #20502, NYPD OFFICER CHARLES MURPHY, #31915, NYPD OFFICER JOSEPH WOODLEY, #12116, NYPD OFFICER PAUL ALBANO, #26129, NYPD OFFICER JORDAN MAZUR, #06497, NYPD OFFICER JAMELL KENDRICK, #28700, NYPD OFFICER HONMAN YAN, #31946, NYPD OFFICER EUGENE HACKETT, #21155, NYPD OFFICER ERIC ALBRECHT, #15016, NYPD OFFICER JOHN LUONGO, #00777, NYPD OFFICER MOHAMMAD ARYAKIA, #01705, NYPD OFFICER KATHLEEN CURNYN, #04318, NYPD OFFICER STEVEN VALENTINE, #13585,  NYPD OFFICER "FNU" ACOSTA, #20660, NYPD OFFICER ANTHONY ANZALONE, #04699, NYPD OFFICER ERIC ALBRECHT, #15016, NYPD OFFICER BRENDA BACOTE, #00167, NYPD OFFICER SHUHEL SUBHAN, #240099, NYPD OFFICER LOUIS CHIACCHERI, #02786; NYPD SUPERVISORS AND COMMANDERS RICHARD AND MARY ROES 1-50; NYPD OFFICERS JOHN AND JULIE DOES 1-50; individually and in their official capacities, jointly and severally, (the names John and Jane Doe, as well as Richard and Mary Roe, being fictitious, as the true names of these defendants are presently unknown),

Defendants.

Plaintiffs  SHEILA  CALLAGHAN,  ARUN  GUPTA,  SCOTT  KERNS,  VADIM NEWQUIST, JESSICA RECHTSCHAFFER, WILLIAM SCHWARTZ, ELIZABETH SHURA, WILLIAM TSU, JASON YEN, THOMAS BONAMICI, BRADFORD CONOVER, JOSHUA COTTON, SARAH HACKNEY, SALLY NEWMAN, TERESA TORCHIANO, JAMESON ROLLINS, JONATHAN BECK, REBECCA HEINEGG, MADELINE NELSON, CAROLINE

SAMPONARO, MARK TAYLOR, BLUE MINER YOUNG, CHRISTOPHER BLAND, TOMAS MELCHOR, CHRISTOPHER NEFF, BARBARA ROSS, CHRISTOPHER RYAN, LISA SHALOM, SARA STOUT, NEAL ALDRICH, NICHOLAS BIRTH, CHRISTOPHER BLAND, MARK DAVIS, KAREN DE GEORGE, ANDREW DZIJA, BRONWYN FLEMING-JONES, TIM GAMBLE, JEFFREY GANO, ZACHARY GELNAW-RUBIN, JASON GODLEWICZ, NIALL HEFFERNAN, GWEN KASH, BRIDGET KENNEDY, WILLIAM LAVIANO, JULIETTE MOORE, GABRIEL PAGANO, and BENJAMIN BRODIE, by their attorneys, Rose M. Weber, Esq., Gideon Orion Oliver, Esq., and David B. Rankin, Esq., complaining of defendants, respectfully allege as follows:

<u>PRELIMINARY STATEMENT</u>

1.      Plaintiffs bring this action for compensatory damages, punitive damages, and attorneys' fees pursuant to 42 USC §§ 1983 and 1988 for violations of their civil rights, as said rights are secured by said statutes and the Constitutions of the United States and the State of New York.

<u>JURISDICTION</u>

2.      This action is brought pursuant to 42 USC §§ 1983 and 1988 and the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

3.      Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343,

<u>VENUE</u>

4.      Venue is properly laid in the Southern District of New York under 28 USC § 1391(b) in that this is the District in which the claims arose.

<u>JURY DEMAND</u>

3

5.     Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

PARTIES

6.     Plaintiff SHEILA CALLAGHAN is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

7.     Plaintiff ARUN GUPTA is an Asian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

8.     Plaintiff SCOTT KERNS is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

9.     Plaintiff VADIM NEWQUIST is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

10.     Plaintiff JESSICA RECHTSCHAFFER is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

11.     Plaintiff WILLIAM SCHWARTZ is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

12.     Plaintiff ELIZABETH SHURA is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

13.     Plaintiff WILLIAM TSU is an Asian male and at all relevant times a resident of the City and State of New York.

14.     Plaintiff JASON YEN is an Asian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

15.     Plaintiff THOMAS BONAMICI is a caucasian male, a citizen of the United States.

16.     Plaintiff BRADFORD CONOVER is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

17.     Plaintiff JOSHUA COTTON is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

18.     Plaintiff SARAH HACKNEY is a caucasian female and a citizen of the United States.

19.     Plaintiff SALLY NEWMAN is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

20.     Plaintiff TERESA TORCHIANO is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

21.     Plaintiff JAMESON ROLLINS is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

22.     Plaintiff JONATHAN BECK is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

23.     Plaintiff CHRISTOPHER BLAND is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

24.     Plaintiff REBECCA HEINEGG is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

25.     Plaintiff TOMAS MELCHOR is a Latino male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

26.     Plaintiff CHRISTOPHER NEFF is a Caucasian male and a citizen of the United States.

27.     Plaintiff MADELINE NELSON is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

28.     Plaintiff BARBARA ROSS is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

29.     Plaintiff CHRIS RYAN is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

30.     Plaintiff CAROLINE SAMPONARO is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

31.     Plaintiff LISA SHALOM is a Caucasian female and a citizen of Canada.

32.     Plaintiff SARA STOUT is a Caucasian female and a citizen of the United States.

33.     Plaintiff MARK TAYLOR is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

34.     Plaintiff BLUE MINER YOUNG is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

35.     Plaintiff NEAL ALDRICH is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

36.     Plaintiff NICHOLAS BIRTH is a Caucasian male and a citizen of the United States.

37.     Plaintiff BENJAMIN BRODIE is a Caucasian male and a citizen of the United States.

38.     Plaintiff MARK DAVIS is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

39.    Plaintiff KAREN DE GEORGE is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

40.    Plaintiff ANDREW DZIJA is a Caucasian male and a citizen of the United States.

41.    Plaintiff BRONWYN FLEMING-JONES is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

42.    Plaintiff TIM GAMBLE is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

43.    Plaintiff JEFFREY GANO is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

44.    Plaintiff ZACHARY GELNAW-RUBIN is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

45.    Plaintiff JASON GODLEWICZ is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

46.    Plaintiff NIALL HEFFERNAN is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

47.    Plaintiff GWEN KASH is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

48.    Plaintiff BRIDGET KENNEDY Is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

49.    Plaintiff WILLIAM LAVIANO is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

50.    Plaintiff JULIETTE MOORE is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

51.     Plaintiff GABRIEL PAGANO is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

52.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

53.     At all times relevant herein, as set forth more fully below, defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

54.     Each individual defendant is sued in her or his individual and official capacities.

55.     Defendant THE CITY OF NEW YORK ("NYC" or "the City") is a municipal entity created and authorized under the laws of the State of New York, with general offices located at City Hall, New York, New York  10007.  NYC is authorized by law to maintain the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement, and defendant NYC is ultimately responsible for the NYPD and assumes the risks incidental to the maintenance of it and its employees.

56.     At all times relevant herein, defendant RAYMOND KELLY was the NYPD Commissioner and its chief policymaking official, defendant BRUCE H. SMOLKA was the Assistant Chief of NYPD Patrol Boro Manhattan South, defendant THOMAS GRAHAM was the Commander of the NYPD Disorder Control Unit, defendant STEPHEN PARAGALLO was a Deputy Chief within the NYPD, defendant Patrick Steffens was a Sergeant, and then Lieutenant, who drove and otherwise assisted defendant Paragallo, defendant LOUIS TURCO was a

Lieutenant within the NYPD who headed its First Precinct Scooter Task Force, defendant DANIEL ALBANO was a Lieutenant in the NYPD Legal Bureau, defendant JOSEPH CANECO was a NYPD Lieutenant, and these defendants were each and all supervisors and high-level NYPD policymaking officials personally involved in depriving plaintiffs of their rights and/or in developing and/or implementing the unconstitutional policies, practices, customs and/or conduct complained of herein.

57.    At all times relevant herein, defendants NYPD OFFICER FIRST NAME UNKNOWN ("FNU") DELLEVALLE, SHIELD #6830; NYPD OFFICER KENNETH WAGNER, SHIELD #28519; NYPD OFFICER JOHN WARREN, SHIELD #13763; NYPD OFFICER JOSEPH SCHINZ, SHIELD #21951; NYPD OFFICER "FNU" FURBUSH; NYPD OFFICER JUAN BERRIO, SHIELD #28430;  NYPD OFFICER RAYMOND NG, SHIELD #21793; NYPD OFFICER ANTHONY DIFRANCESCA, SHIELD #4200; NYPD OFFICER "FNU" WOLF, SHIELD # UNKNOWN; CAUCASIAN FEMALE NYPD OFFICER FNU LAST NAME UNKNOWN, SHIELD # 22451; NYPD OFFICER JOANN SPREEN, #19464, NYPD OFFICER JOSE TORRES, #11394, NYPD OFFICER JAMES ZAVALA, #05726, NYPD OFFICER ARTHUR CLARKE, #8001, NYPD OFFICER MICHAEL GERBASI, #20502, NYPD OFFICER CHARLES MURPHY, #31915, NYPD OFFICER JOSEPH WOODLEY, #12116, NYPD OFFICER PAUL ALBANO, #26129, NYPD OFFICER JORDAN MAZUR, #06497, NYPD OFFICER JAMELL KENDRICK, #28700, NYPD OFFICER HONMAN YAN, #31946, NYPD OFFICER EUGENE HACKETT, #21155, NYPD OFFICER ERIC ALBRECHT, #15016, NYPD OFFICER JOHN LUONGO, #00777, NYPD OFFICER MOHAMMAD ARYAKIA, #01705, NYPD OFFICER KATHLEEN CURNYN, #04318, NYPD OFFICER STEVEN VALENTINE, #13585,  NYPD OFFICER "FNU" ACOSTA,

#20660, NYPD OFFICER ANTHONY ANZALONE, #04699, NYPD OFFICER ERIC ALBRECHT, #15016, NYPD OFFICER BRENDA BACOTE, #00167, NYPD OFFICER SHUHEL SUBHAN, #240099, and NYPD OFFICER LOUIS CHIACCHERI, #02786; and NYPD SUPERVISORS AND COMMANDERS RICHARD AND MARY ROES 1-50; and NYPD OFFICERS JOHN AND JULIE DOES 1-50 were each and all personally involved in depriving plaintiffs of their rights and  in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein.

58.    At all times relevant herein, as set forth more fully below, defendant NYC had _de facto_ policies, practices, customs and usages of failing properly to train, screen, supervise, and discipline agents, employees, and police officers, and of failing to inform the individual defendants and their supervisors of their need to train, screen, supervise or discipline said defendants, which were a direct and proximate cause of the unconstitutional conduct alleged herein and the damages attendant thereto.

59.    At all times relevant herein, defendants were duly sworn police officers of the NYPD and were acting under the supervision of said department and according to their official duties.

60.    At all times relevant herein, defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

61.    Each and all of the acts of defendants alleged herein were done by said defendants while acting within the scope of and in furtherance of their employment by defendant THE CITY OF NEW YORK.

<u>FACTS</u>

62.    Critical Mass is a bicycle riding phenomenon that occurs in hundreds of major cities worldwide the last Friday of every month.

63.    Manhattan Critical Mass bicycle rides began in approximately 1994 and have occurred on the last Friday of every month since.

64.    Cyclists who wish to participate in the rides have been congregating at Union Square Park at 7:00 PM on the last Friday of every month for at least the past approximately five years.

65.    Upon information and belief, between 1994 and approximately August of 2004, the NYPD regularly escorted and/or otherwise facilitated and/or acquiesced in the monthly rides, including by blocking traffic at intersections and ushering riders through red lights.

66.    Upon information and belief, NYPD's actions created a situation wherein riders in Critical Mass bicycle rides came to believe that it was NYPD's desire the ride remain together, even if that involved blocking intersections and riding through red lights.

67.    Upon information and belief, Critical Mass bicycle rides were approximately the same size in the summer of 2003 as they were in the summer of 2004 prior to the RNC.

68.    After defendant Smolka was promoted in April of 2004, he became involved with planning the NYPD's police response to future rides, in connection with which he made arrangements for the use of orange nets as well as NYPD scooters and other marked and unmarked police vehicles for crowd control and mass arrest purposes.

69.    Upon information and belief, at all times relevant herein, defendants Kelly, Smolka, Graham, Paragallo, Steffens, Turco, Caneco, and Albano cooperated to develop, design, implement, and supervise the implementation of the procedures, policies, regulations, practices and/or customs of the NYPD about which plaintiffs complain.

11

70.    Defendants designed and implemented policies, practices or customs of indiscriminately arresting without just or probable cause groups of people who were peacefully assembled, and who were either participating in, supporting, observing, or in the vicinity of demonstrations and protests, including Critical Mass bicycle rides.

71.    In anticipation of the RNC and beginning in as early as approximately 2003, defendants gathered intelligence regarding the activities and potential plans of potential demonstrators, including potential participants in Critical Mass bicycle rides, and developed plans: to arrest participants on the August 27, 2004 ride in Manhattan for, *inter alia*, riding their bicycles "*en masse*" or more than two abreast; to prosecute them for violating the parade permitting scheme and committing disorderly conduct; to assign officers who had not observed plaintiffs engage in unlawful conduct to process their arrests and sign criminal court complaints charging them with violations based on false allegations that plaintiffs were observed engaging in unlawful conduct; to seize and voucher their bicycles as "arrest evidence" and to refuse to release plaintiffs' bicycles until the criminal proceedings against them were terminated; and to falsify and/or withhold evidence in connection with those criminal proceedings.

72.    Defendants' indiscriminate mass arrest policy refined tactics employed by the defendants at other recent demonstrations in the City, including, *inter alia*, the February 15, 2003 protest against the war which is the subject of *Haus, et al. v. City of New York, et al.*, 03 Civ. 4915 (RWS), the April 7, 2003 protest against the Carlyle Group which is the subject of *Larsen, et al. v. City of New York, et al.*, 04 Civ. 665 (RWS), and protests against the Republican National Convention ("RNC") in 2004, in which mass arrests were used to unlawfully suppress conduct protected by the First Amendment.

73.    Defendants' policies of mass arrests, processing, and prosecutions about which plaintiffs complain feature:

(a) Use of orange netting, lines of police officers and lines of police bicycles or scooters to corral and essentially trap groups of people who were engaging, or were perceived by the NYPD as associated with, Critical Mass bicycle rides;

(b) Failure to distinguish bystanders, media personnel and legal observers from groups of corralled or trapped people prior to effecting arrests;

(c) Failure to advise prospective arrestees who were behaving in a peaceful and non-violent manner that they were in violation of any law or ordinance;

(d) Failure to give dispersal orders that, if given at all, were audible to all prospective arrestees;

(e) Failure to provide a reasonable opportunity to disperse, including actively preventing people who wanted to disperse from leaving;

(f) Assigning one "arresting" officer to swear out criminal court paperwork alleging that she or he had personally observed multiple arrestees each engage in specific conduct, regardless of whether the officer had seen any of them prior to their arrest or had even been present at the scene when the decision to arrest was made or aware of the name of the supervisor who made the decision;

(g) Requiring review by NYPD Legal Bureau and/or other personnel of arresting/assigned officers' paperwork before it was shown to the District Attorney's office for the purpose of insuring that the narratives in the criminal court paperwork would appear facially sufficient despite the attesting officers' lack of personal

knowledge, resulting in boilerplate allegations which routinely overstated the attesting officers' personal knowledge;

(h) Having arresting officers sign police complaints and swear to criminal court complaints falsely attesting they had witnessed arrestees engaging in conduct that provided a basis for the alleged probable cause when the officers, in fact, lacked personal knowledge of the arrestees' conduct; and

(i) Selective enforcement of the vague, overbroad and strict liability parade permitting scheme, the New York State disorderly conduct statute, New York City Administrative Code § 16-122, and VTL § 1234, *inter alia*, to criminalize perceived participation in, or proximity to, Critical Mass bicycle rides.

74.     In designing and implementing these policies, procedures, and practices, defendants knew or should have known that participation in Critical Mass bicycle rides was protected by the First Amendment.

75.     In designing and implementing these policies, procedures, and practices, defendants knew or should have known that the use of police vehicles against peaceful perceived demonstrators as a means of crowd control was an unreasonable use of force and lacked narrow tailoring as a means of regulating participation in Critical Mass bicycle rides or associating for that perceived purpose.

76.     In designing and implementing these policies, procedures, and practices, defendants knew or should have known that their plans to apply the parade permitting scheme and the New York State disorderly conduct statute to criminalize perceived participation in Critical Mass bicycle rides or lawful activities associated with them were unconstitutional.

77.     In designing and implementing these policies, procedures, and practices, defendants knew or should have known that their use of nets and police vehicles to trap peaceful perceived participants in Critical Mass bicycle rides, and the seizures of bicycles either attendant to arrest or as allegedly "abandoned" property, would result in unlawful arrests, malicious prosecutions, unwarranted property deprivations, and cast a chilling effect on protected conduct.

78.     Defendants Kelly, Smolka, Graham, Paragallo, Steffens, Turco, Albano, and Caneco were each and all personally involved in making strategic and command and control – including arrest – decisions in connection with plaintiffs' arrests.

79.     Defendants Kelly, Smolka, Graham, Paragallo, Steffens, Turco, Albano, and Caneco were personally involved in arresting plaintiffs or supervising plaintiffs' arrests and their processings and/or prosecutions, and/or they were advised of the circumstances surrounding plaintiffs' arrests and aware of the status of their prosecutions.  Defendant Albano assisted other defendants in filling out paperwork regarding plaintiffs' arrests or supervised other NYPD Legal Bureau officers who did so.

80.     On August 27, 2004 - the eve of the 2004 RNC in New York - 5,000 cyclists participated in the Critical Mass ride, and the NYPD arrested 264 cyclists.

81.     Upon information and belief, the majority of those 264 people were subsequently charged with parading without a permit in violation of New York City Administrative Code ("NYCAC") § 10-110(c) and committing disorderly conduct New York State Penal Law ("PL") §§ 240.20(5) and/or (6).

82.     Upon information and belief, on or about September 22, 2004, the NYPD put up a "Statement Concerning Possible Bicyclist Event on 9/24" and a set of "Reminders to Bicyclists

in the Five Boroughs" on its website stating, *inter alia*, that bicyclists must not ride more than two abreast.

83.    Upon information and belief, the source of those portions of the "Reminders" was New York State Vehicle and Traffic Law ("VTL") § 1234, which has no effect whatsoever in the City of New York, as it has been specifically superseded by rules of the New York City Department of Transportation ("NYCDOT") pursuant to VTL § 1642 and the relevant provisions of the NYCDOT rules.

84.    Nothing in the NYCDOT rules prohibits bicyclists from riding more than two abreast.

85.    The September 24, 2004 Critical Mass ride drew approximately 1,200 participants to Union Square Park.

86.    As potential participants assembled in Union Square Park, the NYPD circulated a flyer threatening bicyclists with arrest, *inter alia*, if they participated in an unpermitted procession or rode more than two abreast.

87.    Defendant Smolka negotiated an on-the-spot route for cyclists who wished to participate in the ride that evening based on a conversation he had with a single attorney, which defendant Smolka considered effectively the same thing as a permit.

88.    Although there were over a thousand people gathered in Union Square Park, defendant Smolka only conveyed the route he had proposed to a single attorney; the NYPD provided cyclists with no written flyers describing its proposed route, and made no bullhorn or loudspeaker announcements proposing that such a route exist, let alone setting the course it was to take.

89.     Nevertheless, police officers escorted the ride along the route defendant Smolka had proposed and did their best to facilitate the ride by blocking traffic and/or waving cyclists through intersections at which the traffic lights were red.

90.     At some point, a group of riders turned east on 36th Street from Fifth Avenue, thereby moving beyond the route defendant Smolka had proposed.  Moments later, a phalanx of police officers on scooters interdicted the 36th Street riders between Fifth and Sixth Avenues.

91.     According to defendant Smolka, the NYPD had only been escorting and providing assistance to those who were following his proposed route; when cyclists diverted from it, they would have been parading without a permit at certain points, possibly, even if they obeyed all traffic laws.

92.     The NYPD made nine arrests, allegedly because those arrestees were participating in an unpermitted event.

93.     The lawsuit underlying *Bray v. New York City*, 346 F.Supp.2d 480 (S.D.N.Y., October 28, 2004) was filed on October 20, 2004 on behalf of five individuals whose bicycles the NYPD had seized as allegedly abandoned property under the purported authority of New York City Administrative Code § 16-122 in connection with the September Critical Mass bicycle ride although they were not charged with any crime or violation of law.

94.     On October 25, 2004, the City counterclaimed for a reverse class action and moved to enjoin preliminarily the five individual plaintiffs and others with notice from participating in the October 29, 2004 Critical Mass bicycle ride and subsequent Critical Mass events unless parade permits were issued by the Police Department.

95.     The parties appeared for a hearing before United States District Court Judge Hon. William H. Pauley III on October 27, 2004 at which the City admitted that VTL § 1234 had no application in the City of New York.

96.     On October 28, 2004, Judge Pauley denied the City's application for a preliminary injunction as barred by the doctrine of *laches* and because it raised the need to adjudicate novel and complex state law issues, primarily concerning the lawfulness of applying the parade permitting scheme to Manhattan Critical Mass rides.

97.     On October 28, 2004, the New York Daily News published an article by defendant Kelly entitled "BE OUR GUEST:  Extremists have hijacked the bike rides," in which defendant Kelly stated:  "Now that Critical Mass has identified itself as an interested party, the Police Department has called on it to seek a permit if it intends to continue to use the rides in a way that puts so many in jeopardy.  Otherwise, each and every participant is expected to obey the law or be subject to arrest.  That includes observing traffic signals and riding in the curb lane no more than two abreast."

98.     Because of the Court's involvement, the NYPD agreed to unilaterally propose a route for cyclists to follow during the October 29, 2004 Critical Mass ride.

99.     Upon information and belief, on October 28 or 29, 2004, defendants Kelly, Smolka, Graham, Albano, and Caneco devised such a route and otherwise developed a plan to police the October 29, 2004 Critical Mass ride.

100.     The route that was proposed was for the bicyclists to gather in Union Square Park, ride northbound from Union Square Park along Park Avenue to 55th Street, ride east on 55th Street to Fifth Avenue, ride south on Fifth Avenue to 23rd Street, and at 23rd Street ride south along Broadway to Union Square Park where the riders would disperse.

<u>THE OCTOBER 29, 2004 ARRESTS</u>

101.    On the evening of October 29, 2004, cyclists began to congregate in Union Square at approximately 7:00 PM.  The NYPD unilaterally proposed a route by distributing a flyer describing the route and, *inter alia*, threatening bicyclists with arrest if they rode more than two abreast, and broadcasting its contents from an amplified sound truck.

102.    The NYPD deployed several hundred police personnel in connection with policing the October 29, 2004 Critical Mass ride pursuant to a request for such a detail penned by defendant Smolka.

103.    Defendant Smolka told his subordinates that if cyclists deviated from the NYPD's proposed route, they could be arrested.

104.    For the first thirty minutes of the ride, the majority of cyclists followed the designated route.

105.    Police officers regularly stopped cross-town traffic to ensure the safety of the participants.  In addition, officers were present at the back of the group to ensure that cars that were behind the cyclists would remain at a safe distance behind the riders.

106.    Just after 8:00 PM, some cyclists deviated from the proposed route by turning right from Fifth Avenue onto 39th Street.

107.    At approximately Madison Square Park on 25th Street, where Broadway and 5th Avenue merge, the NYPD's route directed cyclists to proceed south on Broadway to Union Square.

108.    However, NYPD officers stretched orange mesh netting across 5th Avenue to Broadway and directed cyclists to proceed west on 23rd Street.

109. Defendant Smolka subsequently received radio reports from other officers stating that other riders were "breaking off" the designated route in "groups" of anywhere between twenty and five hundred cyclists at other points along the way, including at Fifth Avenue near Madison Square Park.

110. Defendant Smolka tried to follow them in his vehicle and continued to patrol the ride and the areas where the NYPD knew cyclists had deviated until after the conclusion of the ride (approximately 10:15 PM).

111. Upon information and belief, there were only approximately 200 riders that followed the designated route back to Union Square Park.

112. The NYPD made 35 arrests, and charged the vast majority of those arrestees with disorderly conduct and parading without a permit.

## PLAINTIFF SHEILA CALLAGHAN

113. At approximately 9:00 PM on October 29, 2004, plaintiff SHEILA CALLAGHAN was lawfully present in the vicinity of 26th street and 10th Avenue in the County, City, and State of New York.

114. Defendant "FNU" DELLAVAELLE, #6830, and other unidentified NYPD officers, detained and arrested plaintiff Callaghan and seized her bicycle without any probable cause, privilege, or consent.

115. Defendant Dellavalle and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

116. Defendant Dellavalle and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

117.    Plaintiff Callaghan was subsequently transported to an NYPD facility for arrest processing and eventually issued a Desk Appearance Ticket ("DAT.")

118.    Plaintiff Callaghan was in NYPD custody for approximately five hours.

119.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving her of the use and enjoyment of her primary means of transportation and forcing her to spend money for travel expenses.

120.    Defendants initiated criminal proceedings against plaintiff Callaghan despite their knowledge that they lacked probable cause to do so.

121.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

122.    At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

123.    Plaintiff was offered, and accepted, an Adjournment in Contemplation of Dismissal ("ACD") in order to retrieve her bicycle from the NYPD and to avoid further disruption to her life.

124.    When Ms. Callaghan retrieved her bicycle, the front wheel was bent and several spokes in the back wheel were broken, and plaintiff spent approximately $80.00 repairing her bicycle.

<u>PLAINTIFF ARUN GUPTA</u>

125.    At approximately 9:00 PM on October 29, 2004, plaintiff ARUN GUPTA was lawfully present in the vicinity of 11th Street and 5th Avenue in the County, City, and State of New York.

126.    Defendant KENNETH WAGNER, #28519, and other unidentified NYPD officers, detained and arrested plaintiff Gupta and seized his bicycle without any probable cause, privilege, or consent.

127.    Defendant Wagner and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

128.    Defendant Wagner and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

129.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

130.    Plaintiff was in NYPD custody for approximately three hours.

131.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving him of the use and enjoyment of his bicycle.

132.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

133.    At plaintiff's arraignment approximately a month after his arrest, plaintiff pleaded not guilty to charges that he violated the parade permitting scheme and committed disorderly conduct by riding his bicycle as part of a group.

134.    Plaintiff hired an attorney to defend the charges against him.

135.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

136.    On or about May 2, 2005, after appearing approximately three times to defend against the charges in the criminal proceedings defendants had initiated against him, those charges were dismissed.

137.    When plaintiff retrieved his bicycle, the bicycle was damaged, and plaintiff was forced to pay approximately $80.00 to repair it.

<u>PLAINTIFF SCOTT KERNS</u>

138.    At approximately 9:00 PM on October 29, 2004, plaintiff SCOTT KERNS was lawfully present in the vicinity of 26th street and 10th Avenue in the County, City, and State of New York.

139.    Defendant JOHN WARREN, #13763, and other unidentified NYPD officers, detained and arrested plaintiff and seized his bicycle without any probable cause, privilege, or consent.

140.    Defendant Warren and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

141.    Defendant Warren and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

142.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

143.    Plaintiff was in NYPD custody for approximately six hours.

144.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving him of the use and enjoyment of his primary means of transportation and forcing him to spend money for travel expenses.

145.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

146.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

147.    At plaintiff's arraignment approximately a month after his arrest, plaintiff pleaded not guilty to charges that he violated the parade permitting scheme and committed disorderly conduct by riding his bicycle as part of a group.

148.    On or about February 17, 2005, after appearing approximately three times to defend against the charges in the criminal proceedings defendants had initiated against him, those charges were dismissed.

149.    When plaintiff retrieved his bicycle after February 17, 2005, the bicycle was damaged, and plaintiff was forced to pay approximately $30.00 to repair it.

<u>PLAINTIFF VADIM NEWQUIST</u>

150.    At approximately 9:00 PM on October 29, 2004, plaintiff VADIM NEWQUIST was lawfully present in the vicinity of 11th Street and 7th Avenue in the County, City, and State of New York.

151.    Defendant RAYMOND NG, SHIELD # 21793, and other unidentified NYPD officers, detained and arrested plaintiff and seized his bicycle without any probable cause, privilege, or consent.

24

152.    Defendant Ng deliberately handcuffed plaintiff too tightly and kept him handcuffed for an excessive period of time, causing plaintiff pain and injury.

153.    Defendant Ng then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

154.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

155.    Plaintiff was in NYPD custody for approximately eight hours.

156.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving him of the use and enjoyment of his bicycle.

157.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

158.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

159.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

160.    Plaintiff was offered, and accepted, an ACD in order to retrieve the bicycle from the NYPD and to avoid further disruption to his life.

161.    When plaintiff retrieved the bicycle, the bicycle was damaged.

<u>PLAINTIFF JESSICA RECHTSCHAFFER</u>

162.    At approximately 9:00 PM on October 29, 2004, plaintiff JESSICA RECHTSCHAFFER was lawfully present in the vicinity of 28th Street and 7th Avenue in the County, City, and State of New York.

163.    Defendant NYPD officer FNU WOLF and other unidentified NYPD officers detained and arrested plaintiff and seized plaintiff's bicycle without any probable cause, privilege, or consent.

164.    Defendant Wolf deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

165.    Unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

166.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a summons and released.

167.    Plaintiff was in NYPD custody for approximately one and a half hours.

168.    The charges against plaintiff were subsequently dismissed.

<u>PLAINTIFF WILLIAM SCHWARTZ</u>

169.    At approximately 9:00 PM on October 29, 2004, plaintiff WILLIAM SCHWARTZ was lawfully present in the vicinity of 26th street and 10th Avenue in the County, City, and State of New York.

170.    Defendant CAUCASIAN FEMALE NYPD OFFICER FNU LAST NAME UNKNOWN, SHIELD # 22451 ("22451") and other unidentified NYPD officers detained and arrested plaintiff and seized plaintiff's bicycle without any probable cause, privilege, or consent.

171.    Defendant 22451 and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept him handcuffed for an excessive period of time, causing plaintiff pain and injury.

172.    Unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

173.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

174.    Plaintiff was in NYPD custody for a number of hours.

175.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving plaintiff of the use and enjoyment of plaintiff's primary means of transportation and forcing plaintiff to spend money for travel expenses.

176.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

177.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

178.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

179.    Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption to his life.

<u>PLAINTIFF ELIZABETH SHURA</u>

180.    At approximately 9:00 PM on October 29, 2004, plaintiff ELIZABETH SHURA was lawfully present in the vicinity of 11th Street and 5th Avenue in the County, City, and State of New York.

181.    Defendant JOSEPH SHINZ, SHIELD #21951, and other unidentified NYPD officers, detained and arrested plaintiff Shura and seized her bicycle without any probable cause, privilege, or consent.

182.    Defendant Shinz and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

183.    Defendant Shinz and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

184.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

185.    Plaintiff was in NYPD custody for approximately seven hours.

186.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving her of the use and enjoyment of her bicycle.

187.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

188.    At plaintiff's arraignment approximately a month after her arrest, plaintiff pleaded not guilty to charges that she violated the parade permitting scheme and committed disorderly conduct by riding her bicycle as part of a group.

189.    Plaintiff hired an attorney to defend the charges against her.

190.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

191.    On or about June 28, 2005, following a bench trial, after appearing approximately five times to defend against the charges in the criminal proceedings defendants had initiated against her, those charges were dismissed.

<u>PLAINTIFF WILLIAM TSU</u>

192.    At approximately 9:00 PM on October 29, 2004, plaintiff WILLIAM TSU was lawfully present in the vicinity of 10th Street and 5th Avenue in the County, City, and State of New York.

193.    Defendant NYPD officer ANTHONY DIFRANCESCA, # 4200, and other unidentified NYPD officers detained and arrested plaintiff and seized plaintiff's bicycle without any probable cause, privilege, or consent.

194.    Defendant Difrancesca  deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

195.    Defendant Difrancesca then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

196.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

197.    Plaintiff was in NYPD custody for a number of hours.

198.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

199.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

200.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

201.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

202.    Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption to his life.

<u>PLAINTIFF JASON YEN</u>

203.    At approximately 9:00 PM on October 29, 2004, plaintiff JASON YEN was lawfully present in the vicinity of 26th Street and 10th Avenue in the County, City, and State of New York.

204.    Defendant JOHN WARREN, #13763, and other unidentified NYPD officers, detained and arrested plaintiff and seized his bicycle without any probable cause, privilege, or consent.

205.    Defendant Warren and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

206.    Defendant Warren and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

207.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

208.    Plaintiff was in NYPD custody for approximately four hours.

209.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

210.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

211.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

212.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

213.    Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption to his life.

<u>THE NOVEMBER 2004 ARRESTEES</u>

214.    Pursuant to another detail request penned by defendant Smolka, the NYPD deployed several hundred personnel in connection with the November 26, 2004 assembly in Union Square and to police that night's anticipated Critical Mass ride.

215.    Defendants Smolka, Graham, Caneco, and Albano were personally involved in making command and control decisions in connection with the November 26, 2004 Critical Mass detail.

216.    NYPD officers distributed a flyer threatening bicyclists with arrest, *inter alia*, if they participated in an unpermitted procession, the contents which were repeated in a loop over a loud speaker as of approximately 7:30 PM.

PLAINTIFFS JOSHUA COTTON,
SALLY NEWMAN, THOMAS BONAMICI, AND SARAH HACKNEY

217.    Prior to arriving in Union Square Park on November 26, 2004, plaintiffs Josh Cotton, Sally Newman, Thomas Bonamici, and Sarah Hackney had gathered at Mr. Cotton's house earlier that evening planning to participate in the Critical Mass bicycle ride and then see a 9:30 PM comedy show at the Laugh Factory.

218.    On the way from the subway station exit to the north end of Union Square Park, an unidentified female NYPD officer told Mr. Cotton that if they "rode no more than two abreast and obeyed all traffic laws" they would not get arrested, but that "they're going to be real strict tonight."

219.    Mr. Cotton and his friends decided to forego riding in the Critical Mass ride because they were scared that they would be arrested if they participated.  They left Union Square riding two abreast down Union Square west directly south of East 15th Street.

220.    They stopped behind two cars at the red light at the intersection of Union Square West and East 14th Street.

221.    While waiting at the red light, unidentified NYPD officers spread an orange net across University Place at the southern end of East 14th Street directly in front of plaintiffs Cotton, Newman, Bonamici, and Hackney.  When the light turned green, plaintiffs Cotton, Newman, Bonamici, and Hackney followed the two cars, which made a right turn onto East 14th Street heading west.

222.    As soon as the two cars completed their turns, NYPD officers pulled orange nets from the north and south sides of East 14th Street on the Western side of the intersection, detaining plaintiffs Cotton, Newman, Bonamici, and Hackney.

223.    Plaintiffs Cotton, Newman, Bonamici, and Hackney were then ushered onto the sidewalk and placed under arrest.

224.    Defendants "FNU" FURBUSH, JUAN BERRIO, SHIELD #28430, and other unidentified NYPD officers, detained and arrested plaintiffs Cotton, Newman, Bonamici, and Hackney and seized their bicycles without any probable cause, privilege, or consent.

225.    Defendants Furbush and Berrio and/or other unidentified NYPD officers deliberately handcuffed plaintiffs Cotton, Newman, Bonamici, and Hackney too tightly and kept then handcuffed for an excessive period of time, causing plaintiffs pain and injury.

226.    Defendants Furbush and Berrio and other unidentified NYPD officers caused a Polaroid photograph or photographs of Cotton, Newman, Bonamici, and Hackney and their bicycles to be taken.

227.    Plaintiffs Cotton, Newman, Bonamici, and Hackney were subsequently transported to an NYPD facility for arrest processing and eventually issued DATs.

228.    Plaintiffs Cotton, Newman, Bonamici, and Hackney were in NYPD custody for approximately five hours.

229.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs a prompt hearing before a neutral fact-finder to test the probable validity of the deprivations *pendent lite*, depriving them of the use and enjoyment of their bicycles.

230.     Defendants initiated criminal proceedings against plaintiffs Cotton, Newman, Bonamici, and Hackney despite their knowledge that they lacked probable cause to do so.

231.    Defendants refused to release plaintiffs' bicycles until the criminal proceedings against plaintiffs were terminated.

232.     At plaintiffs' arraignments approximately a month after their arrests, plaintiffs Cotton, Newman, Bonamici, and Hackney were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

233.     Defendants refused to release plaintiffs' bicycles until the criminal proceedings against plaintiff were terminated.

234.     Upon information and belief, plaintiff Bonamici took an ACD in order to retrieve the bicycle from the NYPD and to avoid further disruption to his life.

235.     Plaintiffs Cotton, Newman, and Hackney hired an attorney to defend the charges against them.

236.     Upon information and belief, on or about May of 2005, after appearing several times to defend against the charges in the criminal proceedings defendants had initiated against them, the charges against plaintiffs Cotton, Newman, and Hackney were dismissed.

237.     When plaintiffs retrieved their bicycles, they were damaged, and plaintiffs spent time and money repairing them.

### PLAINTIFF TERESA TORCHIANO

238.     At approximately 7:30 PM on November 26, 2004, plaintiff TERESA TORCHIANO was lawfully present in the vicinity of Union Square West and 14th Streets in the County, City, and State of New York.

239.     Defendant "FNU" FURBUSH and other unidentified NYPD officers, detained and arrested plaintiff Torchiano and seized her bicycle without any probable cause, privilege, or consent.

240.    Defendant Furbush and/or other unidentified NYPD officers deliberately handcuffed plaintiff Torchiano too tightly and kept her handcuffed for an excessive period of time, causing her pain and injury.

241.    Defendant Furbush and other unidentified NYPD officers caused a Polaroid photograph or photographs of plaintiff Torchiano and her bicycle to be taken.

242.    Plaintiff Torchiano was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

243.    Plaintiff Torchiano was in NYPD custody for approximately five hours.

244.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivations *pendent lite*, depriving her of the use and enjoyment of her bicycles.

245.    Defendants initiated criminal proceedings against plaintiff Torchiano despite their knowledge that they lacked probable cause to do so.

246.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff was terminated.

247.    At plaintiff's arraignment approximately a month after her arrests, plaintiff Torchiano was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

248.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

249.    Upon information and belief, plaintiff Torchiano took an ACD in order to retrieve the bicycle from the NYPD and to avoid further disruption to her life.

<u>PLAINTIFF BRADFORD CONOVER</u>

250.    At approximately 8:30 PM on November 26, 2004, plaintiff BRADFORD CONOVER was lawfully present in the vicinity of Houston Street and Broadway in the County, City, and State of New York.

251.    Defendants Schinz and other unidentified NYPD officers detained and arrested plaintiff and seized his bicycle without any probable cause, privilege, or consent.

252.    Defendants deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

253.    Defendants then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

254.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

255.    Plaintiff was in NYPD custody for approximately four hours.

256.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

257.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

258.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

259.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating PL § 240.20(5).

260.    Plaintiff hired attorneys to defend the charges him.

261.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

262.    On or about September 19, 2004, after appearing approximately seven times to defend against the charges in the criminal proceedings defendants had initiated against him, those charges were dismissed on speedy trial grounds.

### PLAINTIFF JAMESON ROLLINS'S JANUARY 28, 2005 ARREST

263.    On December 31, 2004, there was a large Critical Mass bicycle ride that the NYPD accompanied and at which there were no arrests.

264.    On or before January 28, 2005, defendants Smolka, Graham, Caneco, Albano, Paragallo, Steffens, and/or other unidentified NYPD supervisors acting under their orders and supervision planned to utilize plainclothes and/or other officers to infiltrate groups of potential participants in the January 28, 2005 Critical Mass bicycle ride and to conduct overt and covert video, audio, and other surveillance of their activities, including their constitutionally protected activities.

265.    In the afternoon of January 28, 2005, defendants Smolka, Graham, Caneco, Albano, Paragallo, and/or other unidentified NYPD supervisors acting under their orders instructed defendants Turco and other NYPD officers under their command, including defendant Spreen, to arrest perceived participants in the Critical Mass bicycle ride they expected would occur as bicyclists left Union Square Park close to the park by trapping perceived participants using scooters and other vehicles as roadblocks without first warning the perceived participants that they may be violating the law if they continue to ride their bicycles and without providing them with a meaningful opportunity to disperse.

266.    At approximately 7:26 PM, cyclists left the park going south on Union Square West toward 14th Street.

267.    As cyclists turned west on 14th Street and moved toward 5th Avenue, numerous NYPD scooters rode to their left along the double yellow dividing line.

268.    After some made a lawful left-hand turn at the green light at 5th Avenue, NYPD officers, including defendants Steffens and Spreen, made eight arrests on 5th Avenue between 14th and 11th Streets.

269.    At approximately 7:30 PM on January 28, 2005, plaintiff JAMESON ROLLINS was lawfully present in the vicinity of 12th Street and 5th Avenue, in the County, City, and State of New York.

270.    Defendant NYPD officer JOANN SPREEN, #19464, and other unidentified NYPD officers, detained and arrested plaintiff without warning and seized plaintiff's bicycle without any probable cause, privilege or consent.

271.    At approximately 7:30 PM, defendants Smolka, Graham, Caneco, Albano, Paragallo, Turco, and/or other unidentified NYPD supervisors directed and supervised defendant Spreen and other NYPD officers in arresting plaintiff Rollins, and supervised their subsequent arrest processing.

272.    Defendant Spreen and/or other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

273.    Defendant Spreen and/or other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

274.    Plaintiff Rollins was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

275.    Plaintiff Rollins was in NYPD custody for approximately five hours.

276.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

277.    Defendants initiated criminal proceedings against plaintiff despite their knowledge that they lacked probable cause to do so.

278.    At plaintiff's arraignment approximately a month after plaintiff's arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding plaintiff's bicycle as part of a group and allegedly failing to obey a lawful order to disperse.

279.    Plaintiff Rollins hired an attorney to defend against the criminal charges against him.

280.    During the period between January 28, 2005 and January 9, 2006, plaintiff Rollins was required to make approximately 13 court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

281.    At all relevant times in 2005 and in 2006, the City represented the NYPD in affirmative litigation before the New York State Supreme Court aimed at the cessation of Critical Mass bicycle rides in Manhattan, and defendants Kelly, Smolka, Caneco, and Albano, were all personally involved in that litigation.  See City of New York v. Time's Up!, Inc., 11 Misc.3d 1052(A) (Sup. Ct., N.Y. County 2006).

282.    In connection with the criminal proceedings against plaintiff Rollins, on April 11, 2005, DANY, the NYPD, and the City were served with a Notice of Demand for Preservation and Production of All Radio or Other Recorded Police Communications and Observations, a Demand to Produce pursuant to New York State Criminal Procedure Law ("CPL") § 240.20, and a Request for Bill of Particulars pursuant to CPL §§ 100.45 and 200.95 requesting and/or demanding, *inter alia*, that the City preserve and provide the Office of the District Attorney of New York County with certain discoverable evidence, including, but not limited to, videotape, photographs, officer lists, recordings of police communications, and other evidence discoverable under CPL § 240.20, Brady v. Maryland, 373 US 83 (1963), and People v. Rosario, 9 NY2d 286 (1961).

283.    Upon information and belief, defendant Albano was specifically aware of the NYPD's obligation to preserve and produce the requested evidence, and also knew of the requests and demands.

284.    Nevertheless, the NYPD and the City failed to comply by producing the discoverable evidence to DANY.

285.    In October of 2005, defendant Rollins stood trial for three days, during which defendant Spreen and approximately a dozen other NYPD officers testified, including officers who admitted to having communicated over the radio.

286.    On January 9, 2006, plaintiff Rollins was convicted of disorderly conduct, and the Court declared the parade permitting scheme facially unconstitutional.  See People v. Bezjak, 11 Misc.3d 424 (N.Y.City Crim.Ct., January 9, 2006).

287.    Plaintiff's disorderly conduct conviction is on appeal before the Appellate Term.

<u>THE FEBRUARY 25, 2005 CRITICAL MASS DETAIL</u>

288.   On or before February 25, 2005, defendants Smolka, Graham, Caneco, Albano, Paragallo, Steffens, and/or other unidentified NYPD supervisors acting under their orders and supervision planned to utilize plainclothes and/or other officers to infiltrate groups of potential participants in the February 25, 2005 Critical Mass bicycle ride and to conduct overt and covert video, audio, and other surveillance of their activities, including their constitutionally protected activities.

289.   In the afternoon of February 25, 2005, defendants Kelly, Smolka, Graham, Caneco, Albano, Paragallo, and/or other unidentified NYPD supervisors acting under their orders instructed defendants Turco and other NYPD officers under their command, including defendants JOSE TORRES, #11394, JAMES ZAVALA, #05726, ARTHUR CLARKE, #8001, MICHAEL GERBASI, #20502, CHARLES MURPHY, #31915, JOSEPH WOODLEY, #12116, PAUL ALBANO, #26129, JORDAN MAZUR, #06497, JAMELL KENDRICK, #28700, and HONMAN YAN, #31946, to arrest perceived participants in the Critical Mass bicycle ride they expected would occur as bicyclists left Union Square Park close to the park by trapping perceived participants using scooters and other vehicles as roadblocks without first warning the perceived participants that they may be violating the law if they continue to ride their bicycles and without providing them with a meaningful opportunity to disperse.

<u>PLAINTIFFS JONATHAN BECK, REBECCA HEINEGG, MADELINE NELSON,
CAROLINE SAMPONARO, MARK TAYLOR, and BLUE MINER YOUNG</u>

290.   At approximately 7:30 PM on February 25, 2005, plaintiffs JONATHAN BECK, REBECCA HEINEGG, MADELINE NELSON, CAROLINE SAMPONARO, MARK TAYLOR, and BLUE MINER YOUNG were lawfully present in the vicinity of 17th Street and 5th Avenue, in the County, City, and State of New York.

41

291.    Just before and after approximately 7:30 PM, a number of people on bicycles left Union Square Park heading west on 17th Street.

292.    At approximately 7:30 PM, defendant Steffens drove an unmarked NYPD vehicle, along with other vehicles driven by unidentified NYPD officers, west on 17th Street, apparently escorting and/or following the people on bicycles on 17th Street.

293.    Pursuant to their orders and training, defendants Turco, Kendrick, Yan, Clarke, Albano, Murphy, Zavala, and other unidentified NYPD officers were positioned several blocks away, on approximately 18th Street east of 5th Avenue - out of sight of 17th Street.

294.    As or just before a number of bicycles stopped at the red light regulating westbound traffic on 17th Street, defendants Smolka, Graham, Caneco, Paragallo, Turco, and/or Albano directed that defendant Turco and the First Precinct Scooter Task Force officers under his command, including defendants Kendrick, Yan, Clarke, Albano, Murphy, Zavala, and other unidentified NYPD officers, run the red light regulating westbound traffic on 18th Street, turn south onto 5th Avenue, and intercept and trap bicyclists crossing 5th Avenue westbound at 17th Street.

295.    Plaintiff Beck was lawfully crossing 5th Avenue on a green light when defendant NYPD officer JAMELL KENDRICK, #28700, interceded his scooter in plaintiff's path without warning and detained and arrested plaintiff and seized plaitniff's bicycle without any probable cause, privilege, or consent.

296.    Plaintiff Heinegg was lawfully crossing 5th Avenue on a green light when defendant NYPD officer HONMAN YAN, #31946, interceded his scooter in plaintiff's path without warning and detained and arrested plaintiff and seized plantiff's bicycle without any probable cause, privilege, or consent.

42

297.    Plaintiff Young was lawfully crossing 5th Avenue on a green light when defendant NYPD officer ARTHUR CLARKE, #8001, rammed his scooter into Young's bicycle and detained and arrested plaintiff and seized plaintiff's bicycle without any probable cause, privilege, or consent.

298.    Plaintiff Samponaro was lawfully crossing 5th Avenue on a green light when defendant NYPD officer PAUL ALBANO, #26129, interceded his scooter in plaintiff's path without warning and detained and arrested plaintiff and seized plaintiff's bicycle without any probable cause, privilege, or consent.

299.    Plaintiff Taylor, then a law student who was wearing a bright green "legal observer" cap and had deliberately kept his distance from other bicyclists in order to observe police interaction with them without risking arrest, was detained and arrested by NYPD officer CHARLES MURPHY, #31915, as he attempted to observe the ongoing arrests.  Officer Murphy seized plaintiff's bicycle without any probable cause, privilege, or consent.

300.    Plaintiff Nelson was stopped alone at the red light on the east side of 5th Avenue when an unidentified NYPD supervisor ran across the avenue to Nelson to tell her to cross to the west side while straddling her bicycle, despite Nelson's request to get off the bicycle and walk it in a normal manner. On the west side, upon information and belief, the supervisor told defendant NYPD officer JAMES ZAVALA, #05726, who had just arrived at the location and had not witnessed any of the proceedings, to arrest Nelson and seize her bicycle, which defendant Zavala did without any probable cause, privilege, or consent.

301.    Defendants deliberately handcuffed plaintiff too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

302.    Defendants Turco, Kendrick, Yan, Clarke, Albano, Murphy, Zavala, and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiffs and their bicycles to be taken.

303.    Plaintiffs Beck, Heinegg, Nelson, Samponaro, Taylor, and Young were subsequently transported to the NYPD's 9th Precinct for arrest processing and each eventually issued a DAT.

304.    Plaintiffs Beck, Heinegg, Nelson, Samponaro, Taylor, and Young were in NYPD custody for approximately five hours.

305.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving plaintiffs of the use and enjoyment of their bicycles.

306.    Defendants initiated criminal proceedings against plaintiffs Beck, Heinegg, Nelson, Samponaro, Taylor, and Young despite their knowledge that they lacked probable cause to do so.

307.    Defendants refused to release plaintiffs' bicycle until after their arraignments.

308.    At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and  and committing disorderly conduct by riding plaintiff's bicycle as part of a group and allegedly failing to obey a lawful order to disperse.

309.    Plaintiffs hired attorneys to represent them.

310.    .When plaintiff Nelson retrieved her bicycle, the front light was broken and the rear light broken off, and plaintiff spent approximately $50.00 repairing her bicycle.

311.    When plaintiffs Beck, Heinegg, Samponaro, Taylor, and Young retrieved their bicycles, they were damaged, and they spent time and money repairing their bicycles.

312.    During the period between February 25, 2005 and April 16, 2006, plaintiff Nelson was required to make 10 court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

313.    On or about April 16, 2006, all charges against plaintiff Nelson were dismissed.

314.    During the period between February 25, 2005 and January 19, 2006, plaintiffs Beck, Heinegg, Samponaro, Taylor, and Young- along with plaintiffs Bland, Ryan, and Melchor - were required to make approximately 14 court appearances each to defend themselves in the criminal proceedings that defendants had initiated against them.

315.    In connection with the criminal proceedings against those plaintiffs who were arrested on February 25, 2005, on May 19, 2005, DANY, the NYPD, and the City were served with a Notice of Demand for Preservation and Production of All Radio or Other Recorded Police Communications and Observations, a Demand to Produce pursuant to CPL§ 240.20, and a Request for Bill of Particulars pursuant to CPL §§ 100.45 and 200.95, requesting and/or demanding, *inter alia*, that the City preserve and provide the Office of the District Attorney of New York County with certain discoverable evidence, including, but not limited to, videotape, photographs, officer lists, recordings of police communications, and other evidence discoverable under CPL § 240.20, <u>Brady v. Maryland</u>, 373 US 83 (1963), and <u>People v. Rosario</u>, 9 NY2d 286 (1961).

316.    On September 13, 2005, in Jury Part 2 of the New York City Criminal Court, Hon. Neil Ross directed that DANY was required to produce "city-wide police recordings" in connection with the case if there were "some type of <u>Rosario</u> that arises because some

45

Government [sic] witness was heard on the recordings testified at trial" or if "it contained exculpatory information," directing DANY to "be mindful of their <u>Brady</u> obligations and also . . . make sure that they're prepared at the time of trial to comply with their <u>Rosario</u> obligations."

317.    DANY did not produce tapes of or records related to the radio communications prior to or during plaintiffs' January 19, 2006 trial.

318.    On January 19, 2006, plaintiffs Beck, Heinegg, Samponaro, Taylor, and Young, along with plaintiffs Bland, Ryan, and Melchor, were each convicted of parading without a permit and one count of disorderly conduct.

319.    Their convictions are on appeal before the Appellate Term.

<u>PLAINTIFFS CHRISTOPHER BLAND, TOMAS MELCHOR, CHRISTOPHER NEFF, BARBARA ROSS, CHRISTOPHER RYAN, LISA SHALOM, AND SARA STOUT</u>

320.    On February 25, 2005, between approximately 7:30 PM and approximately 8:30 PM, some cyclists who had already gone through the intersection of 5th Avenue and 17th Street prior to the approximately 7:30 PM arrests, along with other bicyclists who joined well after, continued riding unmolested by the police for approximately an hour.

321.    At one point, as the bicyclists were heading north up 6th or 8th Avenue, a NYPD van followed the ride broadcasting words over its loudspeaker to the effect of, "Stay in the right lane," which bicyclists did.

322.    As a number of bicyclists were coming through Times Square, heading south on Broadway, it passed a contingent of police officers gathered in front of the old Paramount Theatre at 1501 Broadway.

323.    Numerous officers said things to the effect of, "Come on through; go ahead; keep moving."

324.    There were approximately five police vans trailing a maximum of eighty cyclists

at approximately 32nd Street and Broadway.

325.    At approximately 26th Street and Broadway, defendant Turco and other NYPD officers under his command, including defendants Gerbasi, Mazur, Woodley,, remained hidden behind a building waiting to ambush the cyclists.

326.    As the cyclists approached 26th Street, acting under the orders and/or directions of defendants Smolka, Graham, Paragallo, Caneco, Steffens, and/or Albano, the scooter squadron under defendant Turco's command and including defendants Gerbasi, Mazur, and Woodley, came up Broadway going the wrong way in the bicycle lane and aiming into the bicyclists.

327.    NYPD officers subsequently arrested eight people on the corner of 26th and Broadway, including plaintiffs CHRISTOPHER BLAND, TOMAS MELCHOR, CHRISTOPHER NEFF, BARBARA ROSS, CHRISTOPHER RYAN, LISA SHALOM, and SARA STOUT, who were lawfully present in the vicinity of 28th Street and Broadway, in the County, City and State of New York at the time.

328.    Defendant Turco struck plaintiff Neff with his scooter, knocking him and his bicycle to the ground.

329.    Defendant Turco and other unidentified NYPD officers then detained and arrested plaintiff Neff, as well as plaintiff Ryan, and seized their bicycles without any probable cause, privilege, or consent.

330.    Defendant NYPD Officer MICHAEL GERBASI, #20502, and other unidentified NYPD officers detained and arrested plaintiffs Bland, Melchor, and Ross and seized their bicycles without any probable cause, privilege or consent.

331.    Defendant NYPD officer JORDAN MAZUR, #6497, and two other unidentified NYPD officers, tackled plaintiff Stout and pinned her to the ground in order to detain and arrest

her, and seized her bicycle without any probable cause, privilege or consent.

332.    Defendant NYPD officer JOSEPH WOODLEY, #12116, and other unidentified NYPD officers detained and arrested plaintiff Shalom and seized her bicycle without any probable cause, privilege or consent.

333.    Defendants deliberately handcuffed plaintiff too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

334.    Defendants Turco, Gerbasi, Mazur, Woodley, and other unidentified NYPD officers then caused a Polaroid photographs of plaintiffs and their bicycles to be taken.

335.    Plaintiffs Bland, Melchor, Neff, Ross, Ryan, Shalom, and Stout were subsequently transported to an NYPD facility for arrest processing and eventually each was issued a DAT.

336.    Plaintiff Stout was in NYPD custody for approximately three hours.

337.    Plaintiffs Bland, Mechor and Neff were in NYPD custody for approximately four hours.

338.    Plaintiff Ross was in NYPD custody for approximately five and a half hours.

339.    Plaintiffs Ryan and Shalom were in NYPD custody for approximately between four and six hours.

340.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving plaintiffs of the use and enjoyment of their bicycles.

341.    Defendants initiated criminal proceedings against plaintiffs Bland, Melchor, Neff, Ross, Ryan, Shalom, and Stout despite their knowledge that they lacked probable cause to do so.

342.     Defendants refused to release plaintiffs' bicycle until after their arraignments.

343.     At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and  committing disorderly conduct by riding bicycles as part of a group and allegedly failing to obey a lawful order to disperse.

344.     When plaintiffs Bland, Melchor, Neff, Ross, Ryan Shalom, and Stout retrieved their bicycles, they were damaged, and they spent time and money repairing their bicycles.

345.     At their arraignments, plaintiff Neff, who lived in Alabama, and plaintiff Shalom, who lived in Canada, were offered, and accepted, ACD's in order to retrieve their bicycles from the NYPD and to avoid further disruption of their lives.

346.     Plaintiffs Bland, Melchor, Ross, Ryan, and Stout pleaded not guilty to the charges against them.

347.     During the period between February 25, 2005 and December 30, 2005, plaintiff Stout was required to make four court appearances, traveling from Portland, Oregon ($600 expense plus lost wages) to defend herself in the criminal proceedings that defendants had initiated against her.

348.     On December 30, 2005, plaintiff Stout was offered, and accepted, an ACD in order to avoid further expense and disruption of her life.

349.     During the period between February 25, 2005 and April 16, 2006, plaintiff Ross was required to make approximately ten court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

350.     On or about April 16, 2006, all charges against plaintiff Ross were dismissed.

THE MARCH 25, 2005 ARRESTEES

351.    On or before March 25, 2005, defendants Smolka, Graham, Caneco, Albano, Paragallo, Steffens, and/or other unidentified NYPD supervisors acting under their orders and supervision planned to utilize plainclothes and/or other officers to infiltrate groups of potential participants in the March 25, 2005 Critical Mass bicycle ride and to conduct overt and covert video, audio, and other surveillance of their activities, including their constitutionally protected activities.

352.    On or before March 25, 2005, defendants Smolka, Graham, Caneco, Albano, Paragallo, Steffens, and/or other unidentified NYPD supervisors acting under their orders planned and prepared to arrest perceived participants in the Critical Mass bicycle ride on March 25, 2005, by pro-positioning orange netting in the vicinity of Union Square Park, including at the intersections around 17th Street between 5th and 6th Avenues, and using those nets to trap bicyclists in order to arrest them.

353.    In the afternoon of March 25, 2005, defendants Kelly, Smolka, Graham, Caneco, Albano, Paragallo, and/or other unidentified NYPD supervisors acting under their orders instructed defendants Turco and other NYPD supervisors under their command, including defendants EUGENE HACKETT, #21155, ERIC ALBRECHT, #15016, JOHN LUONGO, #00777, MOHAMMAD ARYAKIA, #01705, KATHLEEN CURNYN, #04318, STEVEN VALENTINE, #13585, "FNU" ACOSTA, #20660, ANTHONY ANZALONE, #04699, ERIC ALBRECHT, #15016, BRENDA BACOTE, #00167, SHUHEL SUBHAN, #240099, and LOUIS CHIACCHERI, #02786, to arrest perceived participants in the Critical Mass bicycle ride they expected would occur as bicyclists left Union Square Park close to the park by trapping perceived participants in orange netting without first warning the perceived participants that they

354.    At approximately 7:30 PM, a number of bicyclists left Union Square Park heading west on 17th Street.  As a group of bicyclists crossed the intersection of 17th Street and Union Square West, unidentified NYPD officers began to stretch an orange mesh net to block other traffic from crossing Union Square West at 17th Street, briefly stopping to let other bicyclists pass before fully blocking westbound traffic from passing the intersection.    Bicyclists who proceeded west on 17th Street to 5th Avenue were captured stopped at the red light on videotape taken by a plainclothes or undercover NYPD officer who had been pre-positioned at the intersection.  Blocking all of 5th Avenue to the north and south of its intersection with 17th Street were multiple sets of orange mesh nets stretched across the street.  Those who proceeded west on 17th Street on their bicycles were met with other lines of nets on 17th Street between 5th and 6th Avenues.  Along with any people who were walking with, or attempting to lock or unlock, bicycles in the enmeshed area, they were arrested and corralled under scaffolding on the south side of the sidewalk at the intersection of 17th Street and 6th Avenues.  NYPD officers with cordless chainsaws shortly arrived and began to saw the locks off of any and all bicycles that were locked up in the enmeshed area.  Bicycle owners in the area were given the choice of proving ownership of their bicycles and receiving a summons for violating NYCAC § 16-122 or watching as the NYPD sawed the locks off their bicycles.

355.    Defendants Smolka, Graham, Paragallo, and Albano were personally present supervising and directing these activities.

PLAINTIFFS NEAL ALDRICH, NICHOLAS BIRTH, CHRISTOPHER BLAND, MARK DAVIS, KAREN DE GEORGE, ANDREW DZIJA, BRONWYN FLEMING-JONES, TIM GAMBLE, JEFFREY GANO, ZACHARY GELNAW-RUBIN, JASON GODLEWICZ, NIALL

HEFFERNAN, GWEN KASH, BRIDGET KENNEDY, WILLIAM LAVIANO, JULIETTE MOORE, and GABRIEL PAGANO

356.    At approximately 7:30 PM on March 25, 2005, plaintiffs NEAL ALDRICH, NICHOLAS BIRTH, CHRISTOPHER BLAND, MARK DAVIS, KAREN DE GEORGE, ANDREW DZIJA, BRONWYN FLEMING-JONES, TIM GAMBLE, JEFFREY GANO, ZACHARY GELNAW-RUBIN, JASON GODLEWICZ, NIALL HEFFERNAN, GWEN KASH, BRIDGET KENNEDY, WILLIAM LAVIANO, JULIETTE MOORE, and GABRIEL PAGANO were lawfully present in the vicinity of 17th Street between 5th and 6th Avenues, in the County, City, and State of New York.

357.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Hackett, and other unidentified NYPD officers, detained and arrested plaintiff Aldrich and seized plaintiff's bicycle without any probable cause, privilege, or consent.

358.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Albrecht, and other unidentified NYPD officers, detained and arrested plaintiff Birth and seized plaintiff's bicycle without any probable cause, privilege, or consent.

359.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Luongo, and other unidentified NYPD officers, detained and arrested plaintiff Bland and seized plaintiff's bicycle without any probable cause, privilege, or consent.

360.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Luongo, and other unidentified NYPD officers, detained and arrested plaintiff Davis and seized plaintiff's bicycle without any probable cause, privilege, or consent.

361.     In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Aryakia, and other unidentified NYPD officers, detained and arrested plaintiff De George and seized plaintiff's bicycle without any probable cause, privilege, or consent.

362.     In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Luongo, and other unidentified NYPD officers, detained and arrested plaintiff Dzija and seized plaintiff's bicycle without any probable cause, privilege, or consent.

363.     In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Curnyn, and other unidentified NYPD officers, detained and arrested plaintiff Fleming-Jones and seized plaintiff's bicycle without any probable cause, privilege, or consent.

364.     In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Valentine, and other unidentified NYPD officers, detained and arrested plaintiff Gamble and seized plaintiff's bicycle without any probable cause, privilege, or consent.

365.     In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Acosta, and other unidentified NYPD officers, detained and arrested plaintiff Gano and seized plaintiff's bicycle without any probable cause, privilege, or consent.

366.     In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Anzalone, and other unidentified NYPD officers, detained and arrested plaintiff Gelnaw-Rubin and seized plaintiff's bicycle without any probable cause, privilege, or consent.

367.     In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Albrecht, other unidentified NYPD officers, detained and arrested plaintiff Godlewicz and seized plaintiff's bicycle without any probable cause, privilege, or consent.

368.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Luongo, and other unidentified NYPD officers, detained and arrested plaintiff Heffernan and seized plaintiff's bicycle without any probable cause, privilege, or consent.

369.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Bacote, and other unidentified NYPD officers, detained and arrested plaintiff Kash and seized plaintiff's bicycle without any probable cause, privilege, or consent.

370.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Curnyn, and other unidentified NYPD officers, detained and arrested plaintiff Kennedy and seized plaintiff's bicycle without any probable cause, privilege, or consent.

371.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Luongo, and other unidentified NYPD officers, detained and arrested plaintiff Laviano and seized plaintiff's bicycle without any probable cause, privilege, or consent.

372.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Curnyn, and other unidentified NYPD officers, detained and arrested plaintiff Moore and seized plaintiff's bicycle without any probable cause, privilege, or consent.

373.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Subhan, and other unidentified NYPD officers, detained and arrested plaintiff Pagano and seized plaintiff's bicycle without any probable cause, privilege, or consent.

374.    Defendants and other unidentified NYPD officers deliberately handcuffed plaintiffs Aldrich, Birth, Bland, Davis, De George, Dzija, Fleming-Jones, Gamble, Gano, Gelnaw-Rubin, Godlewicz, Heffernan, Kash, Kennedy, Laviano, Moore, and Pagano, too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

375.    Defendants caused a Polaroid photograph or photographs of plaintiffs and their bicycles to be taken.

376.    Plaintiffs Aldrich, Birth, Bland, Davis, De George, Dzija, Fleming-Jones, Gamble, Gano, Gelnaw-Rubin, Godlewicz, Heffernan, Kash, Kennedy, Laviano, Moore, and Pagano were subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

377.    Plaintiffs Dzija, Gamble and Laviano were in NYPD custody for approximately six hours.

378.    Plaintiffs Aldrich, Birth, Bland, Davis, Fleming-Jones, Gano, Gelnaw-Rubin, Godlewicz, Kennedy, and Moore, were in NYPD custody for approximately seven hours.

379.    Plaintiffs De George, Heffernan and Kash were in NYPD custody for approximately eight hours.

380.    Defendants vouchered plaintiffs' bicycles as evidence and impounded it without affording plaintiffs prompt hearings before neutral fact-finders to test the probable validity of the deprivations *pendent lite*, depriving them of the use and enjoyment of their bicycles and forcing them to spend money for travel expenses.

381.    Defendants initiated criminal proceedings against plaintiff Aldrich, Birth, Davis, De George, Dzija, Fleming-Jones, Gamble, Gano, Gelnaw-Rubin, Godlewicz, Heffernan, Kash, Kennedy, Laviano, and Pagano despite their knowledge that they lacked probable cause to do so.

382.    Defendants refused to release plaintiffs' bicycles until after arraignment.

383.    At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

384.     Plaintiffs Birth, Fleming-Jones, Gano, and Laviano, were offered, and accepted, ACD's in order to retrieve their bicycles from the NYPD and to avoid further disruption of their lives.

385.     On or about April 26, 2005, DANY announced that it would decline to prosecute criminal cases against plaintiffs Moore and Bland.

386.     During the period between March 25, 2005 and September 19, 2005, plaintiff Heffernan was required to four 4 court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

387.     On or about September 19, 2005, following a bench trial at which defendant Luongo testified, plaintiff Heffernan was acquitted of all charges.

388.     During the period between March 25, 2005 and January 26, 2006, plaintiffs Godlewicz and Kennedy were required to make ten court appearances to defend themselves in the criminal proceedings that defendants had initiated against him.

389.     On or about January 26, 2006, following a bench trial, plaintiffs Godlewicz and Kennedy were acquitted of all charges.

390.     During the period between March 25, 2005 and February 7, 2006, plaintiff Aldrich was required to make nine court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

391.     On or about February 7, 2006, all charges against plaintiff Aldrich were dismissed.

392.     During the period between March 25, 2005 and February 1, 2006, plaintiff Davis was required to make eleven court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

393.    On or about February 1, 2006, all charges against plaintiff Davis were dismissed.

394.    During the period between March 25, 2005 and February 1, 2006, plaintiff De George was required to make 12 court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

395.    On or about February 1, 2006, all charges against plaintiff De George were dismissed.

396.    During the period between March 25, 2005 and April 3, 2006, plaintiff Dzija was required to make approximately twelve court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

397.    On or about April 3, 2006, all charges against plaintiff Andrew Dzija were dismissed.

398.    During the period between March 25, 2005 and October 18, 2005, plaintiff Kash was required to make four court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

399.    On or about October 18, 2005, all charges against plaintiff Kash were dismissed.

400.    During the period between March 25, 2005 and October 2005, plaintiff Pagano was required to make approximately three court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

401.    On or about October 2005, all charges against plaintiff Pagano were dismissed.

402.    During the period between March 25, 2005 and February 1, 2006, plaintiff Gamble was required to make approximately ten court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

403.    On or about February 1, 2006, following a bench trial, plaintiff Gamble was acquitted of the parading charge but convicted of disorderly conduct.

404.    When plaintiffs retrieved their bicycles, they were damaged, and they spent time and money repairing their bicycles.

### PLAINTIFF BENJAMIN BRODIE

405.    At approximately 8:45 PM on March 25, 2005, plaintiff BENJAMIN BRODIE was lawfully present in the vicinity of Houston Street and Lafayette, in the County, City, and State of New York.

406.    Upon information and belief, defendant LOUIS CHIACCHERI, #02786 and other unidentified NYPD officers detained and arrested Brodie and seized his bicycle without any probable cause, privilege or consent.

407.    Defendant Chicaccheri and other defendants deliberately handcuffed plaintiff too tightly, leaving him handcuffed for an excessive period of time, causing him pain and injury.

408.    Defendant Chiaccheri and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

409.    Plaintiff Brodie was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

410.    Plaintiff  Brodie was in NYPD custody for approximately 4 hours.

411.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendent lite*, depriving him of the use and enjoyment of his bicycle and forcing him to spend money for travel expenses.

412.    Defendants initiated criminal proceedings against plaintiff Brodie despite their knowledge that they lacked probable cause to do so.

413.    Defendants refused to release plaintiff's bicycle until after arraignment.

414.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

415.    Plaintiff Brodie was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

416.    When plaintiff Brodie retrieved his bicycle, it was damaged, and he spent time and money repairing it.

### AS AND FOR A FIRST CLAIM FOR RELIEF
### DEPRIVATION OF PLAINTIFFS' RIGHTS UNDER
### THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983

417.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 416 above as if fully set forth hereat and incorporate them by reference.

418.    By their conduct and actions and/or omissions in depriving plaintiffs of their freedoms to be let alone, to move freely, to assemble, to associate, and to enjoy their property, in seizing them, in falsely arresting them, in assaulting and battering them, in maliciously prosecuting them on the basis of false and/or untrustworthy information, in abusing process against them, in retaliating against them for the exercise of constitutionally protected rights, in inflicting emotional distress upon them, in violating their rights to due process and equal protection, and/or for failing to remedy the aforementioned violations after having witnessed them or having been informed of them by report or appeal, and/or by failing properly to train, supervise, or discipline employees of the defendant CITY OF NEW YORK under their

supervision, defendants, acting under color of law and without lawful justification, intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, deprived plaintiffs of the equal protection of the laws and/or of equal privileges and immunities under the laws, and thereby caused injury and damage in violation of plaintiffs' constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its First, Fourth, Fifth, and Fourteenth Amendments.

419.    All of the aforementioned acts of defendants and their agents, servants, and employees were carried out under color of state law, while defendants were acting in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto, under the supervision of ranking officers of said department, pursuant to the customs, usages, practices, procedures, and the rules of defendant City and the NYPD, and/or defendants, collectively and individually, engaged in conduct that constituted a custom, usage, practice, procedure or rule of defendant NYC.

420.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

<u>AS AND FOR A SECOND CLAIM FOR RELIEF</u>
<u>FALSE ARREST</u>

421.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 420 above as if fully set forth hereat and incorporate them by reference.

422.    As a result of defendants' conduct as described above, plaintiffs were subjected to illegal, improper, and false arrest by defendants and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege, or consent.

423.     As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

AS AND FOR A THIRD CLAIM FOR RELIEF
EXCESSIVE USE OF FORCE

424.     Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 423 above as if fully set forth hereat and incorporate them by reference.

425.     The level of force employed by defendants was objectively unreasonable and in violation of plaintiffs' constitutional rights.

426.     As a result of the foregoing, plaintiffs were subjected to excessive force and sustained physical and emotional injuries.

AS AND FOR A FOURTH CLAIM FOR RELIEF
FIRST AMENDMENT

427.     Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 426 above as if fully set forth hereat and incorporate them by reference.

428.     In detaining, assaulting, and arresting plaintiffs, in prosecuting plaintiffs, and in seizing and impounding plaintiffs' bicycles, and in implementing, enforcing, encouraging, sanctioning, and/or ratifying policies, practices, and/or customs punishing peaceful protest, defendants violated plaintiffs' rights to speak, assemble, associate, and petition the government for redress of grievances peaceably in retaliation for their speaking out on a matter of public concern.

429.     As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and

emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured, and defendants chilled and created the risk of chilling conduct protected by the First Amendment.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### MALICIOUS ABUSE OF PROCESS

430.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 429 above as if fully set forth hereat and incorporate them by reference.

431.    Defendants issued legal process to place plaintiffs under arrest.

432.    Defendants arrested plaintiffs in order to obtain a collateral objective outside the legitimate ends of the legal process.

433.    Defendants acted with intent to do harm to plaintiffs without excuse or justification.

434.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
### MALICIOUS PROSECUTION

435.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 434 above as if fully set forth hereat and incorporate them by reference.

436.    Defendants misrepresented and falsified evidence before the District Attorney of New York County ("DANY").

437.    Defendants did not make a complete and full statement of facts to DANY.

438.    Defendants withheld exculpatory evidence from DANY.

439.    Defendants were directly and actively involved in the initiation of criminal proceedings against plaintiffs.

440.    Defendants lacked probable cause to initiate criminal proceedings against plaintiffs.

441.    Defendants acted with malice in initiating criminal proceedings against plaintiffs.

442.    Defendants were directly and actively involved in the continuation of criminal proceedings against plaintiffs.

443.    Defendants lacked probable cause to continue criminal proceedings against plaintiffs.

444.    Defendants acted with malice in continuing criminal proceedings against plaintiffs.

445.    Defendants misrepresented and falsified evidence throughout all phases of the criminal proceedings.

446.    Notwithstanding defendants' misconduct, the criminal proceedings against plaintiffs were favorably terminated on the merits.

447.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
## DENIAL OF CONSTITUTIONAL RIGHTS TO FAIR TRIALS

448.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 447 above as if fully set forth hereat and incorporate them by reference.

449.    Defendants created false information against plaintiffs.

450.    Defendants forwarded false information to prosecutors in the Office of the District Attorney of New York County.

451.     Defendants misled the prosecutors and/or the Court by providing false information and/or testimony in initiating and throughout the criminal proceedings.

452.     Defendants failed to turn over exculpatory evidence and other materials to the prosecutor despite proper demands and/or requests for the same.

453.     Defendants therefore violated plaintiffs' constitutional rights to fair trials under the Fifth and Fourteenth Amendments to the United States Constitution.

AS AND FOR A SEVENTH CLAIM FOR RELIEF
DENIAL OF  PROPERTY AND DUE PROCESS RIGHTS

454.     Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 453 above as if fully set forth hereat and incorporate them by reference.

455.     Defendants seized plaintiffs' bicycles and impounded them as "arrest evidence" and refused to release them until after the criminal proceedings against plaintiffs were terminated.

456.     Defendants refused to afford plaintiffs notice and an opportunity to be heard to challenge the seizures or retentions.

457.     Defendants' seizure and retention of plaintiffs' vehicles as "arrest evidence" without affording plaintiffs notice and an opportunity to be heard to challenge the seizures and retentions  violated plaintiffs' constitutional rights to enjoy their property and to due process under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

AS AND FOR AN EIGHTH CLAIM FOR RELIEF
SELECTIVE ENFORCEMENT

458.     Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 457 above as if fully set forth hereat and incorporate them by reference.

459.    Defendants' use of the parade permitting scheme, the New York State disorderly conduct statute, VTL § 1234, NYCAC § 16-122, and/or their powers to retain plaintiffs' bicycles against plaintiffs, but not others similarly situated, was invidiously discriminatory, malicious, purposeful, and/or arbitrary and capricious.

460.    Defendants' selective enforcement of the parade permitting scheme, the New York State disorderly conduct statute, VTL § 1234, NYCAC § 16-122, and/or their powers to retain plaintiffs' bicycles against plaintiffs violated plaintiffs' constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

461.    As a result of the foregoing, each plaintiff is entitled to compensatory damages in the sum of five million dollars ($5,000,000.00) and is further entitled to punitive damages against the individual defendants in the sum of five million dollars ($5,000,000.00).

WHEREFORE, each plaintiff demands the following relief jointly and severally against all of the defendants:

A.    An order requiring defendants to return to plaintiffs, or where necessary to expunge and/or destroy all records of fingerprints and other information taken in conjunction with plaintiffs' arrests, to remove from all records and databases and information systems maintained by defendants or their agents or partners any reference to plaintiffs' arrests, and to request that all law enforcement agencies and partners that have received such information destroy the same;

B.    Judgment in the sum of five million dollars ($5,000,000.00) in compensatory damages and five million dollars ($5,000,000.00) in punitive damages;

C.    An award of attorneys' fees and costs and disbursements; and

D.    Other such relief as this Court may deem just and proper.

RESPECTFULLY SUBMITTED,


_____/S/_____

ROSE M. WEBER (RW 0515)
225 Broadway, Suite 1607
New York, NY 10007
(212) 748-3355


_____/S/_____

GIDEON ORION OLIVER (GO 8799)
Of Counsel, Oliver & Oliver
c/o 200 E. 10th St. #917
New York, New York   10003
(646) 602-9242


_____/S/_____

DAVID B. RANKIN (DR 0863)
350 Broadway, Suite 700
New York, NY 10013
(212) 226-4507