UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHEILA CALLAGHAN, ARUN GUPTA, SCOTT
KERNS, VADIM NEWQUIST, JESSICA
RECHTSCHAFFER, WILLIAM SCHWARTZ,
ELIZABETH SHURA, WILLIAM TSU, JASON YEN,
THOMAS BONAMICI, BRADFORD CONOVER,
JOSHUA COTTON, SARAH HACKNEY, SALLY
NEWMAN, TERESA TORCHIANO, JAMESON
ROLLINS, JONATHAN BECK, REBECCA HEINEGG,
MADELINE NELSON, CAROLINE SAMPONARO,
MARK TAYLOR, BLUE MINER YOUNG,
CHRISTOPHER BLAND, TOMAS MELCHOR,
BARBARA ROSS, CHRISTOPHER RYAN, LISA
SHALOM, SARA STOUT, NEAL ALDRICH,
NICHOLAS BIRTH, CHRISTOPHER BLAND, MARK
DAVIS, KAREN DE GEORGE, ANDREW DZIJA,
BRONWYN FLEMING-JONES, TIMOTHY GAMBLE,
JEFFREY GANO, ZACHARY GELNAW-RUBIN,
NIALL HEFFERNAN, GWEN KASH, WILLIAM
LAVIANO, JULIETTE MOORE, GABRIEL PAGANO,
BENJAMIN BRODIE, LISA KOSLOWSKI, BEN
FOSTER, NAZGOL GHANDNOOSH, ELIZABETH
MERBITZ, JULIA ASHERMAN, HENRY BAKER,
TOBY LEAH BOCHAN, JOHN P. CARMAN, DAVID
CONNELLY, CLARA HENDRICKS, CAITLIN KRENN,
EVAN O'NEILL, JESSICA RECHTSCHAFFER,
TREVOR SNAPP, NEAL WEISSMAN, COREY
EASTWOOD, JOSHUA FISHER, KEVIN CAPLICKI,
BRANDON NEUBAUER, ESTHER REGELSON,
DANIEL VATSKY, PETER BERGIN, DEREK
KLEVITZ, WENDY SCHER, JARED KLETT, JULIANA
LUECKING, MATTHEW NAMER, EDWARD
TRISTRAM, MEG YOUNGER, JASON DETZEL, SARA
SCHEUFELE, SHARON BLYTHE, FLORINDO
TRONCELLITI, BRET LIEBENDORFER, ROBERT
MARTUS, LOUISA KRUPP, CHRISTOPHER LONG,
KELLY TISDALE, SCOTT CODEY, PETER NOAH,
BRION BONKOWSKI, YURI CANTOR, ALEXANDER
APPEL, RAHUL CHADHA, JONATHAN GOLDBERG,
ZOE MIZUHO, RACHEL STEIN, GWEN KASH, RYAN
NUCKEL, KAITLYN TIKKUN, SEAN BASINSKI,
KURT BRAUNOHLER, EVAN O'DONNELL, ERIN
MCADAMS, TIMOTHY SHEA, ALLESANDRO

THIRD AMENDED
COMPLAINT AND
DEMAND FOR JURY TRIAL

07-cv-9611 (PKC) (DFE)



POLLEX, NATALIE BELL, JEFFREY WENDT, NEIL FREEMAN, SARAH MATULIS, AMELIA CHAPPELLE, JOHN FLANIGAN, DANIEL KAHN GILLMOR, HARISHABD KHALSA, OBERT R. WOOD III, KENNETH M. COUGHLIN, JAMES B. KELLY, DANIEL TAINOW, LUKE PARSONS, SHANI PARSONS, MARK W. READ, ROBERT BARRETT, and JONATHAN DAVIS,

Plaintiffs,

-against-

THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT ("NYPD") COMMISSIONER RAYMOND KELLY, NYPD ASSISTANT CHIEF BRUCE SMOLKA, NYPD DISORDER CONTROL UNIT COMMANDER THOMAS GRAHAM, NYPD DEPUTY CHIEF STEPHEN PARAGALLO, NYPD DEPUTY INSPECTOR THERESA SHORTELL, NYPD CAPTAIN STEPHEN HUGHES, NYPD LEGAL BUREAU LIEUTENANT DANIEL ALBANO, NYPD LIEUTENANT JOSEPH CANECO, NYPD LIEUTENANT LOUIS TURCO, NYPD LIEUTENANT PATRICK STEFFENS, NYPD DISORDER CONTROL UNIT SERGEANT PHIL MCCABE, NYPD OFFICER FIRST NAME UNKNOWN ("FNU") DELLEVALLE, SHIELD #6830, NYPD OFFICER KENNETH WAGNER, SHIELD #28519, NYPD OFFICER JOHN WARREN, SHIELD #13763, NYPD OFFICER JOSEPH SCHINZ, SHIELD #21951, NYPD OFFICER RAYMOND NG, SHIELD #21793, NYPD OFFICER, ANTHONY DIFRANCESCA, SHIELD #4200, NYPD OFFICER "FNU" WOLF, SHIELD # UNKNOWN, CAUCASIAN FEMALE NYPD OFFICER FNU LAST NAME UNKNOWN, SHIELD # 22451, NYPD OFFICER "FNU" FURBUSH, NYPD OFFICER JUAN BERRIO, SHIELD #28430, NYPD OFFICER JOANN SPREEN, #19464, NYPD OFFICER JOSE TORRES, #11394, NYPD OFFICER JAMES ZAVALA, #05726, NYPD OFFICER ARTHUR CLARKE, #8001, NYPD OFFICER MICHAEL GERBASI, #20502, NYPD OFFICER CHARLES MURPHY, #31615, NYPD OFFICER JOSEPH WOODLEY, #12116, NYPD OFFICER PAUL ALBANO, #26129, NYPD OFFICER JORDAN MAZUR, #06497, NYPD OFFICER JAMELL KENDRICK, #28700, NYPD OFFICER HONMAN YAN, #31946, NYPD OFFICER

EUGENE HACKETT, #21155, NYPD OFFICER JOHN LUONGO, #00777, NYPD OFFICER MOHAMMAD ARYAKIA, #01705, NYPD OFFICER KATHLEEN CURNYN, #04318, NYPD OFFICER STEVEN VALENTINE, #13585, NYPD OFFICER "FNU" ACOSTA, #20660, NYPD OFFICER ANTHONY ANZALONE, #04699, NYPD OFFICER ERIC ALBRECHT, #15016, NYPD OFFICER BRENDA BACOTE, #00167, NYPD OFFICER SHUHEL SUBHAN, #240099, NYPD OFFICER LOUIS CHIACCHERI, #02786, NYPD OFFICER LISA RIDDICK, #11944, NYPD OFFICER CHICHOI BAO, #16456, NYPD OFFICER TAMAR USTER, #10517, NYPD OFFICER DIANA GAYO, #25146, NYPD OFFICER RICHARD LAVELLE, #2384, NYPD OFFICER MARLON GEORGE, #19193, NYPD OFFICER MARTIN GIMENEZ, #22916, NYPD OFFICER SANDRA DELEONMOYA, #27876, NYPD OFFICER GRAHAM EMBUREY, # 25748, NYPD OFFICER FNU CORDON, #25605, NYPD OFFICER JOSEPH JOHN, #2797, NYPD OFFICER DAVID HUNG, #19904, NYPD OFFICER SANTIAGO GOMEZ, #19288, NYPD OFFICER "FNU" O'DOUGHERTY, #13510, NYPD OFFICER DAVID POPLASKI, #15482, LIEUTENANT BARBARA FARLEY, 90th PRECINCT, NYPD OFFICER FNU DIAZ, #24459, NYPD OFFICER JOANN SPREEN, #19464, 1st PRECINCT, NYPD OFFICER VINCENT FIORE, #25517, 1st PRECINCT, NYPD OFFICER JOHN COYLE, #2031, 1st PRECINCT, NYPD OFFICER HONMAN YAN, #31945, 1st PRECINCT, NYPD OFFICER ARTHUR CLARKE, #80001, 1st PRECINCT, NYPD OFFICER ANTHONY SUSI, #31162, 1st PRECINCT, NYPD OFFICER EDDIE PEREZ, #22433, 1st PRECINCT, NYPD OFFICER DONALD GESSNER, #00261, 1st PRECINCT, NYPD OFFICER BENJAMIN BELLINGER, #25108, NYPD OFFICER FNU WALLACE, NYPD OFFICER MARC RICHARDSON, #21396, 103rd PRECINCT, NYPD OFFICER ROBERT STOKES, #18187, MANHATTAN NORTH, NYPD SERGEANT RICHARD JOHNSON, #00759, MANHATTAN NORTH, NYPD OFFICER EDWARD MARCIAL, #13689, 46th PRECINCT, NYPD OFFICER MARCY GARCIA, #17029, 1st PRECINCT, NYPD OFFICER VINCENT GALLO, #19958, 1st PRECINCT, NYPD OFFICER WILLIAM GROSS, #26890, 1st PRECINCT, NYPD OFFICER LEO NUGENT, #11654,

NYPD OFFICER STEVEN VALENTINE, #13585, NYPD OFFICER ABRAHAM ARTEAGA, #27115, 75th PRECINCT, LIEUTENANT ROBERT POLLASTRO, 1st PRECINCT, NYPD OFFICER JOHN MCGOWAN, #13466, 1st PRECINCT, NYPD OFFICER VINCENT GALLO, #19958, 1st PRECINCT, NYPD OFFICER LISA RODRIGUEZ, #8788, NYPD OFFICER DAVID SZABOLCS, #12180, MANHATTAN SOUTH TASK FORCE, NYPD OFFICER "FNU" WALLACE, #1194, NYPD OFFICER STEVEN VALENTINE, #13585, MANHATTAN SOUTH TASK FORCE, NYPD OFFICER BRENDAN BEYRER, #18723, 52nd PRECINCT, NYPD OFFICER JOSEPH CASTRO, #05318, 44th PRECINCT, NYPD OFFICER DANIEL GROTH, #23788, NYPD OFFICER KEITH FOSTER, #08578, 40th PRECINCT, NYPD OFFICER EDDIE PEREZ, #22433, 1st PRECINCT, NYPD OFFICER VINCENT GALLO, #19958, NYPD OFFICER JOHN COYLE, #20321, 1st PRECINCT, NYPD OFFICER JAMELL KENDRICK, #38700, 1st PRECINCT, NYPD OFFICER KENNETH WAGNER, #28519, 1st PRECINCT, NYPD OFFICER NAIM IBROCI, #24725, MANHATTAN SOUTH TASK FORCE, NYPD OFFICER WILLIAM GRODNICK, #04729, NYPD OFFICER JAMES BRUNACHE, 83rd PRECINCT, NYPD OFFICER CHRISTOP TIMM, #06338, 113th PRECINCT, NYPD OFFICER SANDY GONZALEZ, #22997, NYPD OFFICER ALBERTO CORNEA, #06487, MANHATTAN NORTH, NYPD OFFICER HONMAN YAN, #31946, NYPD OFFICER RICARDO WYMAN, #27066, NYPD OFFICER JOANN SPREEN, #19464, 1st PRECINCT, NYPD OFFICER FREDERIC PINEDA, #08502, 46th PRECINCT, NYPD OFFICER JOHN COYLE, #20321, 1st PRECINCT, NYPD OFFICER NEIL RODRIGUEZ, #21015, MANHATTAN SOUTH TASK FORCE, ANTHONY DIFRANCESCA, #04200, 1st PRECINCT, NYPD SUPERVISORS AND COMMANDERS RICHARD AND MARY ROES 1-50, NYPD OFFICERS JOHN AND JULIE DOES 1-50, individually and in their official capacities, jointly and severally, (the names John and Jane Doe, as well as Richard and Mary Roe, being fictitious, as the true names of these defendants are presently unknown),

Defendants.

4

Plaintiffs SHEILA CALLAGHAN, ARUN GUPTA, SCOTT KERNS, VADIM NEWQUIST, JESSICA RECHTSCHAFFER, WILLIAM SCHWARTZ, ELIZABETH SHURA, WILLIAM TSU, JASON YEN, THOMAS BONAMICI, BRADFORD CONOVER, JOSHUA COTTON, SARAH HACKNEY, SALLY NEWMAN, TERESA TORCHIANO, JAMESON ROLLINS, JONATHAN BECK, REBECCA HEINEGG, MADELINE NELSON, CAROLINE SAMPONARO, MARK TAYLOR, BLUE MINER YOUNG, CHRISTOPHER BLAND, TOMAS MELCHOR, BARBARA ROSS, CHRISTOPHER RYAN, LISA SHALOM, SARA STOUT, NEAL ALDRICH, NICHOLAS BIRTH, CHRISTOPHER BLAND, MARK DAVIS, KAREN DE GEORGE, ANDREW DZIJA, BRONWYN FLEMING-JONES, TIMOTHY GAMBLE, JEFFREY GANO, ZACHARY GELNAW-RUBIN, NIALL HEFFERNAN, GWEN KASH, WILLIAM LAVIANO, JULIETTE MOORE, GABRIEL PAGANO, BENJAMIN BRODIE, LISA KOSLOWSKI, BEN FOSTER, NAZGOL GHANDNOOSH, ELIZABETH MERBITZ, JULIA ASHERMAN, HENRY BAKER, TOBY LEAH BOCHAN, JOHN P. CARMAN, DAVID CONNELLY, CLARA HENDRICKS, CAITLIN KRENN, EVAN O'NEILL, JESSICA RECHTSCHAFFER, TREVOR SNAPP, NEAL WEISSMAN, COREY EASTWOOD, JOSHUA FISHER, KEVIN CAPLICKI, BRANDON NEUBAUER, ESTHER REGELSON, DANIEL VATSKY, PETER BERGIN, DEREK KLEVITZ, WENDY SCHER, JARED KLETT, JULIANA LUECKING, MATTHEW NAMER, EDWARD TRISTRAM, MEG YOUNGER, JASON DETZEL, SARA SCHEUFELE, SHARON BLYTHE, FLORINDO TRONCELLITI, BRET LIEBENDORFER, ROBERT MARTUS, LOUISA KRUPP, CHRISTOPHER LONG, KELLY TISDALE, SCOTT CODEY, PETER NOAH, BRION BONKOWSKI, YURI CANTOR, ALEXANDER APPEL, RAHUL CHADHA, JONATHAN

GOLDBERG, ZOE MIZUHO, RACHEL STEIN, GWEN KASH, RYAN NUCKEL, KAITLYN TIKKUN, SEAN BASINSKI, KURT BRAUNOHLER, EVAN O'DONNELL, ERIN MCADAMS, TIMOTHY SHEA, ALLESANDRO POLLEX, NATALIE BELL, JEFFREY WENDT, NEIL FREEMAN, SARAH MATULIS, AMELIA CHAPPELLE, JOHN FLANIGAN, DANIEL KAHN GILLMOR, HARISHABD KHALSA, OBERT R. WOOD III, KENNETH M. COUGHLIN, JAMES B. KELLY, DANIEL TAINOW, LUKE PARSONS, SHANI PARSONS, MARK W. READ, ROBERT BARRETT, and JONATHAN DAVIS, by their attorneys, Rose M. Weber, Esq., Gideon Orion Oliver, Esq., and David B. Rankin, Esq., complaining of defendants, respectfully allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action for compensatory damages, punitive damages, and attorneys' fees pursuant to 42 USC §§ 1983 and 1988 for violations of their civil rights, as said rights are secured by said statutes and the Constitutions of the United States and the State of New York.

## JURISDICTION

2.      This action is brought pursuant to 42 USC §§ 1983 and 1988 and the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

3.      Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343,

## VENUE

4.      Venue is properly laid in the Southern District of New York under 28 USC § 1391(b) in that this is the District in which the claims arose.

## JURY DEMAND

5.      Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

PARTIES

6.      Plaintiff SHEILA CALLAGHAN is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

7.      Plaintiff ARUN GUPTA is an Asian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

8.      Plaintiff SCOTT KERNS is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

9.      Plaintiff VADIM NEWQUIST is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

10.     Plaintiff JESSICA RECHTSCHAFFER is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

11.     Plaintiff WILLIAM SCHWARTZ is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

12.     Plaintiff ELIZABETH SHURA is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

13.     Plaintiff WILLIAM TSU is an Asian male and at all relevant times a resident of the City and State of New York.

14.     Plaintiff JASON YEN is an Asian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

15.     Plaintiff THOMAS BONAMICI is a caucasian male, a citizen of the United States.

16.     Plaintiff BRADFORD CONOVER is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

17.     Plaintiff JOSHUA COTTON is a caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

18.     Plaintiff SARAH HACKNEY is a caucasian female and a citizen of the United States.

19.     Plaintiff SALLY NEWMAN is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

20.     Plaintiff TERESA TORCHIANO is a caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

21.     Plaintiff JAMESON ROLLINS is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

22.     Plaintiff JONATHAN BECK is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

23.     Plaintiff CHRISTOPHER BLAND is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

24.     Plaintiff REBECCA HEINEGG is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

25.     Plaintiff TOMAS MELCHOR is a Latino male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

26.     Plaintiff MADELINE NELSON is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

8

27.     Plaintiff BARBARA ROSS is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

28.     Plaintiff CHRIS RYAN is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

29.     Plaintiff CAROLINE SAMPONARO is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

30.     Plaintiff LISA SHALOM is a Caucasian female and a citizen of Canada.

31.     Plaintiff SARA STOUT is a Caucasian female and a citizen of the United States.

32.     Plaintiff MARK TAYLOR is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

33.     Plaintiff BLUE MINER YOUNG is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

34.     Plaintiff NEAL ALDRICH is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

35.     Plaintiff NICHOLAS BIRTH is a Caucasian male and a citizen of the United States.

36.     Plaintiff BENJAMIN BRODIE is a Caucasian male and a citizen of the United States.

37.     Plaintiff MARK DAVIS is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

38.     Plaintiff KAREN DE GEORGE is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

39.     Plaintiff ANDREW DZIJA is a Caucasian male and a citizen of the United States.

40.     Plaintiff BRONWYN FLEMING-JONES is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

41.     Plaintiff TIMOTHY GAMBLE is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

42.     Plaintiff JEFFREY GANO is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

43.     Plaintiff ZACHARY GELNAW-RUBIN is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

44.     Plaintiff NIALL HEFFERNAN is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

45.     Plaintiff GWEN KASH is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

46.     Plaintiff WILLIAM LAVIANO is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

47.     Plaintiff JULIETTE MOORE is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

48.     Plaintiff GABRIEL PAGANO is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

49.     Plaintiff BENJAMIN BRODIE is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

50.     Plaintiff LISA KOZLOWSKI is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

51.     Plaintiff BEN FORSTER is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

52.     Plaintiff NAZGOL GHANDNOOSH is a female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

53.     Plaintiff ELIZABETH MERBITZ is a female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

54.     Plaintiff JULIA ASHERMAN is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

55.     Plaintiff HENRY BAKER is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

56.     Plaintiff TOBY LEAH BOCHAN is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

57.     Plaintiff JOHN P. CARMAN is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the State of Massachusetts.

58.     Plaintiff DAVID CONNELLY is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the State of Massachusetts.

59.     Plaintiff CLARA HENDRICKS is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the State of Massachusetts.

60.     Plaintiff CAITLIN KRENN is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

61.     Plaintiff EVAN O'NEILL is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

62.     Plaintiff TREVOR SNAPP is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

63.     Plaintiff NEAL WEISSMAN is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

64.     Plaintiff COREY EASTWOOD is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

65.     Plaintiff JOSHUA FISHER is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

66.     Plaintiff KEVIN CAPLICKI is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

67.     Plaintiff BRANDON NEUBAUER is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

68.     Plaintiff ESTHER REGELSON is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

69.     Plaintiff DANIEL VATSKY is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

70.     Plaintiff PETER BERGIN is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

71.     Plaintiff DEREK KLEVITZ is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

72.     Plaintiff WENDY SCHER is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

12

73.     Plaintiff JARED KLETT is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

74.     Plaintiff JULIANA LUECKING is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

75.     Plaintiff MATTHEW NAMER is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

76.     Plaintiff EDWARD TRISTRAM is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

77.     Plaintiff MEG YOUNGER is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

78.     Plaintiff JASON DETZEL is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

79.     Plaintiff SARA SCHEUFELE is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

80.     Plaintiff SHARON BLYTHE is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

81.     Plaintiff FLORINDO TRONCELLITI is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

82.     Plaintiff BRET LIEBENDORFER is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

83.     Plaintiff ROBERT MARTUS is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

84.    Plaintiff LOUISA KRUPP is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

85.    Plaintiff CHRISTOPHER LONG is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

86.    Plaintiff KELLY TISDALE is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

87.    Plaintiff SCOTT CODEY is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

88.    Plaintiff PETER NOAH is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

89.    Plaintiff BRION BONKOWSKI is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

90.    Plaintiff YURI CANTOR is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

91.    Plaintiff ALEXANDER APPEL is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

92.    Plaintiff RAHUL CHADHA is a male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

93.    Plaintiff JONATHAN GOLDBERG is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

94.    Plaintiff ZOE MIZUHO is a female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

95.     Plaintiff RACHEL STEIN is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

96.     Plaintiff GWEN KASH is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

97.     Plaintiff RYAN NUCKEL is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

98.     Plaintiff KAITLYN TIKKUN is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

99.     Plaintiff SEAN BASINSKI is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

100.    Plaintiff KURT BRAUNOHLER is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

101.    Plaintiff EVAN O'DONNELL is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

102.    Plaintiff ERIN MCADAMS is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

103.    Plaintiff TIMOTHY SHEA is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

104.    Plaintiff ALLESANDRO POLLEX is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

105.    Plaintiff NATALIE BELL is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

15

106.    Plaintiff JEFFREY WENDT is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

107.    Plaintiff NEIL FREEMAN is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

108.    Plaintiff SARAH MATULIS is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

109.    Plaintiff AMELIA CHAPPELLE is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

110.    Plaintiff JOHN FLANIGAN is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

111.    Plaintiff DANIEL KAHN GILLMOR is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

112.    Plaintiff HARISHABD KHALSA is a citizen of the United States, and at all relevant times a resident of the City and State of New York.

113.    Plaintiff OBERT R. WOOD III is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

114.    Plaintiff KENNETH M. COUGHLIN is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

115.    Plaintiff JAMES B. KELLY is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

116.    Plaintiff DANIEL TAINOW is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

117.    Plaintiff LUKE PARSONS is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

118.    Plaintiff SHANI PARSONS is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

119.    Plaintiff MARK W. READ is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

120.    Plaintiff ROBERT BARRETT is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

121.    Plaintiff JONATHAN DAVIS is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

122.    Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

123.    At all times relevant herein, as set forth more fully below, defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

124.    Each individual defendant is sued in her or his individual and official capacities.

125.    Defendant THE CITY OF NEW YORK ("NYC" or "the City") is a municipal entity created and authorized under the laws of the State of New York, with general offices located at City Hall, New York, New York  10007.  NYC is authorized by law to maintain the New York City Police Department ("NYPD"), which acts as its agent in the area of law

enforcement, and defendant NYC is ultimately responsible for the NYPD and assumes the risks incidental to the maintenance of it and its employees.

126.    At all times relevant herein, defendant RAYMOND KELLY was the NYPD Commissioner and its chief policymaking official, defendant BRUCE H. SMOLKA was the Assistant Chief of NYPD Patrol Boro Manhattan South, defendant THOMAS GRAHAM was the Commander of the NYPD Disorder Control Unit, defendant STEPHEN PARAGALLO was a Deputy Chief within the NYPD, defendant THERESA SHORTELL was a Deputy Inspector within the NYPD, defendant STEPHEN HUGHES was a Captain within the NYPD, defendant PATRICK STEFFENS was a Sergeant, and then Lieutenant, who drove and otherwise assisted defendant Paragallo, defendant LOUIS TURCO was a Lieutenant within the NYPD who headed its First Precinct Scooter Task Force, defendant DANIEL ALBANO was a Lieutenant in the NYPD Legal Bureau, defendant JOSEPH CANECO was a NYPD Lieutenant, and defendant PHIL MCCABE was a Sergeant with the NYPD Disorder Control Unit, and these defendants were each and all supervisors and high-level NYPD policymaking officials personally involved in depriving plaintiffs of their rights and/or in developing and/or implementing the unconstitutional policies, practices, customs and/or conduct complained of herein.

127.    At all times relevant herein, defendants NYPD OFFICER FIRST NAME UNKNOWN ("FNU") DELLEVALLE, SHIELD #6830, NYPD OFFICER KENNETH WAGNER, SHIELD #28519, NYPD OFFICER JOHN WARREN, SHIELD #13763, NYPD OFFICER JOSEPH SCHINZ, SHIELD #21951, NYPD OFFICER "FNU" FURBUSH, NYPD OFFICER JUAN BERRIO, SHIELD #28430,  NYPD OFFICER RAYMOND NG, SHIELD #21793, NYPD OFFICER ANTHONY DIFRANCESCA, SHIELD #4200, NYPD OFFICER "FNU" WOLF, SHIELD # UNKNOWN, CAUCASIAN FEMALE NYPD OFFICER FNU

LAST NAME UNKNOWN, SHIELD # 22451, NYPD OFFICER JOANN SPREEN, #19464, NYPD OFFICER JOSE TORRES, #11394, NYPD OFFICER JAMES ZAVALA, #05726, NYPD OFFICER ARTHUR CLARKE, #8001, NYPD OFFICER MICHAEL GERBASI, #20502, NYPD OFFICER CHARLES MURPHY, #31615, NYPD OFFICER JOSEPH WOODLEY, #12116, NYPD OFFICER PAUL ALBANO, #26129, NYPD OFFICER JORDAN MAZUR, #06497, NYPD OFFICER JAMELL KENDRICK, #28700, NYPD OFFICER HONMAN YAN, #31946, NYPD OFFICER EUGENE HACKETT, #21155, NYPD OFFICER JOHN LUONGO, #00777, NYPD OFFICER MOHAMMAD ARYAKIA, #01705, NYPD OFFICER KATHLEEN CURNYN, #04318, NYPD OFFICER STEVEN VALENTINE, #13585, NYPD OFFICER "FNU" ACOSTA, #20660, NYPD OFFICER ANTHONY ANZALONE, #04699, NYPD OFFICER ERIC ALBRECHT, #15016, NYPD OFFICER BRENDA BACOTE, #00167, NYPD OFFICER SHUHEL SUBHAN, #240099, and NYPD OFFICER LOUIS CHIACCHERI, #02786, NYPD OFFICER LISA RIDDICK, #11944, NYPD OFFICER CHICHOI BAO, #16456, NYPD OFFICER TAMAR USTER, #10517, NYPD OFFICER DIANA GAYO, #25146, NYPD OFFICER RICHARD LAVELLE, #2384, NYPD OFFICER MARLON GEORGE, #19193, NYPD OFFICER MARTIN GIMENEZ, #22916, NYPD OFFICER SANDRA DELEONMOYA, #27876, NYPD OFFICER GRAHAM EMBUREY, # 25748, NYPD OFFICER FNU CORDON, #25605, NYPD OFFICER JOSEPH JOHN, #2797, NYPD OFFICER DAVID HUNG, #19904, NYPD OFFICER SANTIAGO GOMEZ, #19288, NYPD OFFICER "FNU" O'DOUGHERTY, #13510, NYPD OFFICER DAVID POPLASKI, #15482, LIEUTENANT BARBARA FARLEY, 90th PRECINCT, NYPD OFFICER FNU DIAZ, #24459, NYPD OFFICER JOANN SPREEN, #19464, 1st PRECINCT, NYPD OFFICER VINCENT FIORE, #25517, 1st PRECINCT, NYPD OFFICER JOHN COYLE, #2031, 1st

PRECINCT, NYPD OFFICER HONMAN YAN, #31945, 1st PRECINCT, NYPD OFFICER ARTHUR CLARKE, #80001, 1st PRECINCT, NYPD OFFICER ANTHONY SUSI, #31162, 1st PRECINCT, NYPD OFFICER EDDIE PEREZ, #22433, 1st PRECINCT, NYPD OFFICER DONALD GESSNER, #00261, 1st PRECINCT,  NYPD OFFICER BENJAMIN BELLINGER, #25108, NYPD OFFICER FNU WALLACE, NYPD OFFICER MARC RICHARDSON, #21396, 103rd PRECINCT, NYPD OFFICER ROBERT STOKES, #18187, MANHATTAN NORTH, NYPD SERGEANT RICHARD JOHNSON, #00759, MANHATTAN NORTH,NYPD OFFICER EDWARD MARCIAL, #13689, 46th PRECINCT, NYPD OFFICER MARCY GARCIA, #17029, 1st PRECINCT, NYPD OFFICER VINCENT GALLO, #19958, 1st PRECINCT, NYPD OFFICER WILLIAM GROSS, #26890, 1st PRECINCT, NYPD OFFICER LEO NUGENT, #11654, NYPD OFFICER STEVEN VALENTINE, #13585, NYPD OFFICER ABRAHAM ARTEAGA, #27115, 75th PRECINCT, LIEUTENANT ROBERT POLLASTRO, 1st PRECINCT, NYPD OFFICER JOHN MCGOWAN, #13466, 1st PRECINCT, NYPD OFFICER VINCENT GALLO, #19958, 1st PRECINCT, NYPD OFFICER LISA RODRIGUEZ, #8788, NYPD OFFICER DAVID SZABOLCS, #12180, MANHATTAN SOUTH TASK FORCE, NYPD OFFICER  "FNU" WALLACE, #1194, NYPD OFFICER  STEVEN VALENTINE, #13585, MANHATTAN SOUTH TASK FORCE, NYPD OFFICER  BRENDAN BEYRER, #18723, 52nd PRECINCT, NYPD OFFICER  JOSEPH CASTRO, #05318, 44th PRECINCT, NYPD OFFICER DANIEL GROTH, #23788, NYPD OFFICER  KEITH FOSTER, #08578, 40th PRECINCT, NYPD OFFICER EDDIE PEREZ, #22433, 1st PRECINCT, NYPD OFFICER  VINCENT GALLO, #19958, NYPD OFFICER JOHN COYLE, #20321, 1st PRECINCT, NYPD OFFICER JAMELL KENDRICK, #38700, 1st PRECINCT, NYPD OFFICER KENNETH WAGNER, #28519, 1st PRECINCT, NYPD OFFICER NAIM IBROCI,

#24725, MANHATTAN SOUTH TASK FORCE, NYPD OFFICER WILLIAM GRODNICK, #04729, NYPD OFFICER JAMES BRUNACHE, 83rd PRECINCT, NYPD OFFICER CHRISTOP TIMM, #06338, 113th PRECINCT, NYPD OFFICER SANDY GONZALEZ, #22997, NYPD OFFICER ALBERTO CORNEA, #06487, MANHATTAN NORTH, NYPD OFFICER HONMAN YAN, #31946, NYPD OFFICER RICARDO WYMAN, #27066, NYPD OFFICER JOANN SPREEN, #19464, 1st PRECINCT, NYPD OFFICER FREDERIC PINEDA, #08502, 46th PRECINCT, NYPD OFFICER JOHN COYLE, #20321, 1st PRECINCT, NYPD OFFICER NEIL RODRIGUEZ, #21015, MANHATTAN SOUTH TASK FORCE, ANTHONY DIFRANCESCA, #04200, 1st PRECINCT, NYPD SUPERVISORS AND COMMANDERS RICHARD AND MARY ROES 1-50, and NYPD OFFICERS JOHN AND JULIE DOES 1-50 were each and all personally involved in depriving plaintiffs of their rights and in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below.

128.    At all times relevant herein, as set forth more fully below, defendant NYC had *de facto* policies, practices, customs and usages of failing properly to train, screen, supervise, and discipline agents, employees, and police officers, and of failing to inform the individual defendants and their supervisors of their need to train, screen, supervise or discipline said defendants, which were a direct and proximate cause of the unconstitutional conduct alleged herein and the damages attendant thereto.

129.    At all times relevant herein, defendants were duly sworn police officers of the NYPD and were acting under the supervision of said department and according to their official duties.

21

130.    At all times relevant herein, defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

131.    Each and all of the acts of defendants alleged herein were done by said defendants while acting within the scope of and in furtherance of their employment by defendant THE CITY OF NEW YORK.

FACTS

132.    Critical Mass is a bicycle riding phenomenon that occurs in hundreds of major cities worldwide the last Friday of every month.

133.    Manhattan Critical Mass bicycle rides began in the early 1990's and have occurred on the last Friday of every month since.

134.    Cyclists who wish to participate in the rides have been congregating at Union Square Park at 7:00 PM on the last Friday of every month for at least the past approximately five years.

135.    Upon information and belief, between 1994 and approximately August of 2004, the NYPD regularly escorted and/or otherwise facilitated and/or acquiesced in the monthly rides, including by blocking traffic at intersections and ushering riders through red lights.

136.    Upon information and belief, NYPD's actions created a situation wherein riders in Critical Mass bicycle rides came to believe that it was NYPD's desire the ride remain together, even if that involved blocking intersections and riding through red lights.

137.    Upon information and belief, Critical Mass bicycle rides were approximately the same size in the summer of 2003 as they were in the summer of 2004 prior to the RNC, which is to say, numbering at times in the thousands.

138.    After defendant Smolka was promoted in April of 2004, he became involved with planning the NYPD's police response to future rides, in connection with which he made arrangements for the use of orange nets as well as NYPD scooters and other marked and unmarked police vehicles for crowd control and mass arrest purposes.

139.    Upon information and belief, at all times relevant herein, defendants Kelly, Smolka, Graham, Paragallo, Shortell, Hughes, Steffens, Turco, Caneco, Albano, and McCabe cooperated to develop, design, implement, and supervise the implementation of the procedures, policies, regulations, practices and/or customs of the NYPD about which plaintiffs complain.

140.    Defendants designed and implemented policies, practices or customs of indiscriminately arresting without just or probable cause groups of people who were peacefully assembled, and who were either participating in, supporting, observing, or in the vicinity of demonstrations and protests, including Critical Mass bicycle rides, and by selectively enforcing "quality of life" violations, including purported traffic rules, with the purpose and effect of deterring participation in Critical Mass bicycle rides.

141.    In anticipation of the RNC and beginning in as early as approximately 2003, defendants gathered intelligence regarding the activities and possible plans of potential demonstrators, including potential participants in Critical Mass bicycle rides, and developed plans: to arrest participants on the August 27, 2004 ride in Manhattan for, *inter alia*, riding their bicycles "*en masse*" or more than two abreast, to prosecute them for violating the parade permitting scheme and committing disorderly conduct, to assign officers who had not observed plaintiffs engage in unlawful conduct to process their arrests and sign criminal court complaints charging them with violations based on false allegations that plaintiffs were observed engaging in unlawful conduct, to seize and voucher their bicycles as "arrest evidence" and to refuse to

release plaintiffs' bicycles until the criminal proceedings against them were terminated, and to falsify and/or withhold evidence in connection with those criminal proceedings.

142.    Defendants' indiscriminate mass arrest policy refined tactics employed by the defendants at other recent demonstrations in the City, including, *inter alia*, the February 15, 2003 protest against the war which is the subject of <u>Haus, et al. v. City of New York, et al.</u>, 03 Civ. 4915 (RWS), the April 7, 2003 protest against the Carlyle Group which is the subject of <u>Larsen, et al. v. City of New York, et al.</u>, 04 Civ. 665 (RWS), and protests against the Republican National Convention ("RNC") in 2004 in which mass arrests were used to unlawfully suppress conduct protected by the First Amendment, which are the subject of scores of ongoing lawsuits.

143.    Defendants' policies of mass arrests, processing, and prosecutions about which plaintiffs complain feature the:

(a) Use of orange netting, lines of police officers and lines of police bicycles or scooters to corral and essentially trap groups of people who were engaging, or were perceived by the NYPD as associated with, Critical Mass bicycle rides;

(b) Failure to distinguish bystanders, media personnel and legal observers from groups of corralled or trapped people prior to effecting arrests;

(c) Failure to advise prospective arrestees who were behaving in a peaceful and non-violent manner that they were in violation of any law or ordinance;

(d) Failure to give dispersal orders that, if given at all, were audible to all prospective arrestees;

(e) Failure to provide a reasonable opportunity to disperse, including actively preventing people who wanted to disperse from leaving;

(f) Practice of assigning one "arresting" officer to swear out criminal court paperwork alleging that she or he had personally observed multiple arrestees each engage in specific conduct, regardless of whether the officer had seen any of them prior to their arrest or had even been present at the scene when the decision to arrest was made or aware of the name of the supervisor who made the decision;

(g) Practice of requiring review by NYPD Legal Bureau and/or other personnel of arresting/assigned officers' paperwork before it was shown to the District Attorney's office for the purpose of insuring that the narratives in the criminal court paperwork would appear facially sufficient despite the attesting officers' lack of personal knowledge, resulting in boilerplate allegations which routinely overstated the attesting officers' personal knowledge;

(h) Practice of having arresting officers sign police complaints and swear to criminal court complaints falsely attesting they had witnessed arrestees engaging in conduct that provided a basis for the alleged probable cause when the officers, in fact, lacked personal knowledge of the arrestees' conduct; and

(i) Selective enforcement of the vague, overbroad, and strict liability parade permitting scheme, the New York State disorderly conduct statute, New York City Administrative Code ("NYCAC") § 16-122, New York State Vehicle and Traffic Law ("VTL") § 1234, and other regulations including, but not limited to, traffic infractions under the VTL and/or the Rules of the City of New York ("RCNY") to criminalize perceived participation in, or proximity to, Critical Mass bicycle rides.

144.  In designing and implementing these policies, procedures, and practices, defendants knew or should have known that participation in Critical Mass bicycle rides was protected by the First Amendment.

145.  In designing and implementing these policies, procedures, and practices, defendants knew or should have known that the use of police vehicles against peaceful perceived demonstrators as a means of crowd control was an unreasonable use of force and lacked narrow tailoring as a means of regulating participation in Critical Mass bicycle rides or associating for that perceived purpose.

146.  In designing and implementing these policies, procedures, and practices, defendants knew or should have known that their plans to apply the parade permitting scheme and the New York State disorderly conduct statute to criminalize perceived participation in Critical Mass bicycle rides or lawful activities associated with them were unconstitutional.

147.  In designing and implementing these policies, procedures, and practices, defendants knew or should have known that their use of nets and police vehicles to trap peaceful perceived participants in Critical Mass bicycle rides, and the seizures of bicycles either attendant to arrest or as allegedly "abandoned" property, would result in unlawful arrests, malicious prosecutions, unwarranted property deprivations, and cast a chilling effect on protected conduct.

148.  Defendants Kelly, Smolka, Graham, Paragallo, Steffens, Turco, Albano, and Caneco were each and all personally involved in making strategic and command and control – including arrest – decisions in connection with plaintiffs' arrests.

149.  Defendants Kelly, Smolka, Graham, Paragallo, Shortell, Hughes, Steffens, Turco, Albano, Caneco, and McCabe were personally involved in arresting plaintiffs or supervising plaintiffs' arrests and their processings and/or prosecutions, and/or they were advised of the

circumstances surrounding plaintiffs' arrests and aware of the status of their prosecutions. Defendant Albano assisted other defendants in filling out paperwork regarding plaintiffs' arrests or supervised other NYPD Legal Bureau officers who did so.

150.    On August 27, 2004 - the eve of the 2004 RNC in New York – approximately 5,000 cyclists participated in the Critical Mass ride, and NYPD officers arrested approximately 264 people they believed were associated with the ride.

151.    Defendant Smolka personally instructed NYPD officers under his command to arrest participants "for parading or taking part in a procession without a permit."

152.    Upon information and belief, the majority of those 264 people were subsequently charged with parading without a permit in violation of NYCAC § 10-110(c) and committing disorderly conduct New York State Penal Law ("PL") §§ 240.20(5) and/or (6).

153.    Upon information and belief, on or about September 22, 2004, the NYPD put up a "Statement Concerning Possible Bicyclist Event on 9/24" and a set of "Reminders to Bicyclists in the Five Boroughs" on its website stating, *inter alia*, that bicyclists must not ride more than two abreast.

154.    Upon information and belief, the source of those portions of the "Reminders" was VTL § 1234, which has no effect whatsoever in the City of New York, as it has been specifically superseded by rules of the New York City Department of Transportation ("NYCDOT") pursuant to VTL § 1642 and the relevant provisions of the NYCDOT rules.

155.    Nothing in the NYCDOT rules prohibits bicyclists from riding more than two abreast.

156.    The September 24, 2004 Critical Mass ride drew approximately 1,200 participants to Union Square Park.

157.    As potential participants assembled in Union Square Park, the NYPD circulated a flyer threatening bicyclists with arrest, *inter alia*, if they participated in an unpermitted procession or rode more than two abreast.

158.    Defendant Smolka negotiated an on-the-spot route for cyclists who wished to participate in the ride that evening based on a conversation he had with a single attorney, which defendant Smolka considered effectively the same thing as a permit.

159.    Although there were over a thousand people gathered in Union Square Park, defendant Smolka only conveyed the route he had proposed to a single attorney, the NYPD provided cyclists with no written flyers describing its proposed route, and made no bullhorn or loudspeaker announcements proposing that such a route exist, let alone setting the course it was to take.

160.    Nevertheless, police officers escorted the ride along the route defendant Smolka had proposed and did their best to facilitate the ride by blocking traffic and/or waving cyclists through intersections at which the traffic lights were red.

161.    At some point, a group of riders turned east on 36th Street from Fifth Avenue, thereby moving beyond the route defendant Smolka had proposed.  Moments later, a phalanx of police officers on scooters interdicted the 36th Street riders between Fifth and Sixth Avenues.

162.    According to defendant Smolka, the NYPD had only been escorting and providing assistance to those who were following his proposed route, when cyclists diverted from it, they would have been parading without a permit at certain points, possibly, even if they obeyed all traffic laws.

163.    The NYPD made nine arrests, allegedly because those arrestees were participating in an unpermitted event.

164.    The lawsuit underlying <u>Bray v. New York City</u>, 346 F.Supp.2d 480 (S.D.N.Y., October 28, 2004) was filed on October 20, 2004 on behalf of five individuals whose bicycles the NYPD had seized as allegedly abandoned property under the purported authority of New York City Administrative Code § 16-122 in connection with the September Critical Mass bicycle ride although they were not charged with any crime or violation of law.

165.    On October 25, 2004, the City counterclaimed for a reverse class action and moved to enjoin preliminarily the five individual plaintiffs and others with notice from participating in the October 29, 2004 Critical Mass bicycle ride and subsequent Critical Mass events unless parade permits were issued by the Police Department.

166.    The parties appeared for a hearing before United States District Court Judge Hon. William H. Pauley III on October 27, 2004 at which the City admitted that VTL § 1234 had no application in the City of New York.

167.    On October 28, 2004, Judge Pauley denied the City's application for a preliminary injunction as barred by the doctrine of *laches* and because it raised the need to adjudicate novel and complex state law issues, primarily concerning the lawfulness of applying the parade permitting scheme to Manhattan Critical Mass rides.

168.    On October 28, 2004, the New York Daily News published an article by defendant Kelly entitled "BE OUR GUEST: Extremists have hijacked the bike rides," in which defendant Kelly stated: "Now that Critical Mass has identified itself as an interested party, the Police Department has called on it to seek a permit if it intends to continue to use the rides in a way that puts so many in jeopardy. Otherwise, each and every participant is expected to obey the law or be subject to arrest. That includes observing traffic signals and riding in the curb lane no more than two abreast."

169.    Because of the Court's involvement, the NYPD agreed to unilaterally propose a route for cyclists to follow during the October 29, 2004 Critical Mass ride.

170.    Upon information and belief, on October 28 or 29, 2004, defendants, including Kelly, Smolka, Graham, Albano, and Caneco, devised such a route and otherwise developed a plan to police the October 29, 2004 Critical Mass ride in light of the Court's decision.

171.    The route that was proposed was for the bicyclists to gather in Union Square Park, ride northbound from Union Square Park along Park Avenue to 55th Street, ride east on 55th Street to Fifth Avenue, ride south on Fifth Avenue to 23rd Street, and at 23rd Street ride south along Broadway to Union Square Park where the riders would disperse.

## THE OCTOBER 29, 2004 ARRESTS

172.    On the evening of October 29, 2004, cyclists began to congregate in Union Square at approximately 7:00 PM.  The NYPD unilaterally proposed a route by distributing a flyer describing the route and, *inter alia*, threatening bicyclists with arrest if they rode more than two abreast, and broadcasting its contents from an amplified sound truck.

173.    The NYPD deployed several hundred police personnel in connection with policing the October 29, 2004 Critical Mass ride pursuant to a request for such a detail penned by defendant Smolka.

174.    Defendant Smolka told his subordinates that if cyclists deviated from the NYPD's proposed route, they could be arrested.

175.    For the first thirty minutes of the ride, the majority of cyclists followed the designated route.

176.    Police officers regularly stopped cross-town traffic to ensure the safety of the participants.  In addition, officers were present at the back of the group to ensure that cars that were behind the cyclists would remain at a safe distance behind the riders.

177.    Just after 8:00 PM, some cyclists deviated from the proposed route by turning right from Fifth Avenue onto 39th Street.

178.    At approximately Madison Square Park on 25th Street, where Broadway and 5th Avenue merge, the NYPD's route directed cyclists to proceed south on Broadway to Union Square.

179.    However, NYPD officers stretched orange mesh netting across 5th Avenue to Broadway and directed cyclists to proceed west on 23rd Street.

180.    Defendant Smolka subsequently received radio reports from other officers stating that other riders were "breaking off" the designated route in "groups" of anywhere between twenty and five hundred cyclists at other points along the way, including at Fifth Avenue near Madison Square Park.

181.    Defendant Smolka tried to follow them in his vehicle and continued to patrol the ride and the areas where the NYPD knew cyclists had deviated until after the conclusion of the ride (approximately 10:15 PM).

182.    Upon information and belief, there were only approximately 200 riders that followed the designated route back to Union Square Park.

183.    The NYPD made 35 arrests, and charged the vast majority of those arrestees with disorderly conduct and parading without a permit.

<u>PLAINTIFF SHEILA CALLAGHAN</u>

184.   At approximately 9:00 PM on October 29, 2004, plaintiff SHEILA CALLAGHAN was lawfully present in the vicinity of 26th street and 10th Avenue in the County, City, and State of New York.

185.   Defendant "FNU" DELLAVAELLE, #6830, and other unidentified NYPD officers, detained and arrested plaintiff Callaghan and seized her bicycle without any probable cause, privilege, or consent.

186.   Defendant Dellavalle and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

187.   Defendant Dellavalle and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

188.   Plaintiff Callaghan was subsequently transported to an NYPD facility for arrest processing and eventually issued a Desk Appearance Ticket ("DAT.")

189.   Plaintiff Callaghan was in NYPD custody for approximately five hours.

190.   Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving her of the use and enjoyment of her bicycle.

191.   Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

192.   At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

193.    Plaintiff was offered, and accepted, an Adjournment in Contemplation of Dismissal ("ACD") in order to retrieve her bicycle from the NYPD and to avoid further disruption to her life.

194.    When Ms. Callaghan retrieved her bicycle, the front wheel was bent and several spokes in the back wheel were broken, and plaintiff spent approximately $80.00 repairing her bicycle.

<u>PLAINTIFF ARUN GUPTA</u>

195.    At approximately 9:00 PM on October 29, 2004, plaintiff ARUN GUPTA was lawfully present in the vicinity of 11th Street and 5th Avenue in the County, City, and State of New York.

196.    Defendant KENNETH WAGNER, #28519, and other unidentified NYPD officers, detained and arrested plaintiff Gupta and seized his bicycle without any probable cause, privilege, or consent.

197.    Defendant Wagner and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

198.    Defendant Wagner and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

199.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

200.    Plaintiff was in NYPD custody for approximately three hours.

201.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving him of the use and enjoyment of his bicycle.

202.    At plaintiff's arraignment approximately a month after his arrest, plaintiff pleaded not guilty to charges that he violated the parade permitting scheme and committed disorderly conduct by riding his bicycle as part of a group.

203.    Plaintiff hired an attorney to defend the charges against him.

204.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

205.    On or about May 2, 2005, after appearing approximately three times to defend against the charges in the criminal proceedings defendants had initiated against him, those charges were dismissed.

206.    When plaintiff retrieved his bicycle, the bicycle was damaged, and plaintiff was forced to pay approximately $80.00 to repair it.

<u>PLAINTIFF SCOTT KERNS</u>

207.    At approximately 9:00 PM on October 29, 2004, plaintiff SCOTT KERNS was lawfully present in the vicinity of 26th street and 10th Avenue in the County, City, and State of New York.

208.    Defendant JOHN WARREN, #13763, and other unidentified NYPD officers, detained and arrested plaintiff and seized his bicycle without any probable cause, privilege, or consent.

209.    Defendant Warren and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

210.    Defendant Warren and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

211.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

212.    Plaintiff was in NYPD custody for approximately six hours.

213.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving him of the use and enjoyment of his bicycle.

214.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

215.    At plaintiff's arraignment approximately a month after his arrest, plaintiff pleaded not guilty to charges that he violated the parade permitting scheme and committed disorderly conduct by riding his bicycle as part of a group.

216.    On or about February 17, 2005, after appearing approximately three times to defend against the charges in the criminal proceedings defendants had initiated against him, those charges were dismissed.

217.    When plaintiff retrieved his bicycle after February 17, 2005, the bicycle was damaged, and plaintiff was forced to pay approximately $30.00 to repair it.

PLAINTIFF VADIM NEWQUIST

218.    At approximately 9:00 PM on October 29, 2004, plaintiff VADIM NEWQUIST was lawfully present in the vicinity of 11th Street and 7th Avenue in the County, City, and State of New York.

219.    Defendant RAYMOND NG, SHIELD # 21793, and other unidentified NYPD officers, detained and arrested plaintiff and seized his bicycle without any probable cause, privilege, or consent.

220.    Defendant Ng deliberately handcuffed plaintiff too tightly and kept him handcuffed for an excessive period of time, causing plaintiff pain and injury.

221.    Defendant Ng then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

222.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

223.    Plaintiff was in NYPD custody for approximately eight hours.

224.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving him of the use and enjoyment of his bicycle.

225.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

226.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

227.    Plaintiff was offered, and accepted, an ACD in order to retrieve the bicycle from the NYPD and to avoid further disruption to his life.

228.     When plaintiff retrieved the bicycle, the bicycle was damaged.

### PLAINTIFF JESSICA RECHTSCHAFFER

229.     At approximately 9:00 PM on October 29, 2004, plaintiff JESSICA RECHTSCHAFFER was lawfully present in the vicinity of 28th Street and 7th Avenue in the County, City, and State of New York.

230.     Defendant NYPD officer FNU WOLF and other unidentified NYPD officers detained and arrested plaintiff and seized plaintiff's bicycle without any probable cause, privilege, or consent.

231.     Defendant Wolf deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

232.     Unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

233.     Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a summons and released.

234.     Plaintiff was in NYPD custody for approximately one and a half hours.

235.     The charges against plaintiff were subsequently dismissed.

### PLAINTIFF WILLIAM SCHWARTZ

236.     At approximately 9:00 PM on October 29, 2004, plaintiff WILLIAM SCHWARTZ was lawfully present in the vicinity of 26th street and 10th Avenue in the County, City, and State of New York.

237.     Defendant CAUCASIAN FEMALE NYPD OFFICER FNU LAST NAME UNKNOWN, SHIELD # 22451 ("22451") and other unidentified NYPD officers detained and arrested plaintiff and seized plaintiff's bicycle without any probable cause, privilege, or consent.

238.     Defendant 22451 and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept him handcuffed for an excessive period of time, causing plaintiff pain and injury.

239.     Unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

240.     Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

241.     Plaintiff was in NYPD custody for a number of hours.

242.     Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving plaintiff of the use and enjoyment of bicycle.

243.     Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

244.     At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

245.     Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption to his life.

<u>PLAINTIFF ELIZABETH SHURA</u>

246.     At approximately 9:00 PM on October 29, 2004, plaintiff ELIZABETH SHURA was lawfully present in the vicinity of 11th Street and 5th Avenue in the County, City, and State of New York.

247.     Defendant JOSEPH SHINZ, SHIELD #21951, and other unidentified NYPD officers, detained and arrested plaintiff Shura and seized her bicycle without any probable cause, privilege, or consent.

248.     Defendant Shinz and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

249.     Defendant Shinz and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

250.     Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

251.     Plaintiff was in NYPD custody for approximately seven hours.

252.     Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving her of the use and enjoyment of her bicycle.

253.     At plaintiff's arraignment approximately a month after her arrest, plaintiff pleaded not guilty to charges that she violated the parade permitting scheme and committed disorderly conduct by riding her bicycle as part of a group.

254.     Plaintiff hired an attorney to defend the charges against her.

255.     Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

256.     On or about June 28, 2005, following a bench trial, after appearing approximately five times to defend against the charges in the criminal proceedings defendants had initiated against her, those charges were dismissed.

<u>PLAINTIFF WILLIAM TSU</u>

257.    At approximately 9:00 PM on October 29, 2004, plaintiff WILLIAM TSU was lawfully present in the vicinity of 10th Street and 5th Avenue in the County, City, and State of New York.

258.    Defendant NYPD officer ANTHONY DIFRANCESCA, #4200, and other unidentified NYPD officers detained and arrested plaintiff and seized plaintiff's bicycle without any probable cause, privilege, or consent.

259.    Defendant Difrancesca deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

260.    Defendant Difrancesca then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

261.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

262.    Plaintiff was in NYPD custody for a number of hours.

263.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

264.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

265.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

40

266.    Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption to his life.

PLAINTIFF JASON YEN

267.    At approximately 9:00 PM on October 29, 2004, plaintiff JASON YEN was lawfully present in the vicinity of 26th Street and 10th Avenue in the County, City, and State of New York.

268.    Defendant JOHN WARREN, #13763, and other unidentified NYPD officers, detained and arrested plaintiff and seized his bicycle without any probable cause, privilege, or consent.

269.    Defendant Warren and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

270.    Defendant Warren and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

271.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

272.    Plaintiff was in NYPD custody for approximately four hours.

273.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

274.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

275. At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

276. Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption to his life.

THE NOVEMBER 26, 2004 CRITICAL MASS DETAIL

277. Upon information and belief, pursuant to another detail request penned by defendant Smolka, the NYPD deployed several hundred personnel in connection with the November 26, 2004 assembly in Union Square and to police that night's anticipated Critical Mass ride.

278. Defendants Smolka, Graham, Caneco, Albano, and other defendants were personally involved in making command and control decisions in connection with the November 26, 2004 Critical Mass detail.

279. NYPD officers distributed a flyer threatening bicyclists with arrest, *inter alia*, if they participated in an unpermitted procession, the contents which were repeated in a loop over a loud speaker as of approximately 7:30 PM.

280. Defendants Albano and Smolka were present in Union Square Park and estimated that approximately 200 people had by then gathered.

PLAINTIFFS JOSHUA COTTON,<br>SALLY NEWMAN, THOMAS BONAMICI, AND SARAH HACKNEY

281. Prior to arriving in Union Square Park on November 26, 2004, plaintiffs Joshua Cotton, Sally Newman, Thomas Bonamici, and Sarah Hackney had gathered at Mr. Cotton's house earlier that evening planning to participate in the Critical Mass bicycle ride and then see a 9:30 PM comedy show at the Laugh Factory.

282.    On the way from the subway station exit to the north end of Union Square Park, an unidentified female NYPD officer told Mr. Cotton that if they "rode no more than two abreast and obeyed all traffic laws" they would not get arrested, but that "they're going to be real strict tonight."

283.    Mr. Cotton and his friends decided to forego riding in the Critical Mass ride because they were scared that they would be arrested if they participated.  They left Union Square riding two abreast down Union Square west directly south of East 15th Street.

284.    They stopped behind two cars at the red light at the intersection of Union Square West and East 14th Street.

285.    While waiting at the red light, unidentified NYPD officers spread an orange net across University Place at the southern end of East 14th Street directly in front of plaintiffs Cotton, Newman, Bonamici, and Hackney.  When the light turned green, plaintiffs Cotton, Newman, Bonamici, and Hackney followed the two cars, which made a right turn onto East 14th Street heading west.

286.    As soon as the two cars completed their turns, NYPD officers pulled orange nets from the north and south sides of East 14th Street on the Western side of the intersection, detaining plaintiffs Cotton, Newman, Bonamici, and Hackney.

287.    Plaintiffs Cotton, Newman, Bonamici, and Hackney were then ushered onto the sidewalk and placed under arrest.

288.    Defendants "FNU" FURBUSH, JUAN BERRIO, SHIELD #28430, and other unidentified NYPD officers, detained and arrested plaintiffs Cotton, Newman, Bonamici, and Hackney and seized their bicycles without any probable cause, privilege, or consent.

289.    Defendants Furbush and Berrio and/or other unidentified NYPD officers deliberately handcuffed plaintiffs Cotton, Newman, Bonamici, and Hackney too tightly and kept then handcuffed for an excessive period of time, causing plaintiffs pain and injury.

290.    Defendants Furbush and Berrio and other unidentified NYPD officers caused a Polaroid photograph or photographs of Cotton, Newman, Bonamici, and Hackney and their bicycles to be taken.

291.    Plaintiffs Cotton, Newman, Bonamici, and Hackney were subsequently transported to an NYPD facility for arrest processing and eventually issued DATs.

292.    Plaintiffs Cotton, Newman, Bonamici, and Hackney were in NYPD custody for approximately five hours.

293.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs a prompt hearing before a neutral fact-finder to test the probable validity of the deprivations *pendente lite*, depriving them of the use and enjoyment of their bicycles.

294.    Defendants refused to release plaintiffs' bicycles until the criminal proceedings against plaintiffs were terminated.

295.    At plaintiffs' arraignments approximately a month after their arrests, plaintiffs Cotton, Newman, Bonamici, and Hackney were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

296.    Defendants refused to release plaintiffs' bicycles until the criminal proceedings against plaintiff were terminated.

297.    Upon information and belief, plaintiff Bonamici took an ACD in order to retrieve the bicycle from the NYPD and to avoid further disruption to his life.

298.    Plaintiffs Cotton, Newman, and Hackney hired an attorney to defend the charges against them.

299.    Upon information and belief, on or about May of 2005, after appearing several times to defend against the charges in the criminal proceedings defendants had initiated against them, the charges against plaintiffs Cotton, Newman, and Hackney were dismissed.

300.    When plaintiffs retrieved their bicycles, they were damaged, and plaintiffs spent time and money repairing them.

<u>PLAINTIFF TERESA TORCHIANO</u>

301.    At approximately 7:30 PM on November 26, 2004, plaintiff TERESA TORCHIANO was lawfully present in the vicinity of Union Square West and 14th Streets in the County, City, and State of New York.

302.    Defendant "FNU" FURBUSH and other unidentified NYPD officers, detained and arrested plaintiff Torchiano and seized her bicycle without any probable cause, privilege, or consent.

303.    Defendant Furbush and/or other unidentified NYPD officers deliberately handcuffed plaintiff Torchiano too tightly and kept her handcuffed for an excessive period of time, causing her pain and injury.

304.    Defendant Furbush and other unidentified NYPD officers caused a Polaroid photograph or photographs of plaintiff Torchiano and her bicycle to be taken.

305.    Plaintiff Torchiano was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

306.    Plaintiff Torchiano was in NYPD custody for approximately five hours.

307.    Defendants vouchered plaintiff's bicycle as evidence and impounded itwithout affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivations *pendente lite*, depriving her of the use and enjoyment of her bicycle.

308.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff was terminated.

309.    At plaintiff's arraignment approximately a month after her arrests, plaintiff Torchiano was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

310.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

311.    Upon information and belief, plaintiff Torchiano took an ACD in order to retrieve the bicycle from the NYPD and to avoid further disruption to her life.

<u>PLAINTIFF BRADFORD CONOVER</u>

312.    At approximately 8:30 PM on November 26, 2004, plaintiff BRADFORD CONOVER was lawfully present in the vicinity of Houston Street and Broadway in the County, City, and State of New York.

313.    Defendants Schinz and other unidentified NYPD officers detained and arrested plaintiff and seized his bicycle without any probable cause, privilege, or consent.

314.    Defendants deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

315.    Defendants then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

316.    Plaintiff was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

317.    Plaintiff was in NYPD custody for approximately four hours.

318.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

319.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

320.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating PL § 240.20(5).

321.    Plaintiff hired attorneys to defend the charges him.

322.    Defendants refused to release plaintiff's bicycle until the criminal proceedings against plaintiff were terminated.

323.    On or about September 19, 2005, after appearing approximately seven times to defend against the charges in the criminal proceedings defendants had initiated against him, those charges were dismissed on speedy trial grounds.

<u>DECEMBER 2004</u>

324.    On December 13, 2004, Judge Pauley granted the City leave to amend their Answer With Counterclaim in the <u>Bray</u> litigation, which the City did, seeking to enjoin gathering in Union Square Park without a Parks Department permit <u>and</u> engaging in a bicycle procession without a parade permit.

325.    Defendant Smolka testified that a federal injunction would be "helpful", but that the NYPD was able to enforce the law without an injunction.

326.    According to lawyers for the City, "the purpose of an injunction, in addition to giving the police department the authority to stop the ride, if people rode illegally and violated the injunction, is that it is a Penal Law violation under the criminal contempt statute, and that is a misdemeanor, it's a harsher criminal, it carries harsher criminal penalties than just violating Administrative Code 10-110 or engaging in disorderly conduct.  . . .  Presumably, people will stay away knowing about the injunction and knowing about the stiffer penalty, and the police department will have a more controllable event that they can nip in the bud with the injunction."

327.    Without an injunction, lawyers for the City announced the NYPD's intention to stop future rides "by putting up netting, by keeping people out of the park, by keeping people from leaving the park" as well:

> MS. BINDER:  . . . The police department's intention, the city's intention for asking for this injunction is, A, to require this group to get a permit, and, B, if this group doesn't get a permit, to stop this group from riding in its present form.  And if there are individuals –

> THE COURT:  How will you stop them from riding in its present form?  By charging people with criminal contempt in the state court?

> MS. BINDER: No, your Honor.  By stopping the ride.  By putting up netting, by keeping people out of the park, by keeping people from leaving the park.  But if there are individuals who insist that I'm going to ride, come hell or high water, then there is the additional tool of criminal enforcement.

328.    On December 23, 2004, Judge Pauley dismissed the City's counterclaims, holding that whether the parade permitting scheme could apply to the rides was a novel and complex question of state law and criticizing the City for its decision to interrupt a "ten-year stasis in enforcement of traffic regulations and permit regimes."

329.    On December 31, 2004, there was a large Critical Mass bicycle ride that the NYPD accompanied and at which there were no arrests.

### PLAINTIFF JAMESON ROLLINS'S JANUARY 28, 2005 ARREST

330.    On or before January 28, 2005, defendants Smolka, Graham, Caneco, Albano, Paragallo, Steffens, and/or other unidentified NYPD supervisors acting under their orders and supervision planned to utilize plainclothes and/or other officers to infiltrate groups of potential participants in the January 28, 2005 Critical Mass bicycle ride and to conduct overt and covert video, audio, and other surveillance of their activities, including their constitutionally protected activities.

331.    In the afternoon of January 28, 2005, defendants Kelly, Smolka, Graham, Caneco, Albano, Paragallo, Steffens, and/or other unidentified NYPD supervisors acting under their orders instructed defendants Turco and other NYPD officers under their command, including defendant Spreen, to arrest perceived participants in the Critical Mass bicycle ride they expected would occur as bicyclists left Union Square Park close to the park by trapping perceived participants using scooters and other vehicles as roadblocks without first warning the perceived participants that they may be violating the law if they continue to ride their bicycles and without providing them with a meaningful opportunity to disperse.

332.    At approximately 7:26 PM, cyclists left the park going south on Union Square West toward 14th Street.

333.    As cyclists turned west on 14th Street and moved toward 5th Avenue, numerous NYPD scooters rode to their left along the double yellow dividing line.

334.    After some made a lawful left-hand turn at the green light at 5th Avenue, NYPD officers, including defendants Steffens and Spreen, made eight arrests on 5th Avenue between 14th and 11th Streets.

335.     At approximately 7:30 PM on January 28, 2005, plaintiff JAMESON ROLLINS was lawfully present in the vicinity of 12th Street and 5th Avenue, in the County, City, and State of New York.

336.     Defendant NYPD officer JOANN SPREEN, #19464, and other unidentified NYPD officers, detained and arrested plaintiff without warning and seized plaintiff's bicycle without any probable cause, privilege or consent.

337.     At approximately 7:30 PM, defendants Smolka, Graham, Caneco, Albano, Paragallo, Turco, and/or other unidentified NYPD supervisors directed and supervised defendant Spreen and other NYPD officers in arresting plaintiff Rollins, and supervised their subsequent arrest processing.

338.     Defendant Spreen and/or other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

339.     Defendant Spreen and/or other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and plaintiff's bicycle to be taken.

340.     Plaintiff Rollins was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

341.     Plaintiff Rollins was in NYPD custody for approximately five hours.

342.     Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

343.     At plaintiff's arraignment approximately a month after plaintiff's arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by

riding plaintiff's bicycle as part of a group and allegedly failing to obey a lawful order to disperse.

344.    Plaintiff Rollins hired an attorney to defend against the criminal charges against him.

345.    During the period between January 28, 2005 and January 9, 2006, plaintiff Rollins was required to make approximately 13 court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

346.    At all relevant times in 2005 and in 2006, the City represented the NYPD in affirmative litigation before the New York State Supreme Court aimed at the cessation of Critical Mass bicycle rides in Manhattan, and defendants Kelly, Smolka, Caneco, and Albano, were all personally involved in moving that litigation forward, including by offering evidence and developing strategies to police Critical Mass rides while the City's second bid for injunctive relief that would have prevented them was pending.  See City of New York v. Time's Up!, Inc., 11 Misc.3d 1052(A) (Sup. Ct., N.Y. County 2006).

347.    In connection with the criminal proceedings against plaintiff Rollins, on April 11, 2005, DANY, the NYPD, and the City were served with a Notice of Demand for Preservation and Production of All Radio or Other Recorded Police Communications and Observations, a Demand to Produce pursuant to New York State Criminal Procedure Law ("CPL") § 240.20, and a Request for Bill of Particulars pursuant to CPL §§ 100.45 and 200.95 requesting and/or demanding, *inter alia*, that the City preserve and provide the Office of the District Attorney of New York County with certain discoverable evidence, including, but not limited to, videotape, photographs, officer lists, recordings of police communications, and other evidence discoverable

under CPL § 240.20, <u>Brady v. Maryland</u>, 373 US 83 (1963), and <u>People v. Rosario</u>, 9 NY2d 286 (1961).

348.    Upon information and belief, defendant Albano was specifically aware of the NYPD's obligation to preserve and produce the requested evidence, and also knew of the requests and demands.

349.    Nevertheless, the NYPD and the City failed to comply by producing the discoverable evidence to DANY.

350.    In October of 2005, defendant Rollins stood trial for three days, during which defendant Spreen and approximately a dozen other NYPD officers testified, including officers who admitted to having communicated over the radio.

351.    On January 9, 2006, plaintiff Rollins was convicted of disorderly conduct, and the Court declared the parade permitting scheme facially unconstitutional.  <u>See</u> <u>People v. Bezjak</u>, 11 Misc.3d 424 (N.Y.City Crim.Ct., January 9, 2006).

352.    Plaintiff's conviction is on appeal before the Appellate Term.

<u>THE FEBRUARY 25, 2005 CRITICAL MASS DETAIL</u>

353.    On or before February 25, 2005, defendants Smolka, Graham, Caneco, Albano, Paragallo, Steffens, and/or other unidentified NYPD supervisors acting under their orders and supervision planned to utilize plainclothes and/or other officers to infiltrate groups of potential participants in the February 25, 2005 Critical Mass bicycle ride and to conduct overt and covert video, audio, and other surveillance of their activities, including their constitutionally protected activities.

354.    In the afternoon of February 25, 2005, defendants Kelly, Smolka, Graham, Caneco, Albano, Paragallo, and/or other unidentified NYPD supervisors acting under their orders

instructed defendants Turco and other NYPD officers under their command, including defendants JOSE TORRES, #11394, JAMES ZAVALA, #05726, ARTHUR CLARKE, #8001, MICHAEL GERBASI, #20502, CHARLES MURPHY, #31615, JOSEPH WOODLEY, #12116, PAUL ALBANO, #26129, JORDAN MAZUR, #06497, JAMELL KENDRICK, #28700, and HONMAN YAN, #31946, to arrest perceived participants in the Critical Mass bicycle ride they expected would occur as bicyclists left Union Square Park close to the park by trapping perceived participants using scooters and other vehicles as roadblocks without first warning the perceived participants that they may be violating the law if they continue to ride their bicycles and without providing them with a meaningful opportunity to disperse.

### PLAINTIFFS JONATHAN BECK, REBECCA HEINEGG, MADELINE NELSON, CAROLINE SAMPONARO, MARK TAYLOR, and BLUE MINER YOUNG

355.    At approximately 7:30 PM on February 25, 2005, plaintiffs JONATHAN BECK, REBECCA HEINEGG, MADELINE NELSON, CAROLINE SAMPONARO, MARK TAYLOR, and BLUE MINER YOUNG were lawfully present in the vicinity of 17th Street and 5th Avenue, in the County, City, and State of New York.

356.    Just before and after approximately 7:30 PM, a number of people on bicycles left Union Square Park heading west on 17th Street.

357.    At approximately 7:30 PM, defendant Steffens drove an unmarked NYPD vehicle, along with other vehicles driven by unidentified NYPD officers, west on 17th Street, apparently escorting and/or following the people on bicycles on 17th Street.  Upon information and belief, defendant Paragallo was present in that vehicle.

358.    Pursuant to their orders and training, defendants Turco, Kendrick, Yan, Clarke, Albano, Murphy, Zavala, and other unidentified NYPD officers were positioned several blocks away, on approximately 18th Street east of 5th Avenue - out of sight of 17th Street.

359.    As or just before a number of bicycles stopped at the red light regulating westbound traffic on 17th Street, defendants Smolka, Graham, Caneco, Paragallo, and/or Albano directed that defendant Turco and the First Precinct Scooter Task Force officers under his command, including defendants Kendrick, Yan, Clarke, Albano, Murphy, Zavala, and other unidentified NYPD officers, who could not observe what was occurring on 17th Street, roll their scooters out west down 18th Street, turn south onto 5th Avenue, and intercept and trap bicyclists crossing 5th Avenue westbound at 17th Street, though the light regulating traffic against them at that time was green.

360.    Plaintiff Beck was lawfully crossing 5th Avenue on a green light when defendant NYPD officer JAMELL KENDRICK, #28700, interceded his scooter in plaintiff's path without warning and detained and arrested plaintiff and seized plaitniff's bicycle without any probable cause, privilege, or consent.

361.    Plaintiff Heinegg was lawfully crossing 5th Avenue on a green light when defendant NYPD officer HONMAN YAN, #31946, interceded his scooter in plaintiff's path without warning and detained and arrested plaintiff and seized plantiff's bicycle without any probable cause, privilege, or consent.

362.    Plaintiff Young was lawfully crossing 5th Avenue on a green light when defendant NYPD officer ARTHUR CLARKE, #8001, rammed his scooter into Young's bicycle and detained and arrested plaintiff and seized plaintiff's bicycle without any probable cause, privilege, or consent.

363.    Plaintiff Samponaro was lawfully crossing 5th Avenue on a green light when defendant NYPD officer PAUL ALBANO, #26129, interceded his scooter in plaintiff's path

54

without warning and detained and arrested plaintiff and seized plaintiff's bicycle without any probable cause, privilege, or consent.

364.    Plaintiff Taylor, then a law student who was wearing a bright green "legal observer" cap and had deliberately kept his distance from other bicyclists in order to observe police interaction with them without risking arrest, was detained and arrested by NYPD officer CHARLES MURPHY, #31615, as he attempted to observe the ongoing arrests.  Officer Murphy seized plaintiff's bicycle without any probable cause, privilege, or consent.

365.    Plaintiff Nelson was stopped alone at the red light on the east side of 5th Avenue when an unidentified NYPD supervisor ran across the avenue to Nelson to tell her to cross to the west side while straddling her bicycle, despite Nelson's request to get off the bicycle and walk it in a normal manner. On the west side, upon information and belief, the supervisor told defendant NYPD officer JAMES ZAVALA, #05726, who had just arrived at the location and had not witnessed any of the proceedings, to arrest Nelson and seize her bicycle, which defendant Zavala did without any probable cause, privilege, or consent.

366.    Defendants deliberately handcuffed plaintiff too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

367.    Defendants Turco, Kendrick, Yan, Clarke, Albano, Murphy, Zavala, and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiffs and their bicycles to be taken.

368.    Plaintiffs Beck, Heinegg, Nelson, Samponaro, Taylor, and Young were subsequently transported to the NYPD's 9th Precinct for arrest processing and each eventually issued a DAT.

369.    Plaintiffs Beck, Heinegg, Nelson, Samponaro, Taylor, and Young were in NYPD custody for approximately five hours.

370.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving plaintiffs of the use and enjoyment of their bicycles.

371.    Defendants refused to release plaintiffs' bicycle until after their arraignments.

372.    At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and  and committing disorderly conduct by riding plaintiff's bicycle as part of a group and allegedly failing to obey a lawful order to disperse.

373.    Plaintiffs hired attorneys to represent them.

374.    When plaintiff Nelson retrieved her bicycle, the front light was broken and the rear light broken off, and plaintiff spent approximately $50.00 repairing her bicycle.

375.    When plaintiffs Beck, Heinegg, Samponaro, Taylor, and Young retrieved their bicycles, they were damaged, and they spent time and money repairing their bicycles.

376.    During the period between February 25, 2005 and April 16, 2006, plaintiff Nelson was required to make approximately 10 court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

377.    On or about April 16, 2006, all charges against plaintiff Nelson were dismissed.

378.    During the period between February 25, 2005 and January 19, 2006, plaintiffs Beck, Heinegg, Samponaro, Taylor, and Young- along with plaintiffs Bland, Ryan, and Melchor - were required to make approximately 14 court appearances each to defend themselves in the

criminal proceedings that defendants had initiated against them.

379.    In connection with the criminal proceedings against those plaintiffs who were arrested on February 25, 2005, on May 19, 2005, DANY, the NYPD, and the City were served with a Notice of Demand for Preservation and Production of All Radio or Other Recorded Police Communications and Observations, a Demand to Produce pursuant to CPL§ 240.20, and a Request for Bill of Particulars pursuant to CPL §§ 100.45 and 200.95, requesting and/or demanding, *inter alia*, that the City preserve and provide the Office of the District Attorney of New York County with certain discoverable evidence, including, but not limited to, videotape, photographs, officer lists, recordings of police communications, and other evidence discoverable under CPL § 240.20, Brady v. Maryland, 373 US 83 (1963), and People v. Rosario, 9 NY2d 286 (1961).

380.    On September 13, 2005, in Jury Part 2 of the New York City Criminal Court, Hon. Neil Ross directed that DANY was required to produce "city-wide police recordings" in connection with the case if there were "some type of Rosario that arises because some Government [sic] witness was heard on the recordings testified at trial" or if "it contained exculpatory information," directing DANY to "be mindful of their Brady obligations and also . . . . make sure that they're prepared at the time of trial to comply with their Rosario obligations."

381.    DANY did not produce tapes of or records related to the radio communications prior to or during plaintiffs' January 19, 2006 trial.

382.    On January 19, 2006, plaintiffs Beck, Heinegg, Samponaro, Taylor, and Young, along with plaintiffs Bland, Ryan, and Melchor, were each convicted of parading without a permit and one count of disorderly conduct.

383.    Their convictions are on appeal before the Appellate Term.

PLAINTIFFS CHRISTOPHER BLAND, TOMAS MELCHOR, <u>BARBARA ROSS</u>, <u>CHRISTOPHER RYAN, LISA SHALOM, AND SARA STOUT</u>

384.    On February 25, 2005, between approximately 7:30 PM and approximately 8:30 PM, some cyclists who had already gone through the intersection of 5th Avenue and 17th Street prior to the approximately 7:30 PM arrests, along with other bicyclists who joined well after, continued riding unmolested by the police for approximately an hour.

385.    At one point, as the bicyclists were heading north up 6th or 8th Avenue, a NYPD van followed the ride broadcasting words over its loudspeaker to the effect of, "Stay in the right lane," which bicyclists did.

386.    As a number of bicyclists were coming through Times Square, heading south on Broadway, they passed a contingent of police officers gathered in front of the old Paramount Theatre at 1501 Broadway.

387.    Numerous officers said things to the effect of, "Come on through, go ahead, keep moving."

388.    There were approximately five police vans trailing a maximum of eighty cyclists at approximately 32nd Street and Broadway.

389.    At approximately 26th Street and Broadway, defendant Turco and other NYPD officers under his command, including defendants Gerbasi, Mazur, and Woodley, remained hidden behind a building waiting to ambush the cyclists.

390.    As the cyclists approached 26th Street, acting under the orders and/or directions of defendants Smolka, Graham, Paragallo, Caneco, Steffens, and/or Albano, the scooter squadron under defendant Turco's command and including defendants Gerbasi, Mazur, and Woodley, came up Broadway going the wrong way in the bicycle lane and aiming into the bicyclists.

391.    NYPD officers subsequently arrested eight people on the corner of 26th and

Broadway, including plaintiffs CHRISTOPHER BLAND, TOMAS MELCHOR, BARBARA ROSS, CHRISTOPHER RYAN, LISA SHALOM, and SARA STOUT, who were lawfully present in the vicinity of 28th Street and Broadway, in the County, City and State of New York at the time.

392.    Defendant Turco and other unidentified NYPD officers then detained and arrested plaintiff Ryan and seized his bicycle without any probable cause, privilege, or consent.

393.    Defendant NYPD Officer MICHAEL GERBASI, #20502, and other unidentified NYPD officers detained and arrested plaintiffs Bland, Melchor, and Ross and seized their bicycles without any probable cause, privilege or consent.

394.    Defendant NYPD officer JORDAN MAZUR, #6497, and two other unidentified NYPD officers, tackled plaintiff Stout and pinned her to the ground in order to detain and arrest her, and seized her bicycle without any probable cause, privilege or consent.

395.    Defendant NYPD officer JOSEPH WOODLEY, #12116, and other unidentified NYPD officers detained and arrested plaintiff Shalom and seized her bicycle without any probable cause, privilege or consent.

396.    Defendants deliberately handcuffed plaintiff too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

397.    Defendants Turco, Gerbasi, Mazur, Woodley, and other unidentified NYPD officers then caused a Polaroid photographs of plaintiffs and their bicycles to be taken.

398.    Plaintiffs Bland, Melchor, Ross, Ryan, Shalom, and Stout were subsequently transported to an NYPD facility for arrest processing and eventually each was issued a DAT.

399.    Plaintiff Stout was in NYPD custody for approximately three hours.

400.    Plaintiffs Bland and Melchor were in NYPD custody for approximately four

hours.

401.    Plaintiff Ross was in NYPD custody for approximately five and a half hours.

402.    Plaintiffs Ryan and Shalom were in NYPD custody for approximately between four and six hours.

403.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving plaintiffs of the use and enjoyment of their bicycles.

404.    Defendants refused to release plaintiffs' bicycles until after their arraignments.

405.    At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and  committing disorderly conduct by riding bicycles as part of a group and allegedly failing to obey a lawful order to disperse.

406.    When plaintiffs Bland, Melchor, Ross, Ryan Shalom, and Stout retrieved their bicycles, they were damaged, and they spent time and money repairing their bicycles.

407.    At her arraignment, plaintiff Shalom, who lived in Canada, was offered, and accepted, an ACD in order to retrieve her bicycle from the NYPD and to avoid further disruption of her life.

408.    Plaintiffs Bland, Melchor, Ross, Ryan, and Stout pleaded not guilty to the charges against them.

409.    During the period between February 25, 2005 and December 30, 2005, plaintiff Stout was required to make approximately four court appearances, traveling from Portland, Oregon ($600 expense plus lost wages) to defend herself in the criminal proceedings that defendants had initiated against her.

410.    On December 30, 2005, plaintiff Stout was offered, and accepted, an ACD in order to avoid further expense and disruption of her life.

411.    During the period between February 25, 2005 and April 16, 2006, plaintiff Ross was required to make approximately ten court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

412.    On or about April 16, 2006, all charges against plaintiff Ross were dismissed on speedy trial grounds.


## THE MARCH 25, 2005 CRITICAL MASS DETAIL

413.    On or before March 25, 2005, defendants Kelly, Smolka, Graham, Caneco, Albano, Paragallo, Steffens, Turco, McCabe, and/or other unidentified NYPD supervisors acting under their orders and supervision planned to utilize plainclothes and/or other officers to infiltrate groups of potential participants in the March 25, 2005 Critical Mass bicycle ride and to conduct overt and covert video, audio, and other surveillance of their activities, including their constitutionally protected activities.

414.    On or before March 25, 2005, defendants Kelly, Smolka, Graham, Caneco, Albano, Paragallo, Steffens, Turco, McCabe, and/or other unidentified NYPD supervisors acting under their orders planned and prepared to arrest perceived participants in the Critical Mass bicycle ride on March 25, 2005, by pro-positioning orange netting in the vicinity of Union Square Park, including at the intersections around 17th Street between 5th and 6th Avenues, and using those nets to trap bicyclists in order to arrest them.

415.    In the afternoon of March 25, 2005, defendants Kelly, Smolka, Graham, Caneco, Albano, Paragallo, and/or other unidentified NYPD supervisors acting under their orders

instructed defendants Turco and other NYPD officers under their command, including defendants EUGENE HACKETT, #21155, ERIC ALBRECHT, #15016, JOHN LUONGO, #00777, MOHAMMAD ARYAKIA, #01705, KATHLEEN CURNYN, #04318, STEVEN VALENTINE, #13585, "FNU" ACOSTA, #20660, ANTHONY ANZALONE, #04699, ERIC ALBRECHT, #15016, BRENDA BACOTE, #00167, SHUHEL SUBHAN, #240099, and LOUIS CHIACCHERI, #02786, to arrest perceived participants in the Critical Mass bicycle ride they expected would occur as bicyclists left Union Square Park close to the park by trapping perceived participants in orange netting without first warning the perceived participants that they may be violating the law if they continue to ride their bicycles and without providing them with a meaningful opportunity to disperse.

416.    At approximately 7:30 PM, a number of bicyclists left Union Square Park heading west on 17th Street.  As a group of bicyclists crossed the intersection of 17th Street and Union Square West, unidentified NYPD officers began to stretch an orange mesh net to block other traffic from crossing Union Square West at 17th Street, briefly stopping to let other bicyclists pass before fully blocking westbound traffic from passing the intersection.    Bicyclists who proceeded west on 17th Street to 5th Avenue were captured stopped at the red light on videotape taken by a plainclothes or undercover NYPD officer who had been pre-positioned at the intersection.  Blocking all of 5th Avenue to the north and south of its intersection with 17th Street were multiple sets of orange mesh nets stretched across the street.  Those who proceeded west on 17th Street on their bicycles were met with other lines of nets on 17th Street between 5th and 6th Avenues.  Along with any people who were walking with, or attempting to lock or unlock, bicycles in the enmeshed area, they were arrested and corralled under scaffolding on the south side of the sidewalk at the intersection of 17th Street and 6th Avenues.  NYPD officers with

cordless chainsaws shortly arrived and began to saw the locks off of any and all bicycles that were locked up in the enmeshed area.  Bicycle owners in the area were given the choice of proving ownership of their bicycles and receiving a summons for violating NYCAC § 16-122 or watching as the NYPD sawed the locks off their bicycles.

417.    Defendants Smolka, Graham, Paragallo, Albano, and McCabe were personally present supervising and directing these activities.

PLAINTIFFS NEAL ALDRICH, NICHOLAS BIRTH, CHRISTOPHER BLAND, MARK DAVIS, KAREN DE GEORGE, ANDREW DZIJA, BRONWYN FLEMING-JONES, TIMOTHY GAMBLE, JEFFREY GANO, ZACHARY GELNAW-RUBIN, NIALL HEFFERNAN, GWEN KASH, <u>WILLIAM LAVIANO, JULIETTE MOORE, and GABRIEL PAGANO</u>

418.    At approximately 7:30 PM on March 25, 2005, plaintiffs NEAL ALDRICH, NICHOLAS BIRTH, CHRISTOPHER BLAND, MARK DAVIS, KAREN DE GEORGE, ANDREW DZIJA, BRONWYN FLEMING-JONES, TIMOTHY GAMBLE, JEFFREY GANO, ZACHARY GELNAW-RUBIN, NIALL HEFFERNAN, GWEN KASH, WILLIAM LAVIANO, JULIETTE MOORE, and GABRIEL PAGANO were lawfully present in the vicinity of 17th Street between 5th and 6th Avenues, in the County, City, and State of New York.

419.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Hackett, and other unidentified NYPD officers, detained and arrested plaintiff Aldrich and seized plaintiff's bicycle without any probable cause, privilege, or consent.

420.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Albrecht, and other unidentified NYPD officers, detained and arrested plaintiff Birth and seized plaintiff's bicycle without any probable cause, privilege, or consent.

421.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Luongo, and other unidentified NYPD officers, detained and arrested plaintiff Bland and seized plaintiff's bicycle without any probable cause, privilege, or consent.

422.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Luongo, and other unidentified NYPD officers, detained and arrested plaintiff Davis and seized plaintiff's bicycle without any probable cause, privilege, or consent.

423.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Aryakia, and other unidentified NYPD officers, detained and arrested plaintiff De George and seized plaintiff's bicycle without any probable cause, privilege, or consent.

424.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Luongo, and other unidentified NYPD officers, detained and arrested plaintiff Dzija and seized plaintiff's bicycle without any probable cause, privilege, or consent.

425.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Curnyn, and other unidentified NYPD officers, detained and arrested plaintiff Fleming-Jones and seized plaintiff's bicycle without any probable cause, privilege, or consent.

426.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Valentine, and other unidentified NYPD officers, detained and arrested plaintiff Gamble and seized plaintiff's bicycle without any probable cause, privilege, or consent.

427.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Acosta, and other unidentified NYPD officers, detained and arrested plaintiff Gano and seized plaintiff's bicycle without any probable cause, privilege, or consent.

428.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Anzalone, and other unidentified NYPD officers, detained and arrested plaintiff Gelnaw-Rubin and seized plaintiff's bicycle without any probable cause, privilege, or consent.

429.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Luongo, and other unidentified NYPD officers, detained and arrested plaintiff Heffernan and seized plaintiff's bicycle without any probable cause, privilege, or consent.

430.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Bacote, and other unidentified NYPD officers, detained and arrested plaintiff Kash and seized plaintiff's bicycle without any probable cause, privilege, or consent.

431.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Luongo, and other unidentified NYPD officers, detained and arrested plaintiff Laviano and seized plaintiff's bicycle without any probable cause, privilege, or consent.

432.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Curnyn, and other unidentified NYPD officers, detained and arrested plaintiff Moore and seized plaintiff's bicycle without any probable cause, privilege, or consent.

433.    In the vicinity of 17th Street between 5th and 6th Avenues, at approximately 7:30 PM, defendant Subhan, and other unidentified NYPD officers, detained and arrested plaintiff Pagano and seized plaintiff's bicycle without any probable cause, privilege, or consent.

434.    Defendants and other unidentified NYPD officers deliberately handcuffed plaintiffs Aldrich, Birth, Bland, Davis, De George, Dzija, Fleming-Jones, Gamble, Gano, Gelnaw-Rubin, Heffernan, Kash, Laviano, Moore, and Pagano, too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

435.    Defendants caused a Polaroid photograph or photographs of plaintiffs and their bicycles to be taken.

436.    Plaintiffs Aldrich, Birth, Bland, Davis, De George, Dzija, Fleming-Jones, Gamble, Gano, Gelnaw-Rubin, Heffernan, Kash, Laviano, Moore, and Pagano were subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

437.    Plaintiffs Dzija, Gamble and Laviano were in NYPD custody for approximately six hours.

438.    Plaintiffs Aldrich, Birth, Bland, Davis, Fleming-Jones, Gano, Gelnaw-Rubin, and Moore, were in NYPD custody for approximately seven hours.

439.    Plaintiffs De George, Heffernan and Kash were in NYPD custody for approximately eight hours.

440.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs prompt hearings before neutral fact-finders to test the probable validity of the deprivations *pendente lite*, depriving them of the use and enjoyment of their bicycles.

441.    Defendants refused to release plaintiffs' bicycles until after arraignment.

442.    At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

443.    Plaintiffs Birth, Fleming-Jones, Gano, and Laviano were offered, and accepted, ACD's in order to retrieve their bicycles from the NYPD and to avoid further disruption of their lives.

444.    On or about April 26, 2005, DANY announced that it would decline to prosecute criminal cases against plaintiffs Moore and Bland.

445.    During the period between March 25, 2005 and September 19, 2005, plaintiff Heffernan was required to make approximately four court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

446.    On or about September 19, 2005, following a bench trial at which defendant Luongo testified, plaintiff Heffernan was acquitted of all charges.

447.    During the period between March 25, 2005 and February 7, 2006, plaintiff Aldrich was required to make approximately nine court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

448.    On or about February 7, 2006, all charges against plaintiff Aldrich were dismissed on speedy trial grounds.

449.    During the period between March 25, 2005 and February 1, 2006, plaintiff Davis was required to make approximately eleven court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

450.    On or about February 1, 2006, all charges against plaintiff Davis were dismissed on speedy trial grounds.

451.    During the period between March 25, 2005 and February 1, 2006, plaintiff De George was required to make approximately 12 court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

452.    On or about February 1, 2006, all charges against plaintiff De George were dismissed on speedy trial grounds.

453.    During the period between March 25, 2005 and April 3, 2006, plaintiff Dzija was required to make approximately twelve court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

454.    On or about April 3, 2006, all charges against plaintiff Dzija were dismissed on speedy trial grounds.

455.    During the period between March 25, 2005 and October 18, 2005, plaintiff Kash was required to make approximately four court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

456.    On or about October 18, 2005, all charges against plaintiff Kash were dismissed on speedy trial grounds.

457.    During the period between March 25, 2005 and October 2005, plaintiff Pagano was required to make approximately three court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

458.    In or about October 2005, all charges against plaintiff Pagano were dismissed on speedy trial grounds.

459.    During the period between March 25, 2005 and February 1, 2006, plaintiff Gamble was required to make approximately ten court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

460.    On or about February 1, 2006, following a bench trial, plaintiff Gamble was acquitted of the parading charge but convicted of disorderly conduct.

461.    When plaintiffs retrieved their bicycles, they were damaged, and they spent time and money repairing their bicycles.

<u>PLAINTIFF BENJAMIN BRODIE</u>

462.    At approximately 8:45 PM on March 25, 2005, plaintiff BENJAMIN BRODIE was lawfully present in the vicinity of Houston Street and Lafayette, in the County, City, and State of New York.

463.    Upon information and belief, defendant LOUIS CHIACCHERI, #02786 and other unidentified NYPD officers detained and arrested Brodie and seized his bicycle without any probable cause, privilege or consent.

464.    Defendant Chicaccheri and other defendants deliberately handcuffed plaintiff too tightly, leaving him handcuffed for an excessive period of time, causing him pain and injury.

465.    Defendant Chiaccheri and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

466.    Plaintiff Brodie was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

467.    Plaintiff  Brodie was in NYPD custody for approximately four hours.

468.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving him of the use and enjoyment of his bicycle.

469.    Defendants refused to release plaintiff's bicycle until after arraignment.

470.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

471.    Plaintiff Brodie was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

472.   When plaintiff Brodie retrieved his bicycle, it was damaged, and he spent time and money repairing it.

### THE APRIL 29, 2005 CRITICAL MASS DETAIL

473.   On or before April 29, 2005, defendants Kelly, Smolka, Graham, Paragallo, Shortell, Hughes, Caneco, Albano, Turco, Steffens, McCabe, and/or other unidentified NYPD supervisors acting under their orders and supervision planned to utilize plainclothes and/or other officers to infiltrate groups of potential participants in the April 29, 2005 Critical Mass bicycle ride and to conduct overt and covert video, audio, and other surveillance of their activities, including their constitutionally protected activities.

474.   For example, defendants, including defendants Smolka, Graham, Caneco, Albano, Turco, and/or McCabe, deployed at least one female, undercover law enforcement officer, "SUE", to participate in, report upon, and record with videotape and possibly by other means a small, non-Critical Mass related group bicycle Ride of Silence in April, and they organized a detail of NYPD officers, including 1st Precinct Scooter Task Force officers under Lt. Turco's command, to police the small, orderly, group ride, with the purpose and effect of deterring participation in group bicycle rides, including Critical Mass bicycle rides.

475.   In the afternoon of April 29, 2005, defendants Smolka, Graham, Paragallo, Shortell, Hughes, Caneco, Albano, Steffens, McCabe, and/or other unidentified NYPD supervisors acting under their orders instructed defendants Turco and other NYPD officers under their command, including defendants LISA RIDDICK, #11944, CHICHOI BAO, #16456, TAMAR USTER, #10517, DIANA GAYO, #25146, RICHARD LAVELLE, #2384, MARLON GEORGE, #19193, MARTIN GIMENEZ, #22916, SANDRA DELEONMOYA, #27876, GRAHAM EMBUREY, # 25748, FNU CORDON, #25605, JOSEPH JOHN, #2797, DAVID

HUNG, #19904, SANTIAGO GOMEZ, #19288, "FNU" O'DOUGHERTY, #13510, and DAVID POPLASKI, #15482, to arrest perceived participants in the Critical Mass bicycle ride they expected would occur, including through the use of surveillance helicopters and plainclothes and/or undercover officers to infiltrate and locate perceived "groups" of bicyclists throughout the city and to coordinate the use of scooters and other police resources to trap and arrest them without first warning the perceived participants that they may be violating the law if they continue to ride their bicycles and without providing them with a meaningful opportunity to disperse.

476.    At approximately 5:26 PM, a group of approximately 50 NYPD officers gathered at Union Square East and 15th Street to receive their orders from defendant Hughes.

477.    Defendant Hughes instructed officers to "take three violators", stating: "You go down to the D.A.:  'I saw three bicycles in the street.  They didn't have a permit.'  The Capt. Hughes is telling him, telling you now, they don't have a permit, . . . So now we have probable cause. . . .  You gotta make at least three collars, alright.  That's it.  That's the maximum. Alright.  That's from me."

478.    Shortly after receiving the briefing from defendant Hughes, unidentified NYPD officers, supervised by an unidentified NYPD Captain, stretched orange netting across East 17th Street on the east side of 5th Avenue in order to stop five people on bicycles who had been riding single-file.

479.    After detaining and questioning the cyclists, the NYPD Captain explained, "There's a bicycle protest going on inside the park.  We thought you were part of it.  We're satisfied that you're not, so you're free to go" – and so they were.

480.    Approximately 35 people were arrested later that night at locations throughout the city, including plaintiffs LISA KOSLOWSKI, BEN FOSTER, NAZGOL GHANDNOOSH, ELIZABETH MERBITZ, JULIA ASHERMAN, HENRY BAKER, TOBY LEAH BOCHAN, JOHN P. CARMAN, DAVID CONNELLY, CLARA HENDRICKS, CAITLIN KRENN, EVAN O'NEILL, JESSICA RECHTSCHAFFER, TREVOR SNAPP, NEAL WEISSMAN, COREY EASTWOOD, JOSHUA FISHER, KEVIN CAPLICKI, and BRANDON NEUBAUER.

481.    Also among those arrested were "SUE" and at least approximately two other NYPD officers, who, under defendant McCabe's direct supervision, pretended to be arrested, were loaded onto a police wagon, and were subsequently released to continue engaging in their assigned surveillance and infiltration activities.

### PLAINTIFF LISA KOSLOWSKI

482.    On April 29, 2005, at approximately 7:35 PM, plaintiff LISA KOSLOWSKI was lawfully present in the vicinity of Union Square, southeast corner, in the County, City, and State of New York.

483.    The NYPD had issued a permit for a "Still We Speak" demonstration in the park at that time, place, and location.

484.    At approximately that time, place, and location, defendant Smolka and other, unidentified NYPD officers arrested plaintiff Koslowski's friend for allegedly riding her bicycle on the sidewalk.

485.    Upon information and belief, shortly thereafter, defendant Smolka grabbed plaintiff Koslowski, a small woman, by the back of her jacket, lifting her off her feet in order to remove her from her bicycle, and ordered LISA RIDDICK, #11944, and other unidentified

NYPD officers to detain and arrest Koslowski and seize her bicycle, all of which they did without any probable cause, privilege, or consent.

486.    Defendant Riddick and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

487.    Defendant Riddick  and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

488.    Plaintiff Koslowski was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

489.    Plaintiff Koslowski was in NYPD custody for approximately 16 hours.

490.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before neutral fact-finders to test the probable validity of the deprivations *pendente lite*, depriving plaintiff of the use and enjoyment of plaintiff's bicycle and forcing plaintiff to spend money for travel expenses.

491.    Defendants refused to release plaintiff's bicycle until after arraignment.

492.    At plaintiff's arraignment, plaintiff was charged with Obstructing Governmental Administration, among other charges.

493.    Plaintiff Koslowski retained an attorney to defend herself against the charges against her.

494.    During the period between April 29, 2005 and December 13, 2005, plaintiff Koslowski was required to make approximately give court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

495.    On or about December 13, 2005, all charges against plaintiff Koslowski were dismissed.

496.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

### PLAINTIFFS NAZGOL GHANDNOOSH AND ELIZABETH MERBITZ

497.    On April 29, 2005, at approximately 7:15 PM, plaintiffs NAZGOL GHANDNOOSH and ELIZABETH MERBITZ were lawfully present in the vicinity of 19th Street and 9th Avenue, in the County, City, and State of New York.

498.    While crossing 19th Street on foot and not riding her bicycle, plaintiff Ghandnoosh was approached by two police officers.  When she stopped to speak with them, defendant TAMAR USTER, #10517, and another unidentified NYPD officer detained and arrested plaintiff Ghandnoosh and seized her bicycle without any probable cause, privilege, or consent.

499.    Defendant DIANA GAYO, #25146, and other unidentified NYPD officers detained and arrested plaintiff Merbitz and seized her bicycle without any probable cause, privilege, or consent.

500.    Defendant Uster and other unidentified NYPD officers deliberately handcuffed plaintiff Ghandnoosh too tightly, and kept plaintiff handcuffed for an excessive period of time, causing her pain and injury.

501.    Defendant Gayo and other unidentified NYPD officers deliberately handcuffed plaintiff Merbitz too tightly, and kept plaintiff handcuffed for an excessive period of time, causing her pain and injury.

502.    Defendant Uster and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff Ghandnoosh and her bicycle to be taken.

503.    Defendant Gayo and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff Merbitz and her bicycle to be taken

504.    Plaintiffs Ghandnoosh and Merbitz were subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

505.    Plaintiff Ghandnoosh was in NYPD custody for approximately six hours.

506.    Defendants vouchered plaintiffs' bicycles as evidence and impounded yhrm without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving plaintiffs of the use and enjoyment of plaintiffs' bicycles.

507.    Defendants refused to release plaintiffs' bicycles until after arraignment.

508.    At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

509.    Plaintiffs were offered, and accepted, ACD's in order to retrieve their bicycles from the NYPD and to avoid further disruption of their lives.

510.    When plaintiffs retrieved their bicycles, they were damaged, and plaintiffs spent time and money repairing it.

<u>PLAINTIFF BEN FOSTER</u>

511.  On April 29, 2005, at approximately 7:55 PM, plaintiff BEN FOSTER was lawfully present in the vicinity of 21st Street and 7th Avenue, in the County, City, and State of New York.

512.  Defendant CHICHOI BAO, #16456 and other unidentified NYPD officers detained and arrested plaintiff Foster and seized his bicycle without any probable cause, privilege, or consent.

513.  Defendant Bao and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

514.  Defendant Bao and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

515.  Plaintiff Foster was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

516.  Plaintiff Foster was in NYPD custody for approximately six hours.

517.  Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite*, depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

518.  Defendants refused to release plaintiff's bicycle until after arraignment.

519.  At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

520.  Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

521.  When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

PLAINTIFFS JULIA ASHERMAN, HENRY BAKER, TOBY LEAH BOCHAN, JOHN P. CARMAN, DAVID CONNELLY, CLARA HENDRICKS, CAITLIN KRENN, EVAN O'NEILL, JESSICA RECHTSCHAFFER, TREVOR SNAPP, AND NEAL WEISSMAN

522.    On April 29, 2005, at approximately 7:45 PM, plaintiffs JULIA ASHERMAN, HENRY BAKER, TOBY LEAH BOCHAN, JOHN P. CARMAN, DAVID CONNELLY, CLARA HENDRICKS, CAITLIN KRENN, EVAN O'NEILL, JESSICA RECHTSCHAFFER, TREVOR SNAPP, and NEAL WEISSMAN were lawfully present in the vicinity of 19th Street and 10th Avenue in the County, City, and State of New York.

523.    Acting under orders from defendants Smolka, Graham, Paragallo, Shortell, Hughes, Caneco, Albano, Steffens, McCabe, and/or other unidentified NYPD supervisors, Lt. Turco and officers under his command, and other resources, including plainclothes and/or undercover NYPD officers on bicycles posing as participants in the ride, to trap plaintiffs Asherman, Baker, Bochan, Carman, Connelly, Hendricks, Krenn, O'Neill, Rechtschaffer, Snapp, Weissman, and others by physically trapping them between a line of scooters and marked and unmarked NYPD vehicles without warning.

524.    In the vicinity of 19th Street and 10th Avenue, at approximately 7:45 PM, defendant RICHARD LAVELLE, #2384, and other unidentified NYPD officers, detained and arrested plaintiff Asherman and seized plaintiff's bicycle without any probable cause, privilege, or consent.

525.    In the vicinity of 19th Street and 10th Avenue, at approximately 7:45 PM, defendant MARLON GEORGE, #19193, and other unidentified NYPD officers, detained and arrested plaintiff Baker and seized plaintiff's bicycle without any probable cause, privilege, or consent.

526.    In the vicinity of 19th Street and 10th Avenue, at approximately 7:45 PM, unidentified NYPD officers detained and arrested plaintiff Bochan and seized plaintiff's bicycle without any probable cause, privilege, or consent.

527.    In the vicinity of 19th Street and 10th Avenue, at approximately 7:45 PM, defendant MARTIN GIMENEZ, #22916, and other unidentified NYPD officers, detained and arrested plaintiff Carman and seized plaintiff's bicycle without any probable cause, privilege, or consent.

528.    In the vicinity of 19th Street and 10th Avenue, at approximately 7:45 PM, defendant SANDRA DELEONMOYA, #27876, and other unidentified NYPD officers, detained and arrested plaintiff Connelly and seized plaintiff's bicycle without any probable cause, privilege, or consent.

529.    In the vicinity of 19th Street and 10th Avenue, at approximately 7:45 PM, defendant GRAHAM EMBUREY, # 25748, and other unidentified NYPD officers, detained and arrested plaintiff Hendricks and seized plaintiff's bicycle without any probable cause, privilege, or consent.

530.    In the vicinity of 19th Street and 10th Avenue, at approximately 7:45 PM, defendant FNU CORDON, #25605, and other unidentified NYPD officers, detained and arrested plaintiff Krenn and seized plaintiff's bicycle without any probable cause, privilege, or consent.

531.    In the vicinity of 19th Street and 10th Avenue, at approximately 7:45 PM, defendant JOSEPH JOHN, #2797, and other unidentified NYPD officers, detained and arrested plaintiff O'Neill and seized plaintiff's bicycle without any probable cause, privilege, or consent.

532.    In the vicinity of 19th Street and 10th Avenue, at approximately 7:45 PM, unidentified NYPD officers detained and arrested plaintiff Rechtschaeffer and seized plaintiff's bicycle without any probable cause, privilege, or consent.

533.    In the vicinity of 19th Street and 10th Avenue, at approximately 7:45 PM, defendant  DAVID HUNG, #19904, and other unidentified NYPD officers, detained and arrested plaintiff Snapp and seized plaintiff's bicycle without any probable cause, privilege, or consent.

534.    In the vicinity of 19th Street and 10th Avenue, at approximately 7:45 PM, defendant  SANTIAGO GOMEZ, #19288, and other unidentified NYPD officers, detained and arrested plaintiff Weisman and seized plaintiff's bicycle without any probable cause, privilege, or consent.

535.    Defendants and other unidentified NYPD officers deliberately handcuffed plaintiffs too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

536.    Defendants and other unidentified NYPD officers then caused a Polaroid photograph or photographs of each plaintiff and her or his bicycle to be taken.

537.    Plaintiffs Asherman, Baker, Bochan, Carman, Connelly, Hendricks, Krenn, O'Neill, Rechtschaffer, Snapp, and Weissman were subsequently transported to an NYPD facility for arrest processing and eventually issued DAT's.

538.    Plaintiffs Asherman, Baker, Connelly, Hendricks, Snapp, Weissman, were in NYPD custody for approximately eight hours.

539.    Plaintiff Rechtschaffer was in NYPD custody for approximately five and a half hours.

540.    Plaintiffs Bochan, Krenn, and O'Neill were in NYPD custody for approximately four hours.

541.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs prompt hearings before neutral fact-finders to test the probable validity of the deprivations *pendente lite*, depriving plaintiffs of the use and enjoyment of plaintiffs' bicycles.

542.    Defendants refused to release plaintiffs' bicycles until after arraignment.

543.    Plaintiff Carman's bicycle was lost in the NYPD vouchering system and never returned to him.

544.    At plaintiffs' arraignments approximately a month after their arrest, plaintiffs were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

545.    Plaintiffs Asherman, Baker, Bochan, Krenn, Snapp, Rechtschaffer, and Weissman were offered, and accepted, ACD's in order to retrieve their bicycles from the NYPD and to avoid further disruption of their lives.

546.    Plaintiffs O'Neill, Carman, Connelly, and Hendricks hired an attorney to defend the charges against them.

547.    During the period between April 29, 2005 and November 4, 2005, plaintiff O'Neill was required to make approximately four court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

548.    On or about November 4, 2005, the charges against plaintiff O'Neill were dismissed on speedy trial grounds.

549.    During the period between April 29, 2005 and January 30, 2006, plaintiffs Carman, Connelly, and Hendricks were required to make approximately five court appearances to defend themselves in the criminal proceedings that defendants had initiated against them.

550.    On or about January 30, 2006, all charges against plaintiffs Carman, Connelly and Hendricks were dismissed on speedy trial grounds.

551.    When plaintiffs retrieved their bicycles, they were damaged, and plaintiffs spent time and money repairing them.

### PLAINTIFF COREY EASTWOOD

552.    On April 29, 2005, at approximately 8:30 PM, plaintiff COREY EASTWOOD was lawfully present in the vicinity of 5th Street and Avenue A, in the County, City and State of New York.

553.    Upon information and belief, defendant "FNU" O'DOUGHERTY, #13510 and other unidentified NYPD officers detained and arrested Eastwood and seized his bicycle without any probable cause, privilege, or consent.

554.    Defendant O'Dougherty and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

555.    Plaintiff Eastwood was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

556.    Plaintiff Eastwood was in NYPD custody for several hours.

557.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving him of the use and enjoyment of his bicycle.

558.    Defendants refused to release plaintiff's bicycle until after arraignment.

559.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

560.    Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

561.  When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

<u>PLAINTIFF JOSHUA FISHER</u>

562.    On April 29, 2005, at approximately 8:30 PM, plaintiff JOSHUA FISHER was lawfully present downtown in the vicinity of the West Side Highway, in the County, City and State of New York.

563.    Defendant DAVID POPLASKI, #15482 and other unidentified NYPD officers detained and arrested Fisher and seized his bicycle without any probable cause, privilege, or consent.

564.    Defendant Poplaski and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

565.    Defendant Poplaski and other unidentified NYPD officers deliberately handcuffed plaintiff Fisher too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

566.    Plaintiff Fisher was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

567.    Plaintiff Fisher was in NYPD custody for approximately six hours.

568.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving him of the use and enjoyment of his bicycle.

569.    Defendants refused to release plaintiff's bicycle until after arraignment.

570.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

571.    During the period between April 29, 2005 and February 3, 2006, plaintiff Fisher was required to make approximately three court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

572.    On February 3, 2006, plaintiff was offered, and accepted, an ACD in order to avoid further disruption of his life.

573.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

## PLAINTIFF BRANDON NEUBAUER

574.    Defendants Smolka, Graham, Shortell, Turco, McCabe, Albano, and/or other unidentified NYPD officers specifically targeted plaintiff Brandon Neubauer for arrest on April 25, 2005, as he was a named defendant in the City's lawsuit against Time's Up! and defendants believed he was a "leader" or "organizer" of the perceived "group" Critical Mass.  Specifically, defendants utilized plainclothes and undercover officers to report on plaintiff Neubauer's movements and to coordinate the formation of a roadblock utilizing marked and unmarked vehicles, including scooters, patrol cars, and prisoner transport vehicles, to arrest plaintiff Neubauer.

575.    At approximately 9:30 PM, plaintiff Neubauer was lawfully present in the vicinity of 2nd Street and 2nd Avenue, in the County, City, and State of New York.

576.    There, defendant Shortell and other unidentified NYPD officers detained and arrested plaintiff Neubauer, and seized his bicycle without any probable cause, privilege, or consent.

577.    Defendant Shortell and other unidentified NYPD officers pushed plaintiff Neubauer up against a wall, holding his head in place by grabbing his hair.

578.    Defendant Shortell and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

579.    Plaintiff Neubauer was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

580.    Plaintiff Neubauer was in NYPD custody for approximately three and a half hours.

581.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving him of the use and enjoyment of his bicycle.

582.    Defendants refused to release plaintiff's bicycle until after arraignment.

583.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

584.    Plaintiff Neubauer was offered, and accepted, an ACD, in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life, and because he was a defendant in the City's affirmative litigation.

585. When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

### PLAINTIFF KEVIN CAPLICKI

586. On April 29, 2005, at approximately 9:30 PM, plaintiff KEVIN CAPLICKI was lawfully present in the vicinity of 2nd Street and 2nd Avenue, in the County, City, and State of New York.

587. There, defendant Shortell and other unidentified NYPD officers detained and arrested Caplicki and seized his bicycle without any probable cause, privilege, or consent.

588. Defendant Shortell and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

589. Plaintiff Caplicki was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

590. Plaintiff Caplicki was in NYPD custody for approximately four hours.

591. Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving him of the use and enjoyment of his bicycle.

592. Plaintiff hired an attorney to defend against the charges defendants had lodged against him.

593. Defendants refused to release plaintiff's bicycle until after arraignment.

594. At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

595.    During the period between April 29, 2005 and March 27, 2006, plaintiff Caplicki was required to make approximately eight court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

596.    On or about March 27, 2006, all charges against plaintiff Caplicki were dismissed on speedy trial grounds.

597.  When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

## THE MAY 27, 2005 CRITICAL MASS DETAIL

598.    In the afternoon of May 27, 2005, defendants Graham, Paragallo, Caneco, Albano, Steffens, McCabe, and/or other unidentified NYPD supervisors acting under their orders instructed defendants Turco and other NYPD officers under their command, including defendants LT. BARBARA FARLEY, and officers FNU DIAZ, #24459, JOANN SPREEN, #19464, 1st PRECINCT, VINCENT FIORE, #25517, 1st PRECINCT, to arrest perceived participants in the Critical Mass bicycle ride they expected would occur, including through the use of surveillance helicopters and plainclothes and/or undercover officers to infiltrate and locate perceived "groups" of bicyclists throughout the city and to coordinate the use of scooters and other police resources to trap and arrest them without first warning the perceived participants that they may be violating the law if they continue to ride their bicycles and without providing them with a meaningful opportunity to disperse.

## PLAINTIFF ESTHER REGELSON

599.    On May 27, 2005, at approximately 8:30 PM, plaintiff ESTHER REGELSON was lawfully present in the vicinity of 42nd Street and 7th Avenue, in the County, City and State of New York.

600.   Defendant LIEUTENANT BARBARA FARLEY, 90TH PRECINCT and other unidentified NYPD officers, detained and arrested Regelson and seized her bicycle without any probable cause, privilege or consent.

601.   Defendant Farley and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

602.   Plaintiff Regelson was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

603.   Plaintiff Regelson was in NYPD custody for several hours.

604.   Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving her of the use and enjoyment of her bicycle.

605.   Defendants refused to release plaintiff's bicycle until after arraignment.

606.   At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

607.   During the period between May 27, 2005 and the date on which her case was dismissed several months later on speedy trial grounds, plaintiff Regelson was required to make approximately six to eight court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

608.   When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

### PLAINTIFF DANIEL VATSKY

609.    On May 27, 2005, at approximately 8:30 PM, plaintiff DANIEL VATSKY was lawfully present in the vicinity of 42nd Street and 7th Avenue, in the County, City and State of New York.

610.    At aforesaid time and place, members of the New York City Police Department began indiscriminately and randomly arresting individuals who were participating in or were perceived to be participating in a Critical Mass bicycle ride.

611.    Upon information and belief, defendant DIAZ, #24459 and other unidentified NYPD officers, detained and arrested Vatsky and seized his bicycle without any probable cause, privilege or consent.

612.    Defendant Diaz and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

613.    Plaintiff Vatsky was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

614.    Plaintiff Vatsky was in NYPD custody for several hours.

615.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving him of the use and enjoyment of his bicycle.

616.    Defendants also confiscated plaintiff's cell phone, with the explanation of "because it is a camera phone". The cell phone was not returned until two months after the arrest despite repeated requests to the NYPD's Legal Bureau, including specifically at least one request directly to defendant Albano, to return the cell phone.

617.    Defendants refused to release plaintiff's bicycle until after arraignment.

618. At plaintiff's arraignment on June 27, 2005, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

619. Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle and telephone from the NYPD and to avoid further disruption of his life.

620. When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

<u>PLAINTIFFS PETER BERGIN AND DEREK KLEVITZ</u>

621. On May 27, 2005, at approximately 8:45 PM, plaintiffs PETER M. BERGIN and DEREK KLEVITZ were lawfully present in the vicinity of 12th Street and 2nd Avenue, in the County, City and State of New York.

622. Defendant JOANN SPREEN, #19464, 1ST PRECINCT and other unidentified NYPD officers, detained and arrested plaintiff Bergin and seized his bicycle without any probable cause, privilege or consent.

623. Defendant VINCENT FIORE, #25517, 1ST PRECINCT and other unidentified NYPD officers on scooters shot out of the intersection against the light suddenly. Defendent Fiore spet up and struck plaintiff Klevitz from the side with his scooter while Klevitz was on his bicycle, then physically pulled him from the bike. He detained and arrested Klevitz and seized his bicycle without any probable cause, privilege or consent.

624. Defendants Spreen and Foire and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiffs Bergin and Klevitz and their bicycles to be taken.

625.    Plaintiffs Bergin and Klevitz were subsequently transported to an NYPD facility for arrest processing and issued a DAT after having been in NYPD custody for approximately four hours.

626.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs prompt hearings before neutral fact-finders to test the probable validity of the deprivations *pendente lite*, depriving plaintiffs of the use and enjoyment of plaintiffs' bicycles.

627.    Defendants refused to release plaintiffs' bicycles until after arraignment.

628.    At plaintiffs' arraignments approximately a month after their arrests, plaintiffs Bergin and Klevitz were charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

629.    When plaintiffs Bergin and Klevitz retrieved their bicycles, they were damaged, and plaintiffs spent time and money repairing them.

630.    Plaintiffs Bergin and Klevitz hired an attorney to defend against the charges lodged against them by defendants.

631.    During the period between May 27, 2005 and the date their cases were dismissed plaintiffs Bergin and Klevitz were required to make approximately several court appearances to defend themselves in the criminal proceedings that defendants had initiated against them.

632.    On or about October 27, 2005, the parading charges against plaintiffs Klevitz and Bergin were dismissed on facial insufficiency grounds.

633.    Several months later, following separate bench trials, plaintiffs Klevitz and Bergin were convicted of disorderly conduct.

<u>THE JUNE 24, 2005 CRITICAL MASS DETAIL</u>

634.    In the afternoon of June 24, 2005, defendants Graham, Paragallo, Caneco, Albano, Steffens, McCabe, and/or other unidentified NYPD supervisors acting under their orders instructed defendants Turco and other NYPD officers under their command, including defendants JOHN COYLE, #2031, 1st PRECINCT, HONMAN YAN, #31945, 1st PRECINCT, ARTHUR CLARKE, #80001, 1st PRECINCT, ANTHONY SUSI, #31162, 1st PRECINCT, EDDIE PEREZ, #22433, 1st PRECINCT, DONALD GESSNER, #00261, 1st PRECINCT,  and NYPD OFFICER BENJAMIN BELLINGER, #25108, to arrest perceived participants in the Critical Mass bicycle ride they expected would occur, including through the use of surveillance helicopters and plainclothes and/or undercover officers to infiltrate and locate perceived "groups" of bicyclists throughout the city and to coordinate the use of scooters and other police resources to trap and arrest them without first warning the perceived participants that they may be violating the law if they continue to ride their bicycles and without providing them with a meaningful opportunity to disperse.

PLAINTIFF WENDY SCHER

635.    On June 24, 2005, at approximately 8:00 PM, plaintiff WENDY SCHER was lawfully present in the vicinity of the East 50s and Madison Avenue, in the County, City and State of New York.

636.    Defendant JOHN COYLE, #20321, 1ST PRECINCT and other unidentified NYPD officers detained and arrested Scher and seized her bicycle without any probable cause, privilege or consent.

637.    Defendant Coyle and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

638.    Plaintiff Scher was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

639.    Plaintiff Scher was in NYPD custody for approximately two hours.

640.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

641.    Defendants refused to release plaintiff's bicycle until after arraignment.

642.    At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

643.    Plaintiff hired an attorney to defend against the charges defendants had lodged against plaintiff.

644.    During the period between June 24, 2005 and the date the case was dismissed on speedy trial grounds, plaintiff Scher was required to make approximately at least three court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

645.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

## PLAINTIFF JARED KLETT

646.    On June 24, 2005, at approximately 8:05 PM, plaintiff JARED KLETT was lawfully present in the vicinity of 39th Street and 9th Avenue, in the County, City and State of New York.

647.    Defendant HONMAN YAN, #31946, 1ST PRECINCT and other unidentified NYPD officers detained and arrested plaintiff Klett and seized his bicycle without any probable cause, privilege or consent.

648.    Defendant Yan and other unidentified NYPD officers handled plaintiff Klett roughly while removing him from his bicycle.

649.    Defendant Yan and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

650.    Plaintiff Klett was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

651.    Plaintiff Klett was in NYPD custody for approximately six hours.

652.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

653.    Defendants refused to release plaintiff's bicycle until after arraignment.

654.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

655.    Plaintiff Klett was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

<u>PLAINTIFF JULIANA LEUCKING</u>

656.    On June 24, 2005, at approximately 8:20 PM, plaintiff JULIANA LUECKING was lawfully present in the vicinity of 38th Street and 8th Avenue, in the County, City and State of New York.

657.     Defendant ARTHUR CLARKE, #8001, 1ST PRECINCT, who was riding a motor scooter, rammed the scooter into Lueking's bicycle while she was riding, then detained and arrested Luecking and seized her bicycle without any probable cause, privilege or consent.

658.     Defendant Clarke and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

659.     Plaintiff Luecking was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

660.     Plaintiff Luecking was in NYPD custody for approximately three and a half hours.

661.     Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

662.     Defendants refused to release plaintiff's bicycle until after arraignment.

663.     At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

664.     Plaintiff was offered, and accepted, an ACD in order to retrieve her bicycle from the NYPD and to avoid further disruption of her life.

665.     When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

<u>PLAINTIFF MATTHEW NAMER</u>

666.     On June 24, 2005, at approximately 8:20 PM, plaintiff MATTHEW NAMER was lawfully present in the vicinity of 65th Street and Park Avenue, in the County, City and State of New York.

667.     Defendant ANTHONY SUSI, #31162, 1ST PRECINCT and other unidentified NYPD officers detained and arrested Namer and seized his bicycle without any probable cause, privilege or consent.

668.     Defendant Susi and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

669.     Plaintiff Namer was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

670.     Plaintiff Namer was in NYPD custody for approximately three and a half hours.

671.     Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

672.     Defendants refused to release plaintiff's bicycle until after arraignment.

673.     At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

674.     Plaintiff hired an attorney to defend against the charges defendants had lodged against plaintiff.

675.     During the period between June 24, 2005 and March 29, 2006, plaintiff Namer was required to make approximately at least six court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

676.    On or about March 29, 2006, all charges against plaintiff Namer were dismissed on speedy trial grounds.

677.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

PLAINTIFF ED TRISTRAM

678.    On June 24, 2005, at approximately 8:20 PM, plaintiff ED TRISTRAM was lawfully present in the vicinity of 65th Street and Park Avenue, in the County, City and State of New York.

679.    Defendant EDDIE PEREZ, #22433, 1ST PRECINCT and other unidentified NYPD officers, detained and arrested plaintiff Tristram and seized his bicycle without any probable cause, privilege or consent.

680.    Defendant Perez and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

681.    Plaintiff Tristram was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

682.    Plaintiff Tristram was in NYPD custody for approximately five hours.

683.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

684.    Defendants refused to release plaintiff's bicycle until after arraignment.

685.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

96

686.    Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

687.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

## PLAINTIFF JESSICA RECHTSCHAEFFER

688.    On June 24, 2005, at approximately 8:30 PM, plaintiff JESSICA RECHTSCHAFFER was lawfully present in the vicinity of 72nd Street Central Park crossing, in the County, City and State of New York.

689.    Upon information and belief, unidentified NYPD officers detained and arrested Rechtschaffer and seized her bicycle without any probable cause, privilege or consent.

690.    Unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

691.    Plaintiff Rechtschaffer was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

692.    Plaintiff Rechtschaffer was in NYPD custody for approximately four hours.

693.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

694.    Defendants refused to release plaintiff's bicycle until after arraignment.

695.    At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

696.    Plaintiff was offered, and accepted, an ACD in order to retrieve her bicycle from the NYPD and to avoid further disruption of her life.

697.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

## PLAINTIFF MEG YOUNGER

698.    On June 24, 2005, at approximately 8:30 PM, plaintiff MEG YOUNGER was lawfully present in the Upper East Side, in the County, City and State of New York.

699.    Defendant DONALD GESSNER, #00261, 1ST PRECINCT and other unidentified NYPD officers grabbed Younger while she was riding, taking her by surprise and causing her bicycle to fall. Defendants then detained and arrested Younger and seized her bicycle without any probable cause, privilege or consent.

700.    Defendant Gessner and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

701.    Plaintiff Younger was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

702.    Plaintiff Younger was in NYPD custody for approximately three hours.

703.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

704.    Defendants refused to release plaintiff's bicycle until after arraignment.

705.    At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

706. Plaintiff was offered, and accepted, an ACD in order to retrieve her bicycle from the NYPD and to avoid further disruption of her life.

707. When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

### PLAINTIFF JASON DETZEL

708. On June 24, 2005, at approximately 8:40 PM, plaintiff JASON DETZEL was lawfully present in the vicinity of the Queensboro Bridge, in Queens County, City and State of New York.

709. Upon information and belief, numerous unidentified NYPD officers detained and arrested Detzel and seized his bicycle without any probable cause, privilege or consent.

710. Unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

711. Plaintiff Detzel was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

712. Plaintiff Detzel was in NYPD custody for approximately five hours.

713. Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

714. Defendants refused to release plaintiff's bicycle until after arraignment, in fact, plaintiff Detzel's bicycle appeared to have gotten lost in the NYPD's system and was never returned to him.

715.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

716.    During the period between June 24, 2005 and the date his case was dismissed, plaintiff Detzel was required to make approximately a least one court appearance to defend himself in the criminal proceedings that defendants had initiated against him.

717.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

<u>PLAINTIFF SARA SCHEUFELE</u>

718.    On June 24, 2005, at approximately 8:40 PM, plaintiff SARA SCHEUFELE was lawfully present in the vicinity in the vicinity of the Queensboro Bridge, in Queens County, City and State of New York.

719.    Upon information and belief, an unidentified NYPD captain jumped out of a car and flipped plaintiff and her bike over by grabbing her back wheel.  Unidentified NYPD officers, including defendant BENJAMIN BELLINGER, #25108, then detained and arrested Scheufele and seized her bicycle without any probable cause, privilege or consent.

720.    Unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

721.    Plaintiff Scheufele was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

722.    Plaintiff Scheufele was in NYPD custody for approximately four hours.

723.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

724.    Defendants refused to release plaintiff's bicycle until after arraignment.

725.    At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

726.    During the period between June 24, 2005 and the date her case was dismissed, plaintiff Scheufele was required to make approximately at least one court appearance to defend herself in the criminal proceedings that defendants had initiated against her.

727.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

<u>THE JULY 29, 2005 CRITICAL MASS DETAIL</u>

728.    Prior to July 29, 2005, Time's Up!, the organizational defendant in the City's then-ongoing bid in New York State Supreme Court to prevent Critical Mass bicycle rides in any form, published on its webpage a message in sum and substance encouraging participants in Critical Mass bicycle rides to adhere to traffic regulations, including by stopping at red lights unless escorted or directed through them by police.  As a result, in the afternoon of July 29, 2005, people encouraged potential participants in the Critical Mass ride to make approximately so-called "Smolka Stops" at red lights.

729.    In the afternoon of July 29, 2005, defendants Graham, Paragallo, Hughes, Caneco, Albano, Steffens, McCabe, and/or other unidentified NYPD supervisors acting under their orders instructed defendants Turco and other NYPD officers under their command,

101

including defendants "FNU" WALLACE,  MARC RICHARDSON, #21396, 103rd PRECINCT, ROBERT STOKES, #18187, MANHATTAN NORTH, RICHARD JOHNSON, #00759, MANHATTAN NORTH, EDWARD MARCIAL, #13689, 46th PRECINCT,  MARCY GARCIA, #17029, 1st PRECINCT,  VINCENT GALLO, #19958, 1st PRECINCT,  WILLIAM GROSS, #26890, 1st PRECINCT,  LEO NUGENT, #11654,  STEVEN VALENTINE, #13585, ABRAHAM ARTEAGA, #27115, 75th PRECINCT, to arrest perceived participants in the Critical Mass bicycle ride they expected would occur, including through the use of surveillance helicopters and plainclothes and/or undercover officers to infiltrate and locate perceived "groups" of bicyclists throughout the city and to coordinate the use of scooters and other police resources to trap and arrest them without first warning the perceived participants that they may be violating the law if they continue to ride their bicycles and without providing them with a meaningful opportunity to disperse.

<u>PLAINTIFF SHARON BLYTHE</u>

730.    On July 29, 2005, at approximately 8:00 PM, plaintiff SHARON BLYTHE was lawfully present in the vicinity of 14th Street and 7th Avenue, in the County, City and State of New York.

731.    At aforesaid time and place, two police SUVs and several motor scooters rode against oncoming traffic toward plaintiff Blythe, whereupon  defendant "FNU" WALLACE ran toward plaintiff Blythe, who was holding her bicycle. Plaintiff Blythe informed the officer she was pregnant. Without warning, Wallace pushed Blythe's bicycle to the ground, causing Blythe to fall.  Defendant MARC RICHARDSON, #21396, 103RD PRECINCT and defendant "FNU" WALLACE then arrested Blythe and seized her bicycle without any probable cause, privilege or consent.

732.    Defendant Marc Richardson, #21396, 103rd Precinct and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

733.    Defendant Marc Richardson, #21396, 103rd Precinct and other unidentified NYPD officers deliberately handcuffed plaintiff Blythe too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury. While handcuffed and in a very hot police van, Blythe fell off the bench and hit her head.

734.    Plaintiff Blythe was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

735.    Plaintiff Blythe was in NYPD custody for approximately ten hours – until 6:00 AM.

736.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

737.    Defendants refused to release plaintiff's bicycle until after arraignment.

738.    At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

739.    Plaintiff Blythe hired a lawyer to defend against the charges defendants had caused to be brought against her.

740.    During the period between July 29, 2005 and December 14, 2005, plaintiff Blythe was required to make approximately three court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

741.    On or about December 14, 2005, all charges against plaintiff Blythe were dismissed on speedy trial grounds.

742.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

### PLAINTIFFS FLORINDO TRONCELLITI, BRET LIEBENDORFER, ROBERT MARTUS, and LOUISA KRUPP

743.    At approximately 8:00 PM on July 29, 2005, plaintiffs FLORINDO TRONCELLITI, BRET LIEBENDORFER, ROBERT MARTUS, and LOUISA KRUPP were lawfully present in the vicinity of 14th Street and 7th Avenue in the County, City, and State of New York.

744.    In the vicinity of 14th Street and 7th Avenue at approximately 8:00 PM, defendant ROBERT STOKES, #18187, MANHATTAN NORTH, and other unidentified NYPD officers, detained and arrested plaintiff Troncelliti and seized his bicycle without any probable cause, privilege or consent.

745.    In the vicinity of 14th Street and 7th Avenue at approximately 8:00 PM, defendants ROBERT STOKES, #18187, MANHATTAN NORTH, SGT RICHARD JOHNSON, #00759, MANHATTAN NORTH and other unidentified NYPD officers, pulled plaintiff Liebendorfer off his bicycle without warning, then detained and arrested Liebendorfer and seized his bicycle without any probable cause, privilege or consent.

746.    In the vicinity of 14th Street and 7th Avenue at approximately 8:00 PM, an unidentified NYPD officer rammed into Martus with his scooter, knocking him to the ground. Another unidentified officer grabbed and cuffed him, then dragged him to the curb. Defendant ROBERT STOKES, #18187, MANHATTAN NORTH, and other unidentified NYPD officers,

detained and arrested plaintiff Martus and seized his bicycle without any probable cause, privilege or consent.

747.    In the vicinity of 14th Street and 7th Avenue at approximately 8:00 PM, unidentified NYPD officers detained and arrested plaintiff Krupp and seized her bicycle without any probable cause, privilege or consent.

748.    Defendants caused a Polaroid photograph or photographs of plaintiffs and their bicycles to be taken.

749.    Defendants Stokes, Johnson, and other unidentified NYPD officers deliberately handcuffed plaintiffs Troncelliti, Liebendorfer, Martus, and Krupp too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

750.    Plaintiffs Troncelliti, Liebendorfer, Martus, and Krupp were subsequently transported to an NYPD facility for arrest processing.

751.    Plaintiff Troncelliti was in NYPD custody for approximately five hours before he was released from NYPD custody without charge or explanation.

752.    Plaintiffs Liebendorfer and Martus were in NYPD custody for approximately nine hours, and plaintiff Krupp was in NYPD custody for approximately seven hours, before they were released with DAT's.

753.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs prompt hearings before neutral fact-finders to test the probable validity of the deprivations *pendente lite*, depriving them of the use and enjoyment of their bicycles.

754.    Defendants refused to release plaintiffs' bicycles until after arraignment.

755. At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

756. Plaintiffs Troncelliti, Liebendorfer, Martus, and Krupp were offered, and accepted, ACD's in order to retrieve their bicycles from the NYPD and to avoid further disruption of their lives.

757. When plaintiffs retrieved their bicycles, they were damaged, and plaintiffs spent time and money repairing them.

## PLAINTIFF CHRISTOPHER LONG

758. On July 29, 2005, at approximately 8:00 PM, plaintiff CHRISTOPHER LONG was lawfully present in the vicinity of 23rd Street and 8th Avenue, in the County, City and State of New York.

759. Defendant EDWARD MARCIAL, #13689, 46TH PRECINCT and other unidentified NYPD officers, detained and arrested plaintiff Long and seized his bicycle without any probable cause, privilege or consent.

760. Defendant Marcial and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

761. Plaintiff Long was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

762. Plaintiff Long was in NYPD custody for a number of hours.

763. Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

764.    Defendants refused to release plaintiff's bicycle until after arraignment.

765.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

766.    Plaintiff hired an attorney in order to defend against the charges defendants had caused to be lodged against plaintiff.

767.    During the period between July 29, 2005 and the date the case against him was dismissed on speedy trial grounds, plaintiff Long was required to make approximately at least six court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

768.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

<u>PLAINTIFFS KELLY TISDALE, SCOTT CODEY, AND PETER NOAH</u>

769.    At approximately 8:00 PM on July 29, 2005, plaintiffs KELLY TISDALE, SCOTT CODEY, and PETER NOAH were lawfully present in the vicinity of Grove Street and 7th Avenue in the County, City, and State of New York, stopped at a red light.

770.    In the vicinity of Grove Street and 7th Avenue at approximately 8:00 PM, defendant MARCY GARCIA, #17029, 1ST PRECINCT and other unidentified NYPD officers, detained and arrested plaintiff Tisdale and seized her bicycle without any probable cause, privilege or consent.

771.    In the vicinity of Grove Street and 7th Avenue at approximately 8:00 PM, defendant VINCENT GALLO, #19958, 1ST PRECINCT and other unidentified NYPD officers,

detained and arrested plaintiff Codey and seized his bicycle without any probable cause, privilege or consent.

772.    In the vicinity of Grove Street and 7th Avenue at approximately 8:00 PM, defendant WILLIAM GROSS, #26890, 1ST PRECINCT and other unidentified NYPD officers detained and arrested Noah and seized his bicycle without any probable cause, privilege or consent.

773.    Also arrested at the same time, place, and location, while stopped at a red light on their bicycles, were at least two undercover NYPD officers.

774.    Defendants caused a Polaroid photograph or photographs of plaintiffs and their bicycles to be taken.

775.    Defendants Garcia, Gallo, Gross, and other unidentified NYPD officers deliberately handcuffed plaintiffs Tisdale, Codey, and Noah too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

776.    Plaintiffs Tisdale, Codey, and Noah were subsequently transported to an NYPD facility for arrest processing.

777.    Plaintiff Tisdale was in NYPD custody for approximately six hours.

778.    Plaintiff Codey was in NYPD custody for approximately four and a half hours.

779.    Plaintiff Noah was in NYPD custody for approximately eight hours.

780.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs prompt hearings before neutral fact-finders to test the probable validity of the deprivations *pendente lite*, depriving them of the use and enjoyment of their bicycles.

781.    Defendants refused to release plaintiffs' bicycles until after arraignment.

782. At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

783. At his arraignment, plaintiff Noah was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

784. Plaintiff Tisdale hired an attorney in order to defend against the charges defendants had caused to be lodged against plaintiff.

785. During the period between July 29, 2005 and June 19, 2006, plaintiff Tisdale was required to make approximately ten court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

786. On or about June 19, 2006, all charges against plaintiff Tisdale were dismissed on speedy trial grounds.

787. During the period between July 29, 2005 and March 1, 2006, plaintiff Codey was required to make approximately four court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

788. On March 1, 2006, plaintiff Codey was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

789. When plaintiffs retrieved their bicycles, they were damaged, and plaintiffs spent time and money repairing them.

## PLAINTIFFS BRION BONKOWSKI AND YURI CANTOR

790. At approximately 8:45 PM on July 29, 2005, plaintiffs BRION BONKOWSKI and YURI CANTOR were lawfully present in the vicinity of 33rd Street and 1st Avenue in the County, City, and State of New York, stopped at a red light.

791.    In the vicinity of 33rd Street and 1st Avenue at approximately 8:45 PM, defendant LEO NUGENT, #11654 and other unidentified NYPD officers detained and arrested plaintiff Bonkowski and seized his bicycle without any probable cause, privilege or consent.

792.    In the vicinity of 33rd Street and 1st Avenue at approximately 8:45 PM, an unidentifed plainclothes NYPD officer addressed by other officers as "CAPTAIN" jumped out from between parked cars grabbed plaintiff Cantor by a bicycle locking chain around his waist. Plaintiff Cantor was handed off to defendant STEVEN VALENTINE, #13585, and other unidentified NYPD officers, who detained and arrested Cantor and seized his bicycle without any probable cause, privilege or consent.

793.    Defendants caused a Polaroid photograph or photographs of plaintiffs and their bicycles to be taken.

794.    Defendants Nugent and Valentine and other unidentified NYPD officers deliberately handcuffed plaintiffs Bonkowski and Cantor too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

795.    Plaintiffs Bonkowski and Cantor were subsequently transported to an NYPD facility for arrest processing.

796.    Plaintiff Bonkowski was in NYPD custody for approximately three hours.

797.    Plaintiff Cantor was in NYPD custody for approximately six hours.

798.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs prompt hearings before neutral fact-finders to test the probable validity of the deprivations *pendente lite*, depriving them of the use and enjoyment of their bicycles.

799.    Defendants refused to release plaintiffs' bicycles until after arraignment.

800.    At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

801.    Plaintiff Bonkowski was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

802.    Plaintiff Cantor hired a lawyer to defend against the charges defendants had caused to be brought against plaintiff.

803.    During the period between July 29, 2005 and December 5, 2005, plaintiff Cantor was required to make approximately four  court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

804.    On or about December 5, 2005, all charges against plaintiff Cantor were dismissed on speedy trial grounds.

805.    When plaintiffs retrieved their bicycles, they were damaged, and plaintiffs spent time and money repairing them.

<u>PLAINTIFF ALEXANDER APPEL</u>.

806.    On July 29, 2005, at approximately 8:45 PM, plaintiff ALEXANDER APPEL was lawfully present in the vicinity of 33rd Street and 2nd Avenue, in the County, City and State of New York

807.    Plaintiff Appel was standing filming defendant Hughes as he made an arrest when defendant Hughes ordered an unidentified NYPD officer to "grab that guy with the camera."

808.    Plaintiff Appel was then shoved from behind and the camera was knocked from his hand. He was then pulled across street and handcuffed.

809. Defendant ABRAHAM ARTEAGA, #27115, 75TH PRECINCT and other unidentified NYPD officers arrested Appel and seized his bicycle without any probable cause, privilege or consent.

810. Defendant Arteaga and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

811. Plaintiff Appel was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

812. Plaintiff Appel was in NYPD custody for approximately seven hours.

813. Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

814. Defendants refused to release plaintiff's bicycle until after arraignment.

815. At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with committing disorderly conduct.

816. Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

817. When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

## THE AUGUST 26, 2005 CRITICAL MASS DETAIL

818. In the afternoon of August 26, 2005, defendants Graham, Paragallo, Hughes, Caneco, Albano, Steffens, McCabe, and/or other unidentified NYPD supervisors acting under their orders instructed defendants Turco and other NYPD officers under their command, including defendants ROBERT POLLASTRO, 1st PRECINCT,  JOHN MCGOWAN, #13466, 1st

PRECINCT, VINCENT GALLO, #19958, 1st PRECINCT, LISA RODRIGUEZ, #8788, DAVID SZABOLCS, #12180, MANHATTAN SOUTH TASK FORCE, "FNU" WALLACE, #1194, STEVEN VALENTINE, #13585, MANHATTAN SOUTH TASK FORCE, BRENDAN BEYRER, #18723, 52nd PRECINCT, JOSEPH CASTRO, #05318, 44th PRECINCT, DANIEL GROTH, #23788, and KEITH FOSTER, #08578, 40th PRECINCT, to arrest perceived participants in the Critical Mass bicycle ride they expected would occur in accordance with the policies and practices complained of herein.

<u>PLAINTIFFS RAHUL CHADHA, JONATHAN GOLDBERG,<br>ZOE MIZUHO, AND RACHEL STEIN</u>

819.    At approximately 7:40 PM on August 26, 2005, plaintiffs RAHUL CHADHA, JONATHAN GOLDBERG, ZOE MIZUHO, and RACHEL STEIN were lawfully present in the vicinity of Astor Place, in the County, City and State of New York.

820.    In the vicinity of Astor Place at approximately 7:40 PM, defendant LT. ROBERT POLLASTRO, 1ST PRECINCT and other unidentified NYPD officers, detained and arrested Chadha and seized his bicycle without any probable cause, privilege or consent.

821.    In the vicinity of Astor Place at approximately 7:40 PM, defendant JOHN MCGOWAN, #13466, 1ST PRECINCT and other unidentified NYPD officers detained and arrested plaintiff Goldberg and seized his bicycle without any probable cause, privilege or consent.

822.    In the vicinity of Astor Place at approximately 7:40 PM, unidentified NYPD officers detained and arrested plaintiff Mizuho and seized his bicycle without any probable cause, privilege or consent.

823.    In the vicinity of Astor Place at approximately 7:40 PM, defendant VINCENT GALLO, #19958, 1ST PRECINCT and other unidentified NYPD officers, detained and arrested plaintiff Stein and seized her bicycle without any probable cause, privilege or consent.

824.    Defendants caused a Polaroid photograph or photographs of plaintiffs and their bicycles to be taken.

825.    Defendants Pollastro, McGowan, Gallo, and other unidentified NYPD officers deliberately handcuffed plaintiffs Chadha, Goldberg, Mizuho, and Stein too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

826.    Plaintiffs Chadha, Goldberg, Mizuho, and Stein were subsequently transported to an NYPD facility for arrest processing.

827.    Plaintiff Chadha was in NYPD custody for approximately five and a half hours.

828.    Plaintiffs Goldberg and Mizuho were in NYPD custody for approximately four hours.

829.    Plaintiff Stein was in NYPD custody for approximately five hours.

830.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs prompt hearings before neutral fact-finders to test the probable validity of the deprivations *pendente lite*, depriving them of the use and enjoyment of their bicycles.

831.    Defendants refused to release plaintiffs' bicycles until after arraignment.

832.    At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

114

833.    During the period between August 26, 2005 and April 26, 2006, plaintiff Goldberg was required to make approximately six court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

834.    On or about April 26, 2006, all charges against plaintiff Goldberg were dismissed.

835.    During the period between August 26, 2005 and November 29, 2005, plaintiff Chadha was required to make approximately two court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

836.    On or about November 29, 2005, all charges against plaintiff Chadha were dismissed.

837.    During the period between August 26, 2005 and April 26, 2006, plaintiff Mizuho was required to make approximately six court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

838.    On or about April 26, 2006, all charges against plaintiff Mizuho were dismissed.

839.    During the period between August 26, 2005 and April 26, 2006, plaintiff Stein was required to make approximately six court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

840.    On or about April 26, 2006, all charges against plaintiff Stein were dismissed.

841.    When plaintiffs retrieved their bicycles, they were damaged, and plaintiffs spent time and money repairing them.

<u>PLAINTIFF GWEN KASH</u>

842.    On August 26, 2005, at approximately 8:00 PM, plaintiff GWEN KASH was lawfully present in the vicinity of 10th Street and Greenwich Avenue, in the County, City and State of New York.

115

843.    Defendant LISA RODRIGUEZ, #8788 grabbed roughly plaintiff Kash by one arm and dragged her to the sidewalk, even though Kash was off her bicycle and walking it to the sidewalk at the time. Rodriguez then arrested plaintiff Kash and seized her bicycle without any probable cause, privilege or consent.

844.    Defendant Rodriguez and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

845.    Defendant Rodriguez and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

846.    Plaintiff Kash was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

847.    Plaintiff Kash was in NYPD custody for approximately five hours.

848.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

849.    Defendants initiated criminal proceedings against plaintiff Kash despite their knowledge that they lacked probable cause to do so.

850.    Defendants refused to release plaintiff's bicycle until after arraignment.

851.    At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

852.    Plaintiff was offered, and accepted, an ACD in order to retrieve her bicycle from the NYPD and to avoid further disruption of her life.

853.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

## PLAINTIFF RYAN NUCKEL

854.    On August 26, 2005, at approximately 8:00 PM, plaintiff RYAN NUCKEL was lawfully present in the vicinity of 12th Street and Greenwich, in the County, City and State of New York.

855.    Defendant SZABOLCS DAVID, #12180, MANHATTAN SOUTH TASK FORCE and other unidentified NYPD officers, detained and arrested Nuckel and seized his bicycle without any probable cause, privilege or consent.

856.    Defendant David and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

857.    Defendant David and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

858.    Plaintiff Nuckel was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

859.    Plaintiff Nuckel was in NYPD custody for approximately eight hours.

860.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

861.    Defendants initiated criminal proceedings against plaintiff Nuckel despite their knowledge that they lacked probable cause to do so.

862.    Defendants refused to release plaintiff's bicycle until after arraignment.

863.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

864.    Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

865.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

## PLAINTIFF KAITLYN TIKKUN

866.    On August 26, 2005, at approximately 8:13 PM, plaintiff KAILTYN TIKKUN was lawfully present in the vicinity of Bleeker Street near West 4th Street, in the County, City and State of New York.

867.    Defendant "FNU" WALLACE, #1194 and other unidentified NYPD officers, detained and arrested plaintiff Tikkun and seized her bicycle without any probable cause, privilege or consent.

868.    Defendant Wallace and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

869.    Defendant Wallace and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

870.    Plaintiff Tikkun was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

871.    Plaintiff Tikkun was in NYPD custody for approximately four hours.

872.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

873.    Defendants refused to release plaintiff's bicycle until after arraignment.

874.    At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

875.    Plaintiff was offered, and accepted, an ACD in order to retrieve her bicycle from the NYPD and to avoid further disruption of her life.

876.    Plaintiff Tikkun's bicycle was never returned, the NYPD had lost the paperwork to locate it.

### PLAINTIFF SEAN BASINSKI

877.    On August 26, 2005, at approximately 8:30 PM, plaintiff SEAN BASINSKI was lawfully present in the vicinity of Houston Street and 2nd Avenue, in the County, City and State of New York.

878.    Defendant STEVEN VALENTINE, #13585, PATROL BORO MANHATTAN SOUTH TASK FORCE and other unidentified NYPD officers, detained and arrested Basinski and seized his bicycle without any probable cause, privilege or consent.

879.    Defendant Valentine and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

880.    Defendant Valentine and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

881.    Plaintiff Basinski was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

882.    Plaintiff Basinski was in NYPD custody for approximately five and a half hours.

883.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

884.    Defendants refused to release plaintiff's bicycle until after arraignment.

885.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

886.    During the period between August 26, 2005 and April 25, 2006, plaintiff Basinski was required to make approximately five court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

887.    On or about April 25, 2006, all charges against plaintiff Basinski were dismissed on speedy trial grounds.

888.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

<u>PLAINTIFF KURT BRAUNOHLER</u>

889.    On August 26, 2005, at approximately 8:30 PM, plaintiff KURT BRAUNOHLER was lawfully present in the vicinity of Charles Street and Greenwich, in the County, City and State of New York.

890.    Defendant BRENDAN BEYRER, #18723, 52ND PRECINCT and other unidentified NYPD officers, detained and arrested Braunohler and seized his bicycle without any probable cause, privilege or consent.

891.    Defendant Beyrer and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

892.    Defendant Breyer and other unidentified NYPD officers handcuffed plaintiff Braunohler behind his back, making him wear a heavy backpack on his chest and causing pain in plaintff's arms. Although Braunohler alerted the defendants to the situation, they kept plaintiff handcuffed in that manner for an excessive period of time, causing plaintiff pain and injury.

893.    Plaintiff Braunohler was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

894.    Plaintiff Braunohler was in NYPD custody for approximately five and a half hours.

895.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

896.    Defendants refused to release plaintiff's bicycle until after arraignment.

897.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

898.    Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

899.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

### PLAINTIFF JESSICA RECHTSCHAEFFER

900.    On August 26, 2005, at approximately 8:30 PM, plaintiff JESSICA RECHTSCHAFFER was lawfully present in the vicinity of Charles Street in the West Village, in the County, City and State of New York.

901.    Defendant NYPD Officer Daniel Groth, #23788,  grabbed plaintiff Rechtschaffer from behind and threw her off her bicycle.  Defendants then arrested Rechtschaffer and seized her bicycle without any probable cause, privilege or consent.

902.    Defendant Groth and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

903.    Unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

904.    Plaintiff Rechtschaffer was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

905.    Plaintiff Rechtschaffer was in NYPD custody for approximately five and a half hours.

906.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

907.    Defendants initiated criminal proceedings against plaintiff Rechtschaffer despite their knowledge that they lacked probable cause to do so.

908.     Defendants refused to release plaintiff's bicycle until after arraignment.

909.     At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

910.     Plaintiff pled guilty to the charges in order to retrieve her bicycle from the NYPD and to avoid further disruption of her life.

911.     When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

<u>PLAINTIFF EVAN O'DONNELL</u>

912.     On August 26, 2005, at approximately 8:45 PM, plaintiff EVAN O'DONNELL was lawfully present in the vicinity of 18th Street and 7th Avenue, in the County, City and State of New York.

913.     Defendants JOSEPH CASTRO, #05318, 44TH PRECINCT, NYPD OFFICER DANIEL GROTH, #23788, KEITH FOSTER, #08578, 40TH PRECINCT and other unidentified NYPD officers detained and arrested O'Donnell and seized his bicycle without any probable cause, privilege or consent.

914.     Defendants Castro, Foster, and other unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

915.     Defendants Castro, Foster and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

916.     Plaintiff O'Donnell was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

917.    Plaintiff O'Donnell was in NYPD custody for approximately five hours.

918.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

919.    Defendants initiated criminal proceedings against plaintiff O'Donnell despite their knowledge that they lacked probable cause to do so.

920.    Defendants refused to release plaintiff's bicycle until after arraignment.

921.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

922.    Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

923.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

## PLAINTIFF ERIN MCADAMS

924.    On August 26, 2005, at approximately 9:00 PM, plaintiff ERIN MCADAMS was lawfully present in the vicinity of 18th Street and 7th Avenue, in the County, City and State of New York.

925.     An unidentified NYPD officer ran into plaintiff McAdams on a motor scooter, almost knocking her off her bicycle, and then, along with other unidentified NYPD officers, detained and arrested McAdams and seized her bicycle without any probable cause, privilege or consent.

926.    Unidentified NYPD officers deliberately handcuffed plaintiff too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

927.    Unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

928.    Plaintiff McAdams was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

929.    Plaintiff McAdams was in NYPD custody for approximately five hours.

930.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

931.    Defendants refused to release plaintiff's bicycle until after arraignment.

932.    At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

933.    The case against plaintiff was subsequently dismissed in her favor.

934.    When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

<u>THE SEPTEMBER 30, 2005 CRITICAL MASS DETAIL</u>

935.    In the afternoon of September 30, 2005, unidentified NYPD supervisors instructed defendants Turco and other NYPD officers under their command, including defendants EDDIE PEREZ, #22433, 1st PRECINCT, VINCENT GALLO, #19958, JOHN COYLE, #20321, 1st PRECINCT, JAMELL KENDRICK, #38700, 1st PRECINCT, KENNETH WAGNER, #28519, 1st PRECINCT, NAIM IBROCI, #24725, MANHATTAN SOUTH TASK FORCE, WILLIAM GRODNICK, #04729, JAMES BRUNACHE, 83rd PRECINCT,

CHRISTOP TIMM, #06338, 113th PRECINCT,    SANDY  GONZALEZ, #22997,    and ALBERTO CORNEA, #06487, MANHATTAN NORTH to arrest perceived participants in the Critical Mass bicycle ride they expected would occur in accordance with the policies and practices complained of herein.

PLAINTIFFS TIMOTHY SHEA, ALLESSANDRO POLLEX,
NATALIE BELL, JEFFREY WENDT, AND NEIL FREEMAN

936.    At approximately between 7:30 and 7:40 PM on August 26, 2005, plaintiffs TIMOTHY SHEA, ALLESSANDRO POLLEX, NATALIE BELL, JEFFREY WENDT, and NEIL FREEMAN were lawfully present in the vicinity of 14th Street between 6th and 7th Avenues in the County, City and State of New York.

937.    In the vicinity of 14th Street between 6th and 7th Avenues at approximately between 7:30 and 7:40 PM, defendant EDDIE PEREZ, #22433, 1ST PRECINCT and other unidentified NYPD officers detained and arrested Shea and seized his bicycle without any probable cause, privilege or consent.

938.    In the vicinity of 14th Street between 6th and 7th Avenues at approximately between 7:30 and 7:30 PM,  defendant VINCENT GALLO, #19958, 1ST PRECINCT and other unidentified NYPD officers, detained and arrested plaintiff Pollex and seized his bicycle without any probable cause, privilege or consent.

939.    In the vicinity of 14th Street between 6th and 7th Avenues at approximately between 7:30 and 7:30 PM,  defendant JOHN COYLE, #20321, 1ST PRECINCT and other unidentified NYPD officers, detained and arrested Bell and seized her bicycle without any probable cause, privilege or consent.

940.    In the vicinity of 14th Street between 6th and 7th Avenues at approximately between 7:30 and 7:30 PM, defendant JAMELL KENDRICK, #28700, 1ST PRECINCT and

other unidentified NYPD officers, detained and arrested Wendt and seized his bicycle without any probable cause, privilege or consent.

941.    In the vicinity of 14th Street between 6th and 7th Avenues at approximately between 7:30 and 7:30 PM, defendant KENNETH WAGNER, #28519, 1ST PRECINCT and other unidentified NYPD officers, detained and arrested Freeman and seized his bicycle without any probable cause, privilege or consent.

942.    Defendants Perez, Gallo, Coyle, Kendrick, Wagner, and other unidentified NYPD officers deliberately handcuffed plaintiffs Shea, Pollex, Bell, Wendt, and Freeman too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

943.    Defendants caused a Polaroid photograph or photographs of plaintiffs and their bicycles to be taken.

944.    Plaintiffs Shea, Pollex, Bell, Wendt, and Freeman were subsequently transported to an NYPD facility for arrest processing.

945.    Plaintiffs Shea, Pollex, Bell, Wendt, and Freeman were in NYPD custody for approximately five to six hours before being released with DAT's.

946.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs prompt hearings before neutral fact-finders to test the probable validity of the deprivations *pendente lite*, depriving them of the use and enjoyment of their bicycles.

947.    Defendants refused to release plaintiffs' bicycles until after arraignment.

948.    At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

949.    Plaintiffs  Shea, Pollex, Bell, Wendt, and Freeman were offered, and accepted, ACD's in order to retrieve his bicycle from the NYPD and to avoid further disruption of their lives.

950.    When plaintiffs retrieved their bicycles, they were damaged, and plaintiffs spent time and money repairing them.

### PLAINTIFFS SARAH MATULIS AND AMELIA CHAPPELLE

951.    At approximately 8:00 PM on September 30, 2005, plaintiffs SARAH MATULIS and AMELIA CHAPPELLE were lawfully present in the vicinity of  14th Street and Avenue A in the County, City and State of New York.

952.    In the vicinity of  14th Street and Avenue A at approximately 8:000 PM, defendant NAIM IBROCI, #24725, MANHATTAN SOUTH TASK FORCE and other unidentified NYPD officers, "clotheslined" plaintiff Matulis off her bike, detaining and arresting Matulis and thereafter seizing her bicycle without any probable cause, privilege or consent.

953.    In the vicinity of  14th Street and Avenue A at approximately 8:000 PM, defendant WILLIAM GRODNICK, #04729 and other unidentified NYPD officers, detained and arrested plaintiff Chappelle and seized her bicycle without any probable cause, privilege or consent.

954.    Defendant Ibroci and other unidentified NYPD officers deliberately handcuffed plaintiff Chappelle too tightly over a messenger bag and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

955.    Defendant Grodnick and other unidentified NYPD officers deliberately handcuffed plaintiff Chappelle too tightly over a messenger bag and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

956.    Defendants caused a Polaroid photograph or photographs of plaintiffs and their bicycles to be taken.

957.    Plaintiffs Matulis and Chappelle were subsequently transported to an NYPD facility for arrest processing.

958.    Plaintiffs Matulis and Chappelle were in NYPD custody for approximately four hours before their releases with DAT's.

959.    Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs prompt hearings before neutral fact-finders to test the probable validity of the deprivations *pendente lite*, depriving them of the use and enjoyment of their bicycles.

960.    Defendants refused to release plaintiffs' bicycles until after arraignment.

961.    At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

962.    Plaintiffs Matulis and Chappelle were offered, and accepted, ACD's in order to retrieve their bicycles from the NYPD and to avoid further disruption of their lives.

963.    When plaintiffs retrieved their bicycles, they were damaged, and plaintiffs spent time and money repairing them.

PLAINTIFF JOHN FLANIGAN

964.    On September 30, 2005, at approximately 8:00 PM, plaintiff JOHN FLANIGAN was lawfully present in the vicinity of 23rd Street and 6th Ave, in the County, City and State of New York.

965.    Defendant JAMES BRUNACHE, 83RD PRECINCT and other unidentified NYPD officers detained and arrested Flanigan and seized his bicycle without any probable cause, privilege or consent.

966.    Defendant Brunache and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

967.    Plaintiff Flanigan was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

968.    Plaintiff Flanigan was in NYPD custody for approximately six hours.

969.    Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

970.    Defendants initiated criminal proceedings against plaintiff Flanigan despite their knowledge that they lacked probable cause to do so.

971.    Defendants refused to release plaintiff's bicycle until after arraignment.

972.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

973.    During the period between September 30, 2005 and February 9, 2006, plaintiff Flanigan was required to make approximately three court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

974.    On or about February 9, 2006, all charges against plaintiff Flanigan were dismissed.

### PLAINTIFFS DANIEL KAHN GILLMOR AND JAMESON ROLLINS

975.     On September 30, 2005, at approximately 8:00 PM, plaintiffs DANIEL KAHN GILLMOR and JAMESON ROLLINS were lawfully present in the vicinity of 23rd Street and 1st Avenue access road, in the County, City and State of New York.

976.     Defendants SANDY GONZALEZ, #22997, CHRISTOP TIMM, #06338, 113TH PRECINCT and other unidentified NYPD officers, detained and arrested plaintiffs and seized their bicycles without any probable cause, privilege or consent.

977.     Defendants Gonzalez, Timm, and other unidentified NYPD officers deliberately handcuffed plaintiffs Gillmor and Rollins too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

978.     Defendants caused a Polaroid photograph or photographs of plaintiffs and their bicycles to be taken.

979.     Plaintiffs Gillmore and Rollins were subsequently transported to an NYPD facility for arrest processing.

980.     Plaintiffs Rollins and Gillmor were in NYPD custody for approximately four hours before their release with DAT's.

981.     Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiffs prompt hearings before neutral fact-finders to test the probable validity of the deprivations *pendente lite*, depriving them of the use and enjoyment of their bicycles.

982.     Defendants refused to release plaintiffs' bicycles until after arraignment.

983.     At plaintiffs' arraignments approximately a month after their arrests, plaintiffs were charged with violating the parade permitting scheme and committing disorderly conduct by riding their bicycles as part of a group.

984.     During the period between September 30, 2005 and December 2006, plaintiff Rollins was required to make approximately eight court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

985.     Upon information and belief, the proceedings defendants initiated against plaintiffs Rollins and Gillmor were terminated in their favor.

986.     When plaintiffs retrieved their bicycles, they were damaged, and plaintiffs spent time and money repairing them.

## PLAINTIFF HARISHABD KHALSA

987.     On September 30, 2005, at approximately 8:30 PM, plaintiff HARISHABD KHALSA was lawfully present in the vicinity of Carmine Street and Bleeker Street, in the County, City and State of New York.

988.     Defendant ALBERTO CORNEA, #06487, MANHATTAN NORTH and other unidentified NYPD officers, who were riding on motor scooters, knocked plaintiff Khalsa to the ground and off his bike. Defendants then arrested Khalsa and seized his bicycle without any probable cause, privilege or consent.

989.     Defendant Cornea and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

990.     Plaintiff Khalsa was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

991.     Plaintiff Khalsa was in NYPD custody for approximately five hours.

992.     Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

993.    Defendants refused to release plaintiff's bicycle until after arraignment.

994.    At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

995.    Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

996.    When plaintiff retrieved his bicycle, it was damaged, and plaintiff spent time and money repairing it.

### THE DECEMBER 30, 2005 CRITICAL MASS DETAIL

997.    No arrests were made at the Critical Mass rides of October and November 2005.

### PLAINTIFF OBERT R. WOOD III

998.    On December 30, 2005, at approximately 7:35 PM, plaintiff OBERT R. WOOD III was lawfully present in the vicinity of 22nd Street and Park Avenue, in the County, City and State of New York.

999.    Defendant HONMAN YAN, #31946, 1ST PRECINCT and other unidentified NYPD officers, detained and arrested Wood and seized his bicycle without any probable cause, privilege or consent.

1000.    Defendant Yan and other unidentified NYPD officers deliberately handcuffed plaintiff Wood too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

1001.    Defendant Yan and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

1002.   Plaintiff Wood was subsequently transported to an NYPD facility for arrest processing.

1003.   At the station house, an unidentified NYPD officer aggressively pushed plaintiff Wood out of the transport van.

1004.   Plaintiff Wood was in NYPD custody for approximately five hours and eventually was issued a DAT.

1005.   Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

1006.   Defendants initiated criminal proceedings against plaintiff Wood III despite their knowledge that they lacked probable cause to do so.

1007.   Defendants refused to release plaintiff's bicycle until after arraignment.

1008.   At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

1009.   During the period between December 30, 2005 and August 1, 2006, plaintiff Wood was required to make approximately five court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

1010.   On or about August 1, 2006, all charges against plaintiff Wood were dismissed on speedy trial grounds.

## PLAINTIFF KENNETH M. COUGHLIN

1011.  On December 30, 2005, at approximately 7:50 PM, plaintiff KENNETH M. COUGHLIN was lawfully present in the vicinity of 22nd Street and Lexington Avenue, in the County, City and State of New York.

1012.  Defendant RICARDO WYMAN, #27066, MANHATTAN NORTH and other unidentified NYPD officers, detained and arrested Coughlin and seized his bicycle without any probable cause, privilege or consent.

1013.  Defendant Wyman and other unidentified NYPD officers deliberately handcuffed plaintiff Coughlin too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

1014.  Defendant Wyman and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

1015.  Plaintiff Coughlin was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

1016.  Plaintiff Coughlin was in NYPD custody for approximately five hours.

1017.  Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

1018.  Defendants initiated criminal proceedings against plaintiff Coughlin despite their knowledge that they lacked probable cause to do so.

1019.  Defendants refused to release plaintiff's bicycle until after arraignment.

1020.  At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

1021.  During the period between December 30, 2005 and April 4, 2006, plaintiff Coughlin was required to make approximately two court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

1022.  On or about April 4, 2006, all charges against plaintiff Coughlin were dismissed.

1023.  When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

## PLAINTIFF MADELINE NELSON

1024.  On December 30, 2005, at approximately 7:50 PM, plaintiff MADELINE NELSON was lawfully present in the vicinity of 22nd Street between Park and Lexington Avenues, in the County, City and State of New York.

1025.  Defendant JOANN SPREEN, #19464, 1ST PRECINCT and other unidentified NYPD officers, detained and arrested plaintiff Nelson and seized her bicycle without any probable cause, privilege or consent.

1026.  Defendant Spreen and other unidentified NYPD officers deliberately handcuffed plaintiff Nelson too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

1027.  Defendant Spreen and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and her bicycle to be taken.

1028.  Plaintiff Nelson was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

1029.  Plaintiff Nelson was in NYPD custody for approximately two and a half hours.

1030.   Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

1031.   Defendants also vouchered the armband identifying Nelson as a legal observer. The armband was never returned.

1032.   Defendants refused to release plaintiff's bicycle until after arraignment.

1033.   At plaintiff's arraignment approximately a month after her arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding her bicycle as part of a group.

1034.   During the period between December 30, 2005 and May 15, 2006, plaintiff Nelson was required to make approximately four court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

1035.   On or about May 15, 2006, the charges against plaintiff Nelson were dismissed.

1036.   When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

### PLAINTIFF JAMES B. KELLY

1037.   On December 30, 2005, at approximately 8:00 PM, plaintiff JAMES B. KELLY was lawfully present in the vicinity of 22nd Street and Lexington Avenue, in the County, City and State of New York.

1038.   At aforesaid time and place, members of the New York City Police Department began indiscriminately arresting everyone present at that location.

1039.   Defendant FREDERIC PINEDA, #08502, 46TH PRECINCT and other unidentified NYPD officers detained and arrested Kelly and seized his bicycle without any probable cause, privilege or consent.

1040.   Defendant Pineda and other unidentified NYPD officers deliberately handcuffed plaintiff Kelly too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

1041.   Defendant Pineda and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

1042.   Plaintiff Kelly was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

1043.   Plaintiff Kelly was in NYPD custody for approximately five hours.

1044.   Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

1045.   Defendants refused to release plaintiff's bicycle until after arraignment.

1046.   At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

1047.   When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

THE JANUARY 27, 2006 CRITICAL MASS DETAIL

PLAINTIFF DANIEL TAINOW

138

1048.   On January 27, 2006, at approximately 7:30 PM, plaintiff DANIEL TAINOW was lawfully present in the vicinity of 14th Street and 3rd Avenue, in the County, City and State of New York.

1049.   Defendant JOHN COYLE, #20321, 1ST PRECINCT and other unidentified NYPD officers, detained and arrested Tainow and seized his bicycle without any probable cause, privilege or consent.

1050.   Defendant Coyle and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

1051.   Plaintiff Tainow was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

1052.   Plaintiff Tainow was in NYPD custody for approximately 4 hours.

1053.   Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

1054.   Defendants initiated criminal proceedings against plaintiff Tainow despite their knowledge that they lacked probable cause to do so.

1055.   Defendants refused to release plaintiff's bicycle until after arraignment.

1056.   At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

1057.   When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

<u>PLAINTIFFS LUKE AND SHANI PARSONS</u>

1058.   On January 27, 2006, at approximately 7:40 PM, plaintiffs LUKE AND SHANI PARSONS were lawfully present in the vicinity of 13th Street and Broadway, in the County, City and State of New York.

1059.   Other unidentified NYPD officers detained and arrested Parsons and Parsons and seized their bicycles without any probable cause, privilege or consent.

1060.   Unidentified NYPD officers deliberately handcuffed plaintiffs Parsons and Parsons too tightly and kept plaintiffs handcuffed for an excessive period of time, causing plaintiffs pain and injury.

1061.   Unidentified NYPD officers then caused a Polaroid photograph or photographs of the plaintiffs and their bicycles to be taken.

1062.   Plaintiffs Parsons and Parsons was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

1063.   Plaintiffs Parsons and Parsons were in NYPD custody for approximately four and a half hours.

1064.   Defendants vouchered plaintiffs' bicycles as evidence and impounded them without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

1065.   Defendants refused to release plaintiffs' bicycles until after arraignment.

1066.   Upon information and belief, at plaintiffs' arraignments on or about March 31, 2006, all charges against plaintiffs Parsons and Parsons were dismissed, and/or the government declined to prosecute the cases.

1067.   When plaintiffs retrieved their bicycles, they were damaged, and plaintiffs spent time and money repairing them.

### PLAINTIFF MARK W. READ

1068.   On January 27, 2006, at approximately 8:30 PM, plaintiff MARK W. READ was lawfully present in the vicinity of 43rd and Broadway, in the County, City and State of New York.

1069.   Unidentified NYPD officers detained and arrested Read and seized his bicycle without any probable cause, privilege or consent.

1070.   Unidentified NYPD officers deliberately handcuffed plaintiff Read too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

1071.   Unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

1072.   Plaintiff Read was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

1073.   Plaintiff Read was in NYPD custody for approximately twenty-four hours.

1074.   Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

1075.   Defendants refused to release plaintiff's bicycle until after arraignment.

1076.   At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

1077.  Upon information and belief, defendant Read retained an attorney to defend the charges against him, and the case was eventually dismissed.

1078.  When plaintiff retrieved plaintiff's bicycle, it was damaged, and plaintiff spent time and money repairing it.

### THE JANUARY 27, 2006 AND FEBRUARY 24, 2006 CRITICAL MASS DETAILS

### PLAINTIFF ROBERT BARRETT

1079.  On January 27, 2006, at approximately 8:55 PM, plaintiff ROBERT BARRETT was lawfully present in the vicinity of 44th St and 7th Avenue (Times Square), in the County, City and State of New York.

1080.  Defendant NEIL RODRIGUEZ, #21015, MANHATTAN SOUTH TASK FORCE and other unidentified NYPD officers detained and arrested plaintiff Barrett and seized his bicycle without any probable cause, privilege or consent.

1081.  Defendant Rodriguez and other unidentified NYPD officers deliberately handcuffed plaintiff Barrett too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

1082.  Defendant Rodriguez and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

1083.  Plaintiff Barrett was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

1084.  Plaintiff Barrett was in NYPD custody for approximately five hours.

1085.  Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

142

1086.   Defendants refused to release plaintiff's bicycle until after arraignment.

1087.   At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

1088.   During the period between January 27, 2006 and September 11, 2006, plaintiff Barrett was required to make approximately three court appearances to defend himself in the criminal proceedings that defendants had initiated against him.

1089.   On or about September 11, 2006, all charges against plaintiff Barrett were dismissed.

1090.   On February 24, 2006, at approximately 7:50 PM, plaintiff ROBERT BARRETT was lawfully present in the vicinity of Grand Street and Broadway, in the County, City and State of New York.

1091.   Defendant ANTHONY DIFRANCESCA, #04200, 1ST PRECINCT and other unidentified NYPD officers, detained and arrested Barrett and seized his bicycle without any probable cause, privilege or consent.

1092.   Defendant DiFrancesca and other unidentified NYPD officers deliberately handcuffed plaintiff Barrett too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

1093.   Defendant DiFrancesca and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

1094.   Plaintiff Barrett was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

1095.   Plaintiff Barrett was in NYPD custody for approximately two hours.

143

1096.   Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving plaintiff of the use and enjoyment of plaintiff's bicycle.

1097.   Defendants refused to release plaintiff's bicycle until after arraignment.

1098.   At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

1099.   During the period between February 24, 2006 and the date his case was dismissed plaintiff Barrett was required to make approximately to defend himself in the criminal proceedings that defendants had initiated against him.

1100.   Upon information and belief, all charges against plaintiff Barrett eventually were dismissed.

1101.   When plaintiff Barrett retrieved his bicycle, it was damaged, and plaintiff spent time and money repairing it.

## PLAINTIFF JONATHAN DAVIS

1102.   On March 31, 2006, at approximately 9:05 PM, plaintiff JONATHAN DAVIS was lawfully present in the vicinity of 23rd Street and 7th Avenue, in the County, City and State of New York.

1103.   Defendant ANTHONY DIFRANCESCA, #04200, 1ST PRECINCT, arrested Davis and seized his bicycle without any probable cause, privilege or consent.

1104.   Defendant DiFrancesca and other unidentified NYPD officers deliberately handcuffed plaintiff Davis too tightly and kept plaintiff handcuffed for an excessive period of time, causing plaintiff pain and injury.

1105.  Defendant DiFrancesca and other unidentified NYPD officers then caused a Polaroid photograph or photographs of plaintiff and his bicycle to be taken.

1106.  Plaintiff Davis was subsequently transported to an NYPD facility for arrest processing and eventually issued a DAT.

1107.  Defendants vouchered plaintiff's bicycle as evidence and impounded it without affording plaintiff a prompt hearing before a neutral fact-finder to test the probable validity of the deprivation *pendente lite,* depriving him of the use and enjoyment of his bicycle.

1108.  Defendants initiated criminal proceedings against plaintiff Davis despite their knowledge that they lacked probable cause to do so.

1109.  Defendants refused to release plaintiff's bicycle until after arraignment.

1110.  At plaintiff's arraignment approximately a month after his arrest, plaintiff was charged with violating the parade permitting scheme and committing disorderly conduct by riding his bicycle as part of a group.

1111.  Plaintiff was offered, and accepted, an ACD in order to retrieve his bicycle from the NYPD and to avoid further disruption of his life.

1112.  When plaintiff retrieved his bicycle, it was damaged, and plaintiff spent time and money repairing it.

## AS AND FOR A FIRST CLAIM FOR RELIEF
## DEPRIVATION OF PLAINTIFFS' RIGHTS UNDER
## THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983

1113.  Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 1112 above as if fully set forth hereat and incorporate them by reference.

1114.  By their conduct and actions and/or omissions in depriving plaintiffs of their freedoms to be let alone, to move freely, to assemble, to associate, and to enjoy their property, in

seizing them, in falsely arresting them, in assaulting and battering them, in maliciously prosecuting them on the basis of false and/or untrustworthy information, in abusing process against them, in retaliating against them for the exercise of constitutionally protected rights, in inflicting emotional distress upon them, in violating their rights to due process and equal protection, and/or for failing to remedy the aforementioned violations after having witnessed them or having been informed of them by report or appeal, and/or by failing properly to train, supervise, or discipline employees of the defendant CITY OF NEW YORK under their supervision, defendants, acting under color of law and without lawful justification, intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, deprived plaintiffs of the equal protection of the laws and/or of equal privileges and immunities under the laws, and thereby caused injury and damage in violation of plaintiffs' constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its First, Fourth, Fifth, and Fourteenth Amendments.

1115. All of the aforementioned acts of defendants and their agents, servants, and employees were carried out under color of state law, while defendants were acting in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto, under the supervision of ranking officers of said department, pursuant to the customs, usages, practices, procedures, and the rules of defendant City and the NYPD, and/or defendants, collectively and individually, engaged in conduct that constituted a custom, usage, practice, procedure or rule of defendant NYC.

1116. As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

### AS AND FOR A SECOND CLAIM FOR RELIEF
### FALSE ARREST

1117.   Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through  1116 above as if fully set forth hereat and incorporate them by reference.

1118.   As a result of defendants' conduct as described above, plaintiffs were subjected to illegal, improper, and false arrest by defendants and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege, or consent.

1119.   As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

### AS AND FOR A THIRD CLAIM FOR RELIEF
### EXCESSIVE USE OF FORCE

1120.   Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through  1119 above as if fully set forth hereat and incorporate them by reference.

1121.   The level of force employed by defendants was objectively unreasonable and in violation of plaintiffs' constitutional rights.

1122.   As a result of the foregoing, plaintiffs were subjected to excessive force and sustained physical and emotional injuries.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
### FIRST AMENDMENT

1123.   Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through  1122 above as if fully set forth hereat and incorporate them by reference.

1124.   In detaining, assaulting, and arresting plaintiffs, in prosecuting plaintiffs, and in seizing and impounding plaintiffs' bicycles, and in implementing, enforcing, encouraging, sanctioning, and/or ratifying policies, practices, and/or customs punishing peaceful protest, defendants violated plaintiffs' rights to speak, assemble, associate, and petition the government for redress of grievances peaceably in retaliation for their speaking out on a matter of public concern.

1125.   As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured, and defendants chilled and created the risk of chilling conduct protected by the First Amendment.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
## MALICIOUS ABUSE OF PROCESS

1126.   Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 1125 above as if fully set forth hereat and incorporate them by reference.

1127.   Defendants issued legal process to place plaintiffs under arrest.

1128.   Defendants arrested plaintiffs in order to obtain a collateral objective outside the legitimate ends of the legal process.

1129.   Defendants acted with intent to do harm to plaintiffs without excuse or justification.

1130.   As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
## MALICIOUS PROSECUTION

1131.   Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through   1130 above as if fully set forth hereat and incorporate them by reference.

1132.   Defendants misrepresented and falsified evidence before the District Attorney of New York County ("DANY").

1133.   Defendants did not make a complete and full statement of facts to DANY.

1134.   Defendants withheld exculpatory evidence from DANY.

1135.   Defendants were directly and actively involved in the initiation of criminal proceedings against plaintiffs.

1136.   Defendants lacked probable cause to initiate criminal proceedings against plaintiffs.

1137.   Defendants acted with malice in initiating criminal proceedings against plaintiffs.

1138.   Defendants were directly and actively involved in the continuation of criminal proceedings against plaintiffs.

1139.   Defendants lacked probable cause to continue criminal proceedings against plaintiffs.

1140.   Defendants acted with malice in continuing criminal proceedings against plaintiffs.

1141.   Defendants misrepresented and falsified evidence throughout all phases of the criminal proceedings.

1142.   Notwithstanding defendants' misconduct, the criminal proceedings against plaintiffs were favorably terminated on the merits.

1143.   As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
## DENIAL OF CONSTITUTIONAL RIGHTS TO FAIR TRIALS

1144.   Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through  1143 above as if fully set forth hereat and incorporate them by reference.

1145.   Defendants created false information against plaintiffs.

1146.   Defendants forwarded false information to prosecutors in the Office of the District Attorney of New York County.

1147.   Defendants misled the prosecutors and/or the Court by providing false information and/or testimony in initiating and throughout the criminal proceedings.

1148.   Defendants failed to turn over exculpatory evidence and other materials to the prosecutor despite proper demands and/or requests for the same.

1149.   Defendants therefore violated plaintiffs' constitutional rights to fair trials under the Fifth and Fourteenth Amendments to the United States Constitution.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF
## DENIAL OF  PROPERTY AND DUE PROCESS RIGHTS

1150.   Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through  1149 above as if fully set forth hereat and incorporate them by reference.

1151.   Defendants seized plaintiffs' bicycles and impounded them as "arrest evidence" and refused to release them until after the criminal proceedings against plaintiffs were terminated.

1152.   Defendants refused to afford plaintiffs notice and an opportunity to be heard to challenge the seizures or retentions.

1153.   Defendants' seizure and retention of plaintiffs' vehicles as "arrest evidence" without affording plaintiffs notice and an opportunity to be heard to challenge the seizures and retentions  violated plaintiffs' constitutional rights to enjoy their property and to due process under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

<u>AS AND FOR AN EIGHTH CLAIM FOR RELIEF</u>
<u>SELECTIVE ENFORCEMENT</u>

1154.   Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through  1153 above as if fully set forth hereat and incorporate them by reference.

1155.   Defendants' use of the parade permitting scheme, the New York State disorderly conduct statute, VTL § 1234, NYCAC § 16-122, and/or their powers to retain plaintiffs' bicycles against plaintiffs, but not others similarly situated, was invidiously discriminatory, malicious, purposeful, and/or arbitrary and capricious.

1156.   Defendants' selective enforcement of the parade permitting scheme, the New York State disorderly conduct statute, VTL § 1234, NYCAC § 16-122, and/or their powers to retain plaintiffs' bicycles against plaintiffs violated plaintiffs' constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

1157.   As a result of the foregoing, each plaintiff is entitled to compensatory damages in the sum of five million dollars ($5,000,000.00) and is further entitled to punitive damages against the individual defendants in the sum of five million dollars ($5,000,000.00).

WHEREFORE, each plaintiff demands the following relief jointly and severally against all of the defendants:

A.    An order requiring defendants to return to plaintiffs, or where necessary to expunge and/or destroy all records of fingerprints and other information taken in conjunction with plaintiffs' arrests, to remove from all records and databases and information systems maintained by defendants or their agents or partners any reference to plaintiffs' arrests, and to request that all law enforcement agencies and partners that have received such information destroy the same,

B.    Judgment in the sum of five million dollars ($5,000,000.00) in compensatory damages and five million dollars ($5,000,000.00) in punitive damages,

C.    An award of attorneys' fees and costs and disbursements, and

D.    Other such relief as this Court may deem just and proper.

RESPECTFULLY SUBMITTED,

GIDEON ORION OLIVER (GO 8799)
Of Counsel, Oliver & Oliver
c/o 200 E. 10th St. #917
New York, New York   10003
(718) 783-3682

OF COUNSEL:
DAVID B. RANKIN (DR 0863)
350 Broadway, Suite 700
New York, NY 10013
(212) 226-4507

ROSE M. WEBER (RW 0515)
225 Broadway, Suite 1607
New York, NY 10007
(212) 748-3355